# 25-2938

# United States Court of Appeals

*for the*

# Second Circuit

RARITAN BAYKEEPER, INC., FOOD & WATER WATCH, PROTECTORS OF PINE OAK WOODS, INC., SIERRA CLUB, SURFRIDER FOUNDATION, NATURAL RESOURCES DEFENSE COUNCIL, INC.,

*Petitioners,*

– v. –

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, AMANDA LEFTON, COMMISSIONER, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

*Respondents.*

ON PETITION FOR REVIEW FROM THE NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

## FINAL BRIEF FOR RESPONDENT TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC

YVONNE E. HENNESSEY
BARCLAY DAMON LLP
*Attorneys for Respondent Transcontinental Gas Pipe Line Company, LLC*
80 State Street, 6th Floor
Albany, New York 12207
(518) 429-4200

CP COUNSEL PRESS   (800) 4-APPEAL • (392336)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
25-1938**

RARITAN BAYKEEPER, INC., FOOD & WATER WATCH, PROTECTORS OF PINE OAK WOODS, SIERRA CLUB, SURFRIDER FOUNDATION, and NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioners,*

-versus-

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION; AMANDA LEFTON, Commissioner, New York State Department of Environmental Conservation,

*Respondents,*

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

*Intervenor-Respondent.*

**CORPORATE DISCLOSURE STATEMENT**

Transcontinental Gas Pipe Line Company, LLC, a non-governmental intervenor, by its attorneys, Barclay Damon LLP, hereby declares as follows pursuant to Federal Rules of Appellate Procedure, Rule 26.1:

1. Williams Partners Operating LLC owns 100% of Transcontinental Gas Pipe Line Company, LLC.

2. The Williams Companies, Inc. owns 100% of Williams Partners Operating LLC.

i

ii

3.      No other publicly held corporation holds 10% or more of the stock of Transcontinental Gas Pipe Line Company, LLC.


Dated: April 20, 2026                    BARCLAY DAMON, LLP
                                         Attorneys for Intervenor, Transcontinental
                                         Gas Pipe Line Company, LLC


                                         By:   *s/Yvonne E. Hennessey*
                                               YVONNE E. HENNESSEY

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

PRELIMINARY STATEMENT .......................................................1

ISSUES PRESENTED.....................................................................3

Counterstatement Of The Case ........................................................4

    I.   Overview of the Project ........................................................4

    II.  Procedural History...............................................................5

    III. Transco's Revival of the Project .........................................8

ARGUMENT ..................................................................................19

    I.    NYSDEC'S ISSUANCE OF A WQC IS JUSTIFIED .............................19

    II.   A HEIGHTENED STANDARD OF REVIEW DOES NOT APPLY WHERE NYSDEC'S DECISION WAS NOT BASED ON CONTRADICTORY FACTUAL FINDINGS ..................................................29

        A.  There Has Been No Change in Agency Policy. ...................................31

        B.  NYSDEC's Issuance of the WQC was not Based on Contradictory Factual Findings and Therefore not Subject to Heightened Review.............31

        C.  Even if a Contradiction Exists, Which it Does Not, NYSDEC Provided a Reasoned Explanation and its Decision Merits Deference. ........................34

    III.  NYSDEC WAS NOT REQUIRED TO SUBMIT SUPPLEMENTAL DOCUMENTS FOR PUBLIC COMMENT.......................................................38

        A.  The Revision in Hard Clam Density and Sediment Loss Rate Memorandum Are Supplemental Documents that did not Require Further Public Notice and Comment................................................................38

        B.  Petitioners Have Not Demonstrated Any Prejudice ..............................46

    IV.  NYSDEC DID NOT VIOLATE THE CLEAN WATER ACT BY REQUIRING THE SUBMISSION AND APPROVAL OF FUTURE COMPLIANCE PLANS AS PART OF ITS WQC ............................................48

    CONCLUSION ................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Afr. Cmtys. Together v. Lyons,*
799 F. Supp. 3d 362 (S.D.N.Y. 2025) ...............................................34

*Alaska v. Lubchenco,*
825 F. Supp. 2d 209 (D.C. Cir. 2011) ...............................................40

*American Cruise Lines v. US,*
96 F.4th 283 (2d Cir. 2024) ...............................................21

*Association of Proprietary Colleges v. Duncan,*
107 F. Supp. 3d 332 (S.D.N.Y. 2015) ...............................................35

*Biden v. Texas,*
597 U.S. 785 (2022) ...............................................29

*Camp v. Pitts,*
411 U.S. 138 (1973) ...............................................20

*Catskill Mts. Chptr. of Trout Unlimited, Inc. v. United States EPA,*
846 F.3d 492 (2d Cir. 2017) ...............................................34

*Community Nutrition Institute v. Block,*
749 F.2d 50 (D.C. Cir. 1984)............................................... 39, 42

*Competitive Enter. Inst. v. United States Dept. of Transp.,*
863 F.3d 911 (D.C. Cir. 2017)...............................................40

*Del. RiverkeeperNetwork v. Sec'y Pa. Dep't. of Envtl. Prot. (Riverkeeper I),*
833 F.3d 360 (3d Cir. 2016) ...............................................53

*Del. Riverkeeper Network v. Sec'y Pa. Dep't. of Envtl. Prot. (Riverkeeper III),*
903 F.3d 65 (3d Cir. 2018) ...............................................53

*Department of Homeland Security v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) ...............................................29

*Encino Motorcars, LLV v. Navarro,*
579 U.S. 211 (2016) ............................................... 29, 30

*Env't Def. v. EPA,*
369 F.3d 193 (2d Cir. 2004) ...............................................21

iv

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ....................................................................30

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ....................................................................20

*Idaho Farm Bureau Fed'n. v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ................................................ 44, 46

*Islander East Pipeline Co., LLC v. McCarthy*,
  525 F.3d 141 (2d. Cir. 2008) ................................................ 20, 21

*Kern County Farm Bureau v. Allen*,
  450 F.3d 1072 (9th Cir. 2006) .............................................. 39, 40

*Knight v. Amelkin*,
  150 A.D.2d 528 (2d Dep't 1989)....................................................23

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) .............................................................. 20, 21

*Matter of Cty. of Nassau v. Nassau Cty. Interim Fin. Auth.*,
  2011 NY Slip Op 21103, 33 Misc. 3d 227
  (N.Y. Sup. Ct. Mar. 11, 2011) .....................................................23

*Matter of E. Niagara Project Power Alliance v. N.Y. State Dep't
  of Env't Conservation*,
  42 A.D.3d 857 (3d Dep't 2007).....................................................22

*Matter of Port of Oswego Auth. v. Grannis*,
  70 A.D.3d 1101 (3d Dep't 2010).....................................................22

*Matter of Stahl York Ave. Co., LLC v. City of New York*,
  76 A.D.3d 290 (1st Dept 2010), *lv denied*, 15 N.Y.3d 714 (2010).....................22

*Matter of Waidler v. Young*,
  63 A.D.3d 953 (2d Dep't 2009)................................................ 23, 29

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (2012) ............................................................ 33, 34

*Nat'l Audubon Soc'y v. Hoffman*,
  132 F.3d 7 (2d Cir. 1997) ............................................................20

v

*National Wildlife Federation v. Marsh*,
568 F. Supp. 985 (D.C. Cir. 1983) ...........................................................45

*New York v. Raimondo*,
84 F.4th 102 (2d Cir. 2023) .................................................... 21, 29

*Niagara Mohawk Power Corp. v. N.Y. State Dep't of Env't Conservation*,
82 N.Y.2d 191 (1993)............................................................................22

*Ohio Valley Envtl. Coalition v. United States Army Corps of Eng'rs.*,
674 F. Supp. 2d 783 (W. Va. 2009) .......................................................42

*Sierra Club v. N.Y. State Dep't of Envtl. Con*servation,
Index No. Index No. 2016-0165, 2017 N.Y. Misc. LEXIS 13725
(N.Y. Sup. Ct., Apr. 21*, 2017), aff'd on other grounds*,
169 A.D.3d 1485 (4th Dept. 2019).........................................................20

*Solite Corp. v. E.P.A.,*
952 F.2d 473 (D.C. Cir. 1991)...............................................................40

*State v. Bessent*,
149 F.4th 127, 2025 WL 2327237 (2d Cir. Aug. 13, 2025).............. 20, 21, 30, 33

*United States v. Nova Scotia Food Products Corp.*,
568 F.2d 240 (2d Cir. 1977) .................................................... 42, 43, 44

*Waterkeeper Alliance, Inc. v. U.S. E.P.A.*,
399 F.3d 486 (2d Cir. 2005) .................................................... 51, 52, 55

**Statutes and Other Authorities:**

5 U.S.C. § 706(2)(A).............................................................................20

15 U.S.C. § 717 .......................................................................................5

33 U.S.C. § 1251(e) ..............................................................................55

33 U.S.C. § 1341 ...................................................................................22

33 U.S.C. § 1341(a)(1).........................................................................55

6 N.Y.C.R.R. § 621.1(d) ......................................................................54

6 N.Y.C.R.R. § 621.2(g) .................................................................. 47, 54

6 N.Y.C.R.R. § 621.7(a) ...................................................................54

6 N.Y.C.R.R. § 621.8 ........................................................................6

6 N.Y.C.R.R. Part 621 ...................................................................54

vii

## PRELIMINARY STATEMENT

In the face of rising energy demand and reliability challenges, Transco sought to revive the previously dormant Northeast Supply Enhancement Pipeline project ("NESE" or "Project"), a strategic expansion of a pre-existing natural gas transmission system designed to facilitate the delivery of natural gas to the energy-intensive Northeast region and, in particular, New York City area. Petitioners do not contest the need for the Project, nor could they. Twice now, once in 2019 and now again in 2025, the Federal Energy Regulatory Commission ("FERC"), the federal agency charged with evaluating the need for the Project, has determined that the Project is in the public need. So too has New York's Public Service Commission.

Recognizing that they could not challenge the Project on substantive grounds, Petitioners attempt to seize upon contrived procedural irregularities in the water quality certification issued for the Project by New York State Department of Environmental Conservation ("NYSDEC"), the state agency entrusted with enforcing New York's water quality standards. Transco previously applied to NYSDEC for a Clean Water Act Section 401 Water Quality Certification ("WQC"). NYSDEC denied Transco's application each time, twice after public comment, finding that Transco had provided insufficient documentation to ensure compliance with state water quality standards. In doing so, NYSDEC did not conclude that the

1

Project *could not* comply with state water quality standards, nor did it foreclose Transco from submitting additional documentation to further justify the data previously submitted.

Given the ongoing Project need, Transco ultimately re-applied for a WQC from NYSDEC in May 2025. While the Project remained the same, Transco resubmitted its prior application to NYSDEC and worked closely with NYSDEC to further supplement its application by providing additional documentation and clarifications. This, in addition to agency knowledge derived from additional in-water construction since Transco's prior application, as well as additional protections and mitigation measures that were ultimately built into the WQC as binding requirements, led NYSDEC to conclude that the Project could comply with state water quality standards.

Petitioners take issue with NYSDEC's decision to now issue the water quality certification for the Project, alleging that NYSDEC failed to adequately explain the basis for its change in position and further "shielded" certain "late-submitted" data on hard clam density and Transco's proposed sediment loss rate from public review and comment. What Petitioners fail to acknowledge is that NYSDEC's decision to now issue the WQC does not represent a change in position, nor a contradiction in its prior factual findings. Rather, NYSDEC offered a reasonable explanation for its decision to issue the WQC. Petitioners also ignore that the allegedly "late submitted"

2

data is nothing more than supplemental information that clarifies data and information which Petitioners had the opportunity to review and comment on several times. In short, the contrived procedural irregularities invented by Petitioners are red herrings designed to distract the Court from the fact that NYSDEC appropriately utilized its technical expertise, provided a thorough and reasoned explanation for its determination and further complied with all procedural requirements. The water quality certification must be upheld.

## ISSUES PRESENTED

1. Did NYSDEC rationally determine, based on its technical expertise, that construction and operation of the Project would meet all applicable water quality standards when it reconsidered Transco's previously denied application, required additional technical information and clarification, applied its knowledge gained from additional in-water construction since 2020 and conducted a comprehensive evaluation of Transco's application?

2. Did NYSDEC provide a reasoned explanation for its decision to issue the WQC and rationally connect the facts found and decision made?

3. Given the limited scope of Section 401's review and requirement that NYSDEC act within a "reasonable period of time" and NYSDEC's comprehensive permitting review and certification findings, which complied

3

in all respects with its procedures for public comment, was NYSDEC required to further delay issuance of the WQC to allow for additional public comment on plans required by the WQC?

## COUNTERSTATEMENT OF THE CASE

This case seeks review of NYSDEC's decision to grant a Section 401 WQC for the Project (Permit ID 2-9902-00109/00009) following a rigorous permitting review based on current available information and in accordance with all applicable laws, regulations and rules.

### I.    *Overview of the Project*

The Project is a proposed expansion of Transco's existing natural gas transmission system in Pennsylvania and New Jersey and its existing offshore natural gas pipeline system in New York and New Jersey waters. *See* Joint Permit Application, dated May 30, 2025 ("JPA") [A0473.] The component that will cross New York and New Jersey waters is identified as the Raritan Bay Loop – a 26-inch diameter pipeline that would transport natural gas from Pennsylvania through New Jersey, travelling underwater in Raritan Bay and Lower New York Bay to a connection point approximately three miles offshore of the Rockaway Peninsula in the borough of Queens. *See* Permit Cover Letter dated November 7, 2025 ("Permit Cover Letter") [A1030]. Approximately 23.5 miles of underwater pipeline will be

4

installed. In New York, Transco would construct 17.38 miles of new pipeline offshore in New York waters. *See* JPA [A0453.]; Permit Cover Letter [A1030.] The Project will connect to the existing Rockaway Delivery Lateral in Queens and will provide 400,000 dekatherms per day of incremental capacity to National Grid to serve customers in Brooklyn, Queens, and Long Island. [*Id.*]

## II.    *Procedural History*

FERC is the agency charged with evaluating the need for the Project. 15 U.S.C. §§ 717 *et seq*. On March 27, 2017, Transco applied to FERC for a Certificate of Public Convenience and Necessity ("Certificate") for construction and operation of the Project. *See* May 15, 2020 Denial ("2020 Denial") [A0435.] Pursuant to the National Environmental Policy Act, FERC issued a Draft Environmental Impact Statement ("DEIS") on March 23, 2018, and NYSDEC submitted comments to FERC regarding the DEIS on May 14, 2018. [*Id.*] FERC issued a Final Environmental Impact Statement ("FEIS") for the Project on January 25, 2019. [*Id.*]; FEIS [A0292-A0421.] The FEIS evaluated the potential environmental effects anticipated from the construction and operation of the Project and recommended certain conditions to mitigate impacts to the fullest extent practicable. [*Id.*] On May 3, 2019, FERC issued to Transco a Certificate, subject to environmental conditions recommended in the FEIS. *See* 2020 Denial [A0435.] In issuing its Certificate for

the Project, FERC determined that Transco had demonstrated both market demand and that the public's convenience and necessity had required the issuance. [*Id*.]

On January 31, 2020, Transco filed with FERC an application for an amendment to the Certificate to authorize Transco's use of an alternate access road to a new compressor station in Franklin Township, Somerset County, New Jersey. On July 16, 2020, FERC issued an Order Amending Certificate ("Amended Certificate"), which amended the Certificate to allow for the use of the alternate access road. [A0475.]

In order to proceed with the Project, Transco was required to obtain a WQC for the Project. Transco first submitted a Joint Application to NYSDEC for the Project on June 30, 2017. *See* 2020 Denial [A0436.] NYSDEC denied the original June 30, 2017 WQC application without prejudice on April 20, 2018 due to incomplete information and an ongoing environmental review by FERC ("2018 Denial"). [*Id*.] On May 16, 2018, Transco submitted a new WQC application to NYSDEC that included additional information. [*Id*.] A public comment period and public statement hearings were held. [*Id*.] During the public comment period, pursuant to 6 NYCRR § 621.8, public comment hearings were held on February 26, 2019 in Brooklyn, and on March 6, 2019 in Rockaway Park. [*Id*.] Following the public comment period, NYSDEC denied the 2018 WQC Application without prejudice on May 15, 2019 ("the 2019 Denial"). [*Id*.]; 2019 Denial [A0422.]

6

On May 17, 2019, Transco submitted to NYSDEC a new WQC Application for the Project, which included a proposed 5% sediment loss rate for jet trenching activities as well as the results of a 2016 Benthic Survey Study ("2016 Benthic Survey") which included an estimated hard clam density along the proposed route. [*Id*.]; 2016 Benthic Survey [A0083-A0291.] The 2019 WQC Application included, among other things, changes from the 2018 WQC Application in response to the 2019 Denial. [A0436.] Transco supplemented the 2019 WQC Application on May 23, 2019 and June 19, 2019. *See* 2020 Denial [A0436.]

Numerous public comments were received during a public comment period held between May 29, 2019 through July 13, 2019. *See* 2020 Denial [A0436.] Ultimately, NYSDEC denied the 2019 WQC Application on May 15, 2020, noting that Transco had not demonstrated the Project's compliance with all applicable water quality standards. [*Id*.] As relevant here, NYSDEC noted that water quality impacts were especially problematic within the productive hard clam area in Raritan Bay located between mile posts 14 and 20, which is considered a critical resource area. [*Id*. at A0437.] The 2020 Denial also referenced the sediment loss rate proposed by Transco. [*Id*. at A0440.] The 2020 Denial noted "without further documentation, the Department cannot accept the modeled sediment loss rate of 5%, which was used to project sediment loss due to jet trencher activities." [*Id*.]; NYSDEC Responsiveness Summary dated November 7, 2025 ("Responsiveness Summary") [A1111.] The

7

2020 Denial provided Transco with the opportunity to request an adjudicatory hearing and did not rule out Transco's ability to reapply as it had previously done.[1] *See* 2020 Denial [A0451.]

Without a WQC for the Project, on March 19, 2021, Transco filed a request with FERC for a two-year extension of time to complete the Project and place it into service. *See* August 28, 2025 Order from FERC Reissuing Certificate of Public Convenience ("2025 FERC Order") [A0925.] This request was granted, and in 2023, Transco filed another extension request. [*Id*.] The 2023 request was also granted, extending the project deadline to May 3, 2024. [*Id*.] In granting Transco's extension requests, FERC continued to uphold its findings that the Project was in the public interest and that the FEIS remained valid. [*Id*.] Ultimately, Transco informed FERC it would not seek further extension and instead let the certificate expire in May 2024. [*Id*.] On June 10, 2024, FERC vacated the Certificate. [*Id*.]

### III. *Transco's Revival of the Project*

In 2025, Transco sought to recommence development of the Project given the urgent need for energy transportation infrastructure in the United States, particularly the Northeast. *See* 2025 FERC Order [A0922-A0981.] On May 29, 2025, Transco

---

[1] Although Transco did not challenge the 2020 Denial at the time it was issued, Transco maintains that the Project before NYSDEC in 2020 satisfied the substantive requirements for issuance of the WQC. The 2020 Denial incorrectly rejected the need for the Project, which resulted in a decision that did not consider how the Project could be feasibly constructed *and* meet the standards for issuance.

filed a petition with FERC requesting expedited reissuance of the Certificate for the Project. [*Id*. at A0922.] In its request, Transco stated there had been no change to purpose, scope, or impact of the Project since the Certificate had been issued. [*Id*. at A0925]; June 12, 2025 Correspondence from Transco to NYSDEC [A0742.] As such, FERC was entitled to rely on the prior Project EIS. [*Id*. at A0951-A0953.]

FERC reissued a Certificate of Public Convenience and Necessity, as amended, for the Project on August 28, 2025 noting "Transco has demonstrated a need for the Northeast Supply Enhancement Project, that the project will not have adverse impacts on existing customers, or existing pipelines and their existing customers, and that it will have minimal impacts on the interests of landowners and surrounding communities." 2025 FERC Order [A0978.] As part of its finding of need, FERC found that "there are credible market studies that show that the project may help alleviate reliability issues for project shippers and end-users, provide reliability and system resilience benefits to the wider New York region, and reduce energy prices for consumers" and further that Transco executed new binding precedent agreements for 100% of project capacity. [*Id.* at A0944-A0945.]

On May 30, 2025, Transco filed a new application to NYSDEC for a WQC (the "2025 WQC Application") for the Project, as well as an Article 15 Protection of Waters Permit. *See* Permit Cover Letter [A1029, A0452]; Responsiveness Summary [A1085.] On June 11, 2025, Transco also applied for an Industrial State

Pollutant Discharge Elimination System ("SPDES") Permit. [*Id*.] NYSDEC issued a Notice of Complete Application on July 2, 2025. *See* Responsiveness Summary [A1085.]

Transco submitted its 2025 WQC Application as it existed at the time of the 2020 Denial with substantially the same information, which was the end result of years of analysis and numerous technical meetings and calls with NYSDEC, and set forth how the Project meets the standards for issuance. As a result, Transco's 2025 WQC Application reflected changes and refinements made in response to numerous agency consultations during the NYSDEC's prior review of the Project. *See* May 30, 2025 JPA Filing Letter [A0453.]

Transco's 2025 WQC Application also highlighted the increased need from the Project, specifically, that the Project can make affordable and reliable energy more available to New Yorkers. *See* JPA [*Id*. at A0476.] Since the 2020 Denial, reliability concerns continue to plague downstate New York and the urgent need exists for additional natural gas supply to serve families and businesses in the region. [*Id*.] As highlighted in the Northeast Power Coordinating Council's *Northeast Gas/Electric System Study,* existing gas infrastructure in New York is unable to meet the demand for most electric generators during a cold snap as well as during extreme heat waves. [*Id*.] While many generators in downstate New York — where the Project is intended to serve — are dual-fuel capable, very few electric generators

10

have firm transportation entitlements, exposing electric generation to risk in the event of an extreme weather event or a pipeline outage. [*Id*.]

The addition of new firm transportation capacity would immediately improve the resiliency and reliability of gas service to residential and commercial loads − and help to reduce gas prices − in New York City, including during peak demand days. [*Id*.] It would also reduce the need for electric generators to rely on oil as a backup. [*Id*.]

Following Transco's 2025 WQC Application, numerous technical meetings were held with NYSDEC. *See* Proposed Meeting Schedule [A0738-A0740.] During this time, NYSDEC requested additional technical information on the Project. *See e.g.*, NYSDEC July 15, 2025 Request for Additional Information [A0752-A0758.] Ultimately, NYSDEC found that Transco's application was "complete" for purposes of commencing public review and issued a Notice of Complete Application. Responsiveness Summary [A1085.]

On July 2, 2025, NYSDEC issued a Notice of Complete Application in the Environmental Notice Bulletin, commencing a 30-day public comment period. Responsiveness Summary [A1085.] On July 23, 2025, the public comment period was extended another 15-days, and comments were accepted through August 16, 2025. [*Id*.] During the public comment period, NYSDEC issued a Request for Information to which Transco responded. [*Id*.]

11

Throughout the permitting process, Transco clarified information in its application to better inform the NYSDEC about how water quality will be protected and how Transco will protect the environment and aquatic species. *See, e.g.*, June 12, 2025 Clarification Letter to NYSDEC [A0742-0744.] Transco's subsequent submissions to NYSDEC's information requests provided additional data, methods, and mitigation that supports NYSDEC's decision determination. [A0760-A0885.]

For example, NYSDEC required updates and new draft plans as part of the 2025 application, including a new Mariner Communications Plan, Suspended Sediment and Water Quality Monitoring and Fishing Gear Loss Compensation Plan, Post-construction Benthic Monitoring and Sediment Monitoring Plan and a Draft Mitigation Framework and Marine Mammal Observer Protocol. *See* July 15, 2025 Request for Additional Information [A0752-A0759.] Transco provided these updates to address the 2020 Denial requirement for developing monitoring plans including for corrective actions during construction. *See, e.g.*, Draft Mitigation Framework [A0848-A0862]; Draft Post-Construction Benthic Sampling and Hydrographic Monitoring Plan [A0863-A0885.] These updates and new plans also addressed the 2020 Denial's requirement to provide mitigation and to protect shellfish beds. [A0760-A0885.]

Transco also provided multiple construction method clarifications and updated its application materials requested to resolve inconsistencies. This included

12

confirming (1) the location of jet trenching with respect to marine resources and contaminant levels, (2) proposed dredging rates based on modeling scenarios that demonstrate compliance with water quality standards, (3) that there would be no side-casting or barge overflow, confirming how dredged material and dredge return water would be managed, (4) the location and extent of marine mattresses, (5) installation depth and further explaining why minimum 6-ft burial is not feasible in all areas; (6) the type of pile driving and specific location of all proposed piles and (7) hydrostatic test additives, discharge locations, and discharge rates. *See* June 12, 2025 and June 24, 2025 Clarification Letters to NYSDEC [A0742- A0748.]; [A0760-A0885.]

Transco provided these clarifications and updates addressing the 2020 Denial requirement to comply with water quality standards, reduce total suspended solids ("TSS"), achieve compliance at the edge of mixing zones and provide operational clarity on construction and operation parameters. [*Id*.]

On November 7, 2025, NYSDEC issued the WQC to Transco. *See* Permit Cover Letter [A1029]; *see also* November 7, 2025 NYSDEC WQC [A1037-A1038.] NYSDEC also prepared a Responsiveness Summary summarizing and responding to the comments received, which it made publicly available. *See* Responsiveness Summary [A1085-A1106.] The WQC authorized construction, installation, and operation of the Project. *See* WQC [A1029-1066.] In doing so, the WQC was

detailed and specific. [*Id.*] It includes not only a water quality certification but also 57 detailed permit conditions and additional permit conditions applicable to all Department permits, including the condition that all approved plans become enforceable permit conditions. [*Id.* at A1038-A1065.]

The WQC conditions covered, among other things, construction requirements and prohibitions, required an independent, third-party environmental monitor, imposed seasonal construction windows to protect marine resources, set specific water quality standards specific to the presence of hard clams and contaminated areas as well as specific construction activities, required water quality monitoring as well as restoration and benthic monitoring. [*Id.*] For example, Condition 33 (*Water Quality Standard and Limits for In-Water Work*) provides detailed requirements by mile-post location of the approved mixing zone, the applicable water quality standard by parameter as well as the sampling method. [*Id.* at A1050.] Condition 34 (*Water Quality Standard and Limits for Dredge Return Water (Decanting)*) then does the same thing for dredge return water. [*Id.* at A1053.] Other conditions addressed night work and required Transco to submit specific plans to ensure compliance with WQC and applicable water quality standards. [*Id.* at A1050-A1059.] Each of these plans are subject to review and approval by NYSDEC prior to commencing the authorized activities within, above, or adjacent to New York

14

waters. [*Id*. at A1040-1047, A1056, A1061-A1062]; *see also* Permit Cover Letter [A1031.]

In granting Transco's 2025 WQC Application, NYSDEC acknowledged that it had previously denied a WQC for the Project based on its inability at that time to determine that the Project would comply with all water quality standards and provided an explanation for its decision to now issue the WQC. *See* Permit Cover Letter [A1029-A1033]; *see also* Responsiveness Summary [A1104.] NYSDEC explained that it subjects all permit applications to a "rigorous review process based on current available information", and following a comprehensive evaluation of the 2025 WQC Application, NYSDEC determined that the Project can comply with applicable water quality standards upon appropriate conditions. [*Id*.]

In granting the WQC, NYSDEC explained that "[s]ince the 2020 Denial, considerable in-water utility construction has occurred in New York waters, which has provided NYSDEC with new information relating to in-water construction-related water quality impacts and measures to appropriately avoid and minimize such impacts." [*Id*. at A1031.] In this regard, the WQC was issued contingent upon approval of certain compliance plans and monitoring measures, including (i) a Dredge Management Plan; (ii) a Suspended Sediment and Water Quality Monitoring Plan; (iii) a Sturgeon Acoustic Monitoring Plan; (iv) and three Water Quality Mitigation plans. *See* WQC [A1031, A1043, A1045, A1047, A1056.] These

15

requirements were binding conditions that were built into the terms of the WQC itself [A1065.], as well as the 2025 FERC Order. *See* 2025 FERC Order [A0981.] (noting all conditions attached to the water quality certifications constitute mandatory conditions of the 2025 FERC Order). NYSDEC review and approval of these plans were necessary prior to the commencement of Authorized Activities.[2] [A1043, A1045, A1047, A1056]; *see also*, Permit Cover Letter [A1031.]

The WQC also sets forth various mandatory construction windows to avoid and minimize impacts to aquatic species, including (i) Atlantic and shortnosed sturgeon; (ii) winter flounder; and (iii) critical hard clam areas. *See* Permit Cover Letter [A1030]; *see also* WQC [A1043-A1044.] Due to the sensitive nature of the hard clam area located between mile posts 14 and 20, the WQC implements a strict unconditional prohibition from June 1 to July 31 each year, when the hard clam population is most vulnerable. [*Id*.] Accordingly, no sediment disturbing activities will be permitted between mile posts 14 and 20 during this time of year restriction. [*Id*.]

---

[2] Petitioners' Brief suggests that the Dredge Management Plan does not require NYSDEC approval prior to construction like the other referenced plans. This is false. *See* Permit Cover Letter [A1031.] ("Transco is required to develop a Dredge Management Plan, which will be subject to NYSDEC approval and must include detailed adaptive management techniques should any actual or imminent exceedance of total suspended sediments occur . . ."); WQC [A1056].

With respect to the impact on hard clams specifically, NYSDEC noted that in the 2020 Denial it previously relied on a hard clam density estimate of approximately 69.6 individuals per square foot which was derived from the 2016 Benthic Survey *See* Permit Cover Letter [A1031.] According to FERC, the 2016 Benthic Survey depicted an estimated hard clam density between MPs 14.4 and 21.6 of approximately 69.6 individual hard clams per square foot. [A1003.] Since the time of the 2020 Denial, Transco identified and corrected an error in the underlying FEIS. *See* Responsiveness Summary [A1104]; *see also* September 22, 2025 Transco Response to NYSDEC Questions "Transco Response to NYSDEC" [A1011]; September 24, 2025 correspondence from Transco to FERC [A1018-A1019.] On September 25, 2025, Transco filed a letter with FERC stating that Transco noticed a significant discrepancy in the analysis of the data FERC included in its FEIS regarding Transco's 2016 Benthic Survey on the density of hard clams in the MPs 14.4 to 21.6 area of the Raritan Bay Loop. *See* Responsiveness Summary [A1104]; *see also* September 24, 2025 correspondence from Transco to FERC [A1018-A1019.] In doing so, Transco re-evaluated the data and provided a corrected estimate of individuals per square foot, relying on the same 2016 Benthic Survey data. *See* Permit Cover Letter [A1031.] Prior to concurring with the estimate, NYSDEC required the submission of documentation to support the revised estimate, including the underlying raw data and the related FERC filings. [*Id*.]; [A1013.]; *see also*

17

Responsiveness Summary [A1105.] Ultimately, upon receipt and review of this information, including a review of the raw data itself, NYSDEC concurred with the updated estimate of 3.7 individuals per square foot. [*Id*.]; Barnes HC density Calculations for Revised Clam Density [A1108.]

Further, NYSDEC determined that the 5% sediment loss rate for jet trenching could in fact be supported based upon its receipt of additional documentation justifying the 5% rate. *See* Responsiveness Summary [A1106.] Specifically, Transco provided NYSDEC with a Sediment Loss Rate Memorandum on August 20, 2025, justifying the appropriateness of a 5% sediment loss rate. *See* August 20, 2025 Sediment Loss Rate Memorandum ("Sediment Loss Rate Memorandum") [A0917.]

The WQC further requires mitigation for all unavoidable water quality impacts, including those to hard clams. In this regard, Transco is required to conduct water quality monitoring during Authorized Activities, including visual turbidity monitoring and real-time, in-situ TSS estimates. *See* Responsiveness Summary [A1099-A1100]; WQC [A1049.] This monitoring will be detailed, for NYSDEC review and approval, in a Sediment Sampling and Water Quality Monitoring Plan that must be approved by NYSDEC prior to the commencement of any construction. *See* Responsiveness Summary [A1100]; WQC [A1047.] Further, per the WQC, Transco is required to employ an independent third-party monitor to conduct sampling and analysis and who will have "stop work" authority to be exercised if

18

water quality monitoring demonstrates any issues. *See* Responsiveness Summary [A1091, A1100]; *see also* WQC [A1041.] Additionally, as a requirement of the WQC, Transco is required to implement NYSDEC-approved corrective actions in such instances. *See* Responsiveness Summary [A1100]; WQC [A1055.] The mitigation plans are required to be approved by NYSDEC prior to commencement of any Authorized Activities. *See* WQC [A1031, A1045.]

## ARGUMENT[3]

### I. NYSDEC'S ISSUANCE OF A WQC IS JUSTIFIED

Petitioners maintain that NYSDEC's issuance of a WQC for the Project was arbitrary and capricious. *See* Petitioners' Brief at pp. 32-33. In doing so, Petitioners effectively assert that because NYSDEC previously issued denials, only one of which was arguably substantive, NYSDEC could not change its decision. Effectively, Petitioners contend that despite NYSDEC's thorough and documented review of the application anew, requests for additional technical information that were fully addressed and NYSDEC's use of gained technical experience during the passage of time, NYSDEC could not reach a different result. Petitioners' claim must fail.

NYSDEC's decision to issue Transco a WQC is subject to the arbitrary and capricious standard of review, requiring that agency action be reasonable and

---

[3] Petitioners' brief attaches numerous member affidavits purportedly to establish

reasonably explained. 5 U.S.C. § 706(2)(A); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Islander East Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 150-51 (2d. Cir. 2008). The arbitrary and capricious standard is deferential, and "a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423. A court need only determine that "the agency has acted within a zone of reasonableness and… reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423. To meet this standard, NYSDEC must reasonably explain its decision and rationally connect the facts found and decision made. *Islander East Pipeline Co.*, 525 F.3d at 151.

Even after *Loper Bright,* as confirmed in *State v. Bessent*, 149 F.4th 127, 152, 2025 WL 2327237, at *15 (2d Cir. Aug. 13, 2025), review of agency *actions* is still

---

standing. While Transco does not concede standing, Transco has elected not to contest Petitioners' standing. Transco, however, objects to any request by Petitioners that this Court consider any factual or technical aspects of those affidavits as they are outside the administrative record before NYSDEC at the time of its decision. *See Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (quotations omitted); *Camp v. Pitts*, 411 U.S. 138, 142 (1973)) ("The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *see also Sierra Club v. N.Y. State Dep't of Envtl. Conservation*, Index No. Index No. 2016-0165, 2017 N.Y. Misc. LEXIS 13725, * 9 (N.Y. Sup. Ct., Apr. 21, 2017), *aff'd on other grounds*, 169 A.D.3d 1485 (4th Dept. 2019) (considering Sierra Club affidavits solely for purposes of establishing standing and declining to "consider the technical aspects of those affidavit[s]" because they "were never previously submitted to DEC").

"narrow and particularly deferential" and may only be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *American Cruise Lines v. US*, 96 F.4th 283, 286 (2d Cir. 2024); *Bessent,* 149 F.4th at 152. Unlike "review of an agency's interpretation of a statute, under which the agency is accorded no deference, our review of agency action under the 'arbitrary and capricious standard of review is narrow and particularly deferential.'" *Bessent,* 149 F.4th at 152 (quoting *Env't Def. v. EPA,* 369 F.3d 193, 201 (2d Cir. 2004); *see also Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (the APA "*does* mandate that judicial review of agency policymaking and factfinding be deferential.") (emphasis in original).

An agency action survives arbitrary-and-capricious review if the agency "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id*. (quoting *New York v. Raimondo*, 84 F.4th 102, 106-07 (2d Cir. 2023). To determine whether an agency action is arbitrary and capricious, a court considers whether the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Islander East Pipeline Co.*, 525 F.3d at 150-51. Further, a court

must be confident that an agency "has not examined all relevant data or satisfactorily demonstrated a rational connection" between the facts and the decision before concluding that the decision is arbitrary and capricious. *Id.* at 151.

Even though the appeal of the permits will be in the Second Circuit under the Natural Gas Act, and even though Transco applied to NYSDEC for federal permits, the standards NYSDEC applies to the water quality permits are set forth in state law, and New York courts apply deference to agency decisions under those regulations if a reasoned explanation is provided – and it is those state water quality regulations which the opponents focus on in their comments. *See Niagara Mohawk Power Corp. v. N.Y. State Dep't of Env't Conservation*, 82 N.Y.2d 191, 196 (1993) ("For purposes of issuance of a Clean Water Act § 401 (33 USC § 1341) [s]tate certification, [NYS]DEC is limited to considering the water quality standards set forth by the [s]tate and approved by the United States Environmental Protection Agency."); *Matter of E. Niagara Project Power Alliance v. N.Y. State Dep't of Env't Conservation*, 42 A.D.3d 857 (3d Dep't 2007); *Matter of Port of Oswego Auth. v. Grannis*, 70 A.D.3d 1101, 1103 (3d Dep't 2010). New York law provides: "even where there has been a reversal of a prior administrative decision, it will be upheld if the proffered reasons for the reversal or modification find rational support." *Matter of Stahl York Ave. Co., LLC v City of New York*, 76 A.D.3d 290, 296 (1st Dept 2010), *lv denied*, 15 N.Y.3d 714 (2010). An agency "'may refuse to duplicate previous

error; it may change its views as to what is for the best interests of [its governed]; it may give weight to slight difference which are not easily discernible.'" *Matter of Waidler v Young,* 63 A.D.3d 953, 954 (2d Dep't 2009), quoting *Knight v Amelkin*, 150 A.D.2d 528 (2d Dep't 1989); *Matter of Cty. of Nassau v. Nassau Cty. Interim Fin. Auth.*, 2011 NY Slip Op 21103, ¶¶ 18-19, 33 Misc. 3d 227, 254 (N.Y. Sup. Ct. Mar. 11, 2011).

Here, NYSDEC's decision was not arbitrary and capricious because NYSDEC justified issuance of the WQC by explaining its decision with reliance upon changes in application/methods; reliance on new findings by federal (FERC, U.S. Army Corps of Engineers, National Marine Fisheries Service) and state (New York Department of State, Public Service Commission) agencies acting to issue permits/approvals within their jurisdiction; and finally changes in circumstance such as the increased delay in building of offshore wind. As NYSDEC explained:

> NYSDEC denied a previous request from Transco for a WQC for the Project on May 15, 2020, based on Transco᾽s inability to demonstrate that construction and operation of the Project would meet all applicable water quality standards. Since that time, and as discussed in Water Quality, above, the 2023 Rule was issued. NYSDEC subjects all permit applications to a rigorous review process based on current available information and in accordance with all applicable laws, regulations and rules. Here, following a comprehensive evaluation of this WQC application, and in consideration of the 2023 Rule, plus additional information provided by Transco, NYSDEC has determined, subject to the conditions contained in the WQC, that Transco has sufficiently demonstrated that construction and operation of the Project would meet all applicable water quality standards.

23

> NYSDEC has specifically reevaluated the Project taking into consideration the previous basis for denial, including: burial depth (see Water Quality, above), benthic impacts in the hard clam area (see Biological Resources, above), mixing zones in the hard clam area (see Water Quality, above), demonstrating reduced rate of dredging in TOYRs (see Biological Resources, above), mixing zones for contaminants (e.g., mercury and copper), the sediment loss rate (see Water Quality, above) and consistency with CLCPA (see Climate Change, above).

*See* Responsiveness Summary [A1104.] NYSDEC then expanded on each of these areas and explained its rationale.

For example, NYSDEC provided a robust rationale relative to the burial depth, mixing zones, sediment rate loss, dredging and benthic impacts and hard clams. [*Id*. at A1104-A1105.] In the 2020 Denial, NYSDEC based its denial, in part, on the lack of information regarding impacts of a six-foot burial depth, stating that "absent an evaluation by Transco, the Department [could not] make a determination regarding water quality impact of . . . [a] six-foot burial depth." *See* Responsiveness Summary [A1104.] NYSDEC now determined that a 4-foot burial depth is acceptable based on its technical evaluation of three factors. [*Id*.] First, "a 4-foot burial depth will minimize TSS, thereby decreasing potential impacts to water quality." [*Id*.] Second, because the Project is a gas pipeline and not a high-voltage transmission line project where there is a need to minimize EMF impacts, "[t]hat is not applicable here." [*Id*.] Third, the in seafloor areas where the Project is located are not heavily fished by bottom-tending fishing gear where NYSDEC generally

24

seeks a 6-foot burial depth. [*Id.*] Based on these factors, NYSDEC explained that it "has now determined a 4-foot burial depth is acceptable." [*Id.*]

The 2020 Denial also discussed the mixing zone associated with the hard clam area because "hard clams are vulnerable to mercury and copper and the Project could not meet the mercury or copper concentration standard at the edge of a 500-foot mixing zone within the hard clam area." *See* Responsiveness Summary [A1105.] In reaching a different determination this time, NYSDEC "impose[d] a strict TOYR for all sediment disturbing activities within the hard clam area from June 1 to July 31. This time of year is when the hard clams are at their most sensitive life stages (eggs and larvae), which would be susceptible to sediment and contaminant exposure." [*Id.*] As reasoned by NYSDEC, "[t]his strict prohibition of sediment disturbing activities during this time period will ensure impacts to the vulnerable hard clams are avoided." [*Id.*]

NYSDEC also addressed potential impacts to hard clams outside of June 1 to July 31, and "implement[ed] the conservative 500-foot mixing zone in the hard clam areas." [*Id.*] NYSDEC used its knowledge and experience gained since the 2020 WQC denial "in light of the considerable amount of in-water utility work that has occurred to date, … re-reviewed the existing modeling results and … confirm[ed] that contaminant and TSS limits can generally be met at the edge of applicable mixing zones with the modification of certain construction techniques." [*Id.*]

25

Moreover, the 2020 Denial identified a lack of documentation that any identified need to reduce the rate of dredging to comply with water quality standards would be possible given the required construction windows for important species. [*Id*.] Now, the WQC imposes the applicable standards as well as construction windows. *See* WQC [A1038, A1043-A1055.] It also, as an additional measure of protection, "requires a NYSDEC-approved dredge management plan, including robust adaptive management", which must include "reduced dredge rates as necessary to comply with water quality standards." *See* Responsiveness Summary [A1105.]

With respect to sediment loss rate and NYSDEC's finding that the sediment loss rate of 5% for jet trenching was acceptable, NYSDEC explicitly acknowledges that the 2020 Denial "reference[d] the sediment loss rate" and "stated NYSDEC could not accept the modeled sediment loss rate of 5%, which was used to project sediment loss due to jet trencher activities, *without further documentation*." *See* Responsiveness Summary [A1106.] (emphasis added). As part of the instant WQC Application, and in response to NYSDEC's requests for additional information, Transco provided additional documentation and justification to support a 5% sediment loss rate. [*Id*.]; *see also* Sediment Loss Rate Memorandum [A0917-A0921.] As NYSDEC thoroughly explained, Transco's additional "justification included a discussion of the implementation of the same modeling software as for

26

cable projects that were modeled with the higher loss rates, but the in-situ data from those projects demonstrated that the loss rates modeled were much higher than the sediment loss observed during the actual cable installation." [A1106.] Transco also noted that while the pipeline installation will disturb a larger volume of sediment than cable installation, the overall percent of sediment loss should be similar due to the use of the same technology. [*Id*.] Transco is also relying on the expertise of their modeler, who has experience with modeling this installation technology. [*Id*.]

Relative to benthic impacts and hard clams specifically, NYSDEC acknowledges in its Responsive Summary that a portion of the Project will cross "a portion of Raritan Bay that is a highly productive area for hard clams," and that the associated benthic habitat in that location "is very sensitive." [*Id*. at A1104.] NYSDEC then recognized the error in the underlying FEIS, noting that "Transco filed documentation on the FERC docket correcting the clam density stated in the FEIS from 69.9 individual clams per square foot to 3.0 individual clams per square foot" and then explained that "NYSDEC staff has evaluated the raw data Transco relied upon in making this conclusion and has confirmed its accuracy." [*Id*. at A1104-A1105.]

NYSDEC went even further given the importance of the hard clams and associated benthic habitat and imposed "a strict prohibition of any sediment disturbing work during the hard clam spawning season, being June 1 to July 31" and

27

"[f]or work occurring within the hard clam area outside of the June and July TOYR, NYSDEC [imposed on Transco] various limits to ensure clams are minimally impacts outside of the direct impacts associated with dredging." [*Id*. at A1105.] These limits are detailed in the WQC and include "a 500-foot mixing zone and lower TSS limits where construction will occur for longer continuous durations, being longer than 96 hours without a work stoppage to allow for TSS to return to ambient conditions." [*Id*.] Finally, and as an extra layer of protection, NYSDEC required "Transco to develop a NYSDEC-approved benthic monitoring plan that will include requirements for long-term monitoring of the benthic habitat plus implementation of remediation or mitigation, as applicable." [*Id*.]

Finally, NYSDEC explained in its Responsiveness Summary the changes in circumstance affecting the need for the Project, stating:

> On September 18, 2025, the Public Service Commission (PSC) issued an "Order Regarding Long-Term Gas Plan and Requiring Further Actions," wherein the PSC set requirements on National Grid's Long-Term Plan (LTP) as well as discussed National Grid's Downstate service territory's need for a reliable gas supply (Grid Order). In the Order, the PSC stated, "we observe that the proposed [NESE] Project is needed to ensure the continued provision of safe, adequate, and reliable gas service to customers in New York City and on Long Island," and "the Commission addresses National Grid's Final LTP and acknowledges that there is a need for the more reliable source of supply that the proposed NESE project would provide if it receives all required approvals and is constructed."

Responsiveness Summary [A1087.]

28

In short, NYSDEC "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *New York v. Raimondo*, 84 F.4th 102, 106-07 (2d Cir. 2023). *See Matter of Waidler*, 63 A.D.3d at 954; *Knight*, 150 A.D.2d at 529. Petitioners' arguments to the contrary are simply not supported by the Record and must be rejected.

## II. A HEIGHTENED STANDARD OF REVIEW DOES NOT APPLY WHERE NYSDEC'S DECISION WAS NOT BASED ON CONTRADICTORY FACTUAL FINDINGS

Recognizing that the primary argument lacks merit as NYSDEC adequately explained its change in decision making, Petitioners unsurprisingly seek to undermine just one of NYSDEC's asserted basis – hard clam density along the Project's path – and claim NYSDEC was required to provide a "detailed justification" to support its alleged change in position, because, in Petitioners' view, NYSDEC's decision was based on "contradictory factual findings." *See* Petitioners' Brief, p. 36. Petitioners' characterization of the issue is simply wrong.

Even assuming that there was a change in policy, agencies are allowed to reverse a policy or decision by taking a new agency action. *Department of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020); *Biden v. Texas*, 597 U.S. 785, 808 (2022); *Encino Motorcars, LLV v. Navarro*, 579 U.S. 211, 221 (2016). And if an agency complies with the procedural requirements for a new agency

action, it may use a new action to explore reasons not originally provided in the initial action. *Regents*, 591 U.S. at 21. When an agency changes its existing position, it need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Bessent,* 149 F.4th at 154 (quoting *Encino Motorcars v. Navarro*, 579 U.S. 211, 221 (2016)).

An agency "must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id*. (quoting *Encino*, 579 U.S. at 221). In *Bessent*, the IRS had a previous tax credit policy that it changed with a Final Rule in April 2018, which affected New York state's tax credit program. *Bessent*, 149 F.4th at 139-140. Because the IRS displayed awareness of the policy change in the Final Rule and provided good reasons for the new policy, this was a reasonable change in policy. *Id*. at 154. Petitioners rely on *Fox* for the proposition that NYSDEC was required to provide a "detailed justification," because its decision was based on contradictory factual findings. *See* Petitioners' Brief at p. 36, citing *FCC v. Fox Television Stations, Inc*., 556 U.S. 502 (2009). While it is true that where an agency's policy relies upon "factual findings that contradict those which underlay its prior policy" the agency must provide a more fulsome explanation of its policy, that is not the case here. Not only has there been no change in NYSDEC "policy," no contradictory factual findings exist.

30

### A. There Has Been No Change in Agency Policy.

Here, although NYSDEC had previously denied issuance of a WQC for the Project, that denial was not a "policy" pronouncement of the agency but rather a project (and application) specific determination that it was unable to issue the requested certification, based on the information before the agency and its technical experience and expertise *at that time*. Thus, when Transco filed its 2025 WQC Application, NYSDEC did what it was obligated to do as a regulatory agency – it reviewed Transco's application for the Project in accordance with Department's permitting regulations. Specifically, it technically reviewed Transco's application as well as supplemental and clarifying information it requested and Transco provided, considered public comment, applied its increased experience with in-water construction and reached a different result.

### B. NYSDEC's Issuance of the WQC was not Based on Contradictory Factual Findings and Therefore not Subject to Heightened Review.

Petitioners maintain that a heightened standard of review applies based on their characterization that that NYSDEC reversed its prior Denial based on "Transco's twenty-fold revision of its own, nearly-decade-old calculation of hard clam density along the Project's path." Petitioners' Brief at p. 29. Petitioners misstate the administrative record. NYSDEC was provided with clarifying, not corrected, information on hard clam density which allowed it to reevaluate the certificate request.

31

In 2020, NYSDEC denied Transco's WQC application because Transco had "not demonstrated that construction and operation of the Project would comply with applicable water quality standards." *See* 2020 Denial [A0436.][4] Part of NYSDEC's rationale was the potential impact on hard shell clams and the estimate that clam density was "approximately 69.6 individuals per square foot." [*Id.* at A0443.] This number, however, did not come from Transco and indeed was merely part of the NYSDEC's record because it was the number identified by FERC in the FEIS for the Project. *See* Transco Response to NYSDEC [A1011-A1012.] However, Transco's data – indeed data that was part of the NYSDEC record in 2020, the FERC record and the NYSDEC record in 2025 – was accurate. So, while the mathematical error in the FEIS was not identified or challenged in 2020, it was in 2025. Indeed, as part of the NYSDEC's review of Transco's permit application in 2025, the FERC hard claim density value was renewed as an issue. Upon investigation, it became clear that an error had occurred to which NYSDEC appropriately requested Transco to clarify and "correct" as part of the NYSDEC and FERC proceedings. However, the underlying technical data – the alleged "contradictory factual findings" – never changed. *See* Transco Response to NYSDEC [A1011-A1012]; *see also*, September 24, 2025 correspondence from Transco to FERC [A1018.] Indeed, this same data

---

[4] The prior denial was merely issued to provide NYSDEC with additional time to evaluate Transco's application.

was subject to public comment twice before NYSDEC as well as part of the FERC certificate proceedings. [*Id.*]

NYSDEC reevaluated the properly interpreted data and reconsidered the WQC, an action well within its discretion. Where "the assumptions underpinning the [rule] no longer hold true" it is "reasonable for [an agency] to revisit and repudiate its earlier position in light of developments that give it the impetus to do so." *Bessent*, 149 F.4th at 155. Indeed, the *Fox* court stated that "it suffices [only] that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates . . . [t]his means that an agency need not always provide a more detailed justification." *Id.* at 515; *see also, Nat'l Ass'n of Home Builders v. EPA,* 682 F.3d 1032 (2012). Certainly, "[a]n agency, in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings." *Nat'l. Ass'n. of Home Builders*, 682 F.3d at 1032. In fact, the *Fox* court held that "if the agency's path may reasonably be discerned," an agency decision of even "less than ideal clarity" should be upheld. *Fox*, 556 U.S. at 513-14.

NYSDEC reevaluated its position when the assumptions on which its earlier denial was based no longer held true. *See Bessent*, 149 F.4th at 155. The underlying

33

data – the "factual findings" – have never been and are not in question. Accordingly, NYSDEC's action was proper and should be granted deference.

### C. Even if a Contradiction Exists, Which it Does Not, NYSDEC Provided a Reasoned Explanation and its Decision Merits Deference.

As explained above, there has been no change in agency policy, nor any contradictory factual findings. But even if this were the case, which it is not, NYSDEC has met any perceived obligation to justify its action.

When an agency's new position rests upon factual findings that contradict those which underlay its prior policy, the agency must (1) acknowledge its change in position and (2) offer "a reasoned explanation" for departing from the facts and circumstances that underlay the prior policy. *See Fox*, 556 U.S. at 515; *Nat'l Ass'n of Home Builders,* 682 F.3d at 1032; *Afr. Cmtys. Together v. Lyons,* 799 F. Supp. 3d 362 (S.D.N.Y. 2025); *see also Catskill Mts. Chptr. of Trout Unlimited, Inc. v. United States EPA,* 846 F.3d 492 (2d Cir. 2017).

First, there is no debate that NYSDEC acknowledged the reevaluation of its position – Petitioners recognize as much. *See* Petitioners' Brief at pp. 33-34. Second, NYSDEC properly considered additional clarifying information about the calculation of hard clam density and acted within its discretion to reevaluate its position – an act for which there is precedent.

34

In *Association of Proprietary Colleges v. Duncan,* 107 F.Supp.3d 332 (S.D.N.Y. 2015), the Department of Education promulgated a regulation to curb federal financial aid to students at for-profit colleges who choose to attend programs "whose graduates regularly are un-or under-prepared for gainful employment," and were there likely to carry loan debt. *Id.* at 340. Under the new rule, a program "passes if its graduates' average loan payments are less than or equal to 20 percent of their discretionary income, or eight percent of annual earnings." *Id.* at 344. This was a departure from the previous rule, which set the passing thresholds at 30 percent of discretionary income and 12 percent of annual earnings. *Id.* at 367. The court rejected petitioners' challenge to the new rule, finding the agency had provided a reasoned explanation. The court explained that "upon receiving additional data showing default and repayment rates for graduates from a wide range of programs – data obtained after it promulgated the [prior rule] but before drafting the [current] rule – DOE determined that programs whose graduates were averaging payments between 8-12 percent of annual earnings and 20-30 percent of discretionary income are much more similar to their failing counterparts than their passing counterparts." *Id.* at 367. The court concluded that "based on this additional data, it was neither arbitrary nor capricious" for the agency to modify its rule. *Id.* at 367.

Likewise, NYSDEC has given a "reasoned explanation" for its reliance on the revised hard clam density calculations. As Transco explained, there was a math error

in FERC's calculations when processing the data provided by Transco, but the data itself was accurate. *See* Transco Response to NYSDEC [A1011-A1012.] In fact, the data was (despite Petitioners' assertions otherwise) subjected to public comment and its accuracy was never challenged. *See generally* 2020 Denial [A0434-A0451.] Transco used its 2016 Benthic Survey to analyze and calculate hard clam density between MPs 14.4 and 21.6 of the Raritan Bay Loop. *See* 2016 Benthic Survey [A0083-A0291.] Based on this data, the 2019 FEIS for the Project estimated that the hard clam density value was 69.6 individual hard clams per square foot. *See* September 22, 2025 Transco Response to NYSDEC Questions "Transco Response to NYSDEC" [A1011]; *see also*, September 24, 2025 correspondence from Transco to FERC [A1018-A1019]; Permit Cover Letter [A1031.] A review of the FEIS by the Project team determined that this calculation was incorrect. *See* Transco Response to NYSDEC [A1011.] Specifically, the total count of hard clams noted in Transco's data (212.7) reflects sampling from 66 individual grab samples (i.e. three grab samples per sample site at 22 sample sites.) *See* September 24, 2025 correspondence from Transco to FERC [A1019.] Each grab sample included sediment from approximately 1.08 square feet (0.1 square meter) of seafloor, such that 66 samples represent approximately 71 square feet (6.6 square meters) of seafloor. [*Id*.] The average hard clam density actually represented by the data is

36

approximately 3 individual clams per square foot (212.7 divided by 71 square feet) – not 69.6 individual clams per square foot as represented in the FEIS. [*Id.*]

Further, a digitization of a hard clam special permit harvest area map provided by NYSDEC demonstrated that the designated special permit harvest area for hard clams lies between route MPs 14.0 and 19.8. *See* Transco Response to NYSDEC [A1012.] This MP range includes VC5 through VC24, which is slightly different than the set of stations than noted above and accounts for 223.7 hard clams. [*Id.*] Thus, the average density along the proposed route in the designated hard clam area is 3.7 hard clams per square foot. [*Id.*] On September 25, 2025, Transco filed documentation on the FERC docket correcting the clam density stated in the FEIS from 69.9 individual clams per square foot to 3.0 individual clams per square foot. *See* Responsiveness Summary [A1104-A1105.]

Petitioners incorrectly assert that NYSDEC "failed to[] confirm the validity of the data and all other conclusions drawn from it." Petitioners' Brief at p. 37. Yet NYSDEC not only noted that "Transco identified and corrected an error in the underlying FEIS," but it also confirmed the accuracy of the revised calculations and evaluated the raw data to confirm its accuracy and ensure no other errors existed. *See* Responsiveness Summary [A1104-A1105]; Permit Cover Letter [A1031]; Barnes HC density Calculations for Revised Clam Density [A1108.] Petitioners acknowledge this, albeit buried in a footnote. *See* Petitioners' Brief at pp. 37-38.

37

Perhaps more telling, Petitioners do not, and have never, alleged inaccuracies in the underlying data. *See generally* Petitioners' Brief.

To the extent that NYSDEC's decision to issue the WQC for the Project is based on contradictory factual findings which, as detailed above, it is not, NYSDEC has provided a "reasoned explanation" for its decision. The record is clear that NYSDEC's prior denial was based on a mathematical error by FERC when it interpreted Transco's undisputedly accurate benthic survey data. NYSDEC properly considered the clarification, "evaluated the raw data Transco relied upon in making this [clarification] …, confirmed its accuracy" and issued the WQC for the Project. *See* Responsiveness Summary [A1105.]

## III. NYSDEC WAS NOT REQUIRED TO SUBMIT SUPPLEMENTAL DOCUMENTS FOR PUBLIC COMMENT

Petitioners next assert that the failure to offer (i) the revision in hard clam density and (ii) the Sediment Loss Rate Memorandum justifying the sediment loss rate previously-proposed by Transco in its 2019 WQC Application, was arbitrary and capricious and violates the notice and comment provisions of the Clean Water Act. Petitioners' Brief at pp. 39-47. As discussed herein, there is no merit to this claim.

### A. The Revision in Hard Clam Density and Sediment Loss Rate Memorandum Are Supplemental Documents that did not Require Further Public Notice and Comment

A review of the record makes clear that both the revision in hard clam density and the Sediment Loss Rate Memorandum are supplemental documents that merely expand upon data and information that was previously disclosed for public notice and comment during Transco's prior 2019 WQC Application. Therefore, in contrast to the non-binding case law cited by Petitioners, as distinguished below, NYSDEC's consideration of these supplemental documents did not have the effect of "shielding" the essential data upon which it relied from notice and comment.

It is well-recognized that "[a]fter publishing a proposed rule, agencies often receive new information, which in turn improves the accuracy of agency action: It is perfectly predictable that new data will come in during the comment period, either submitted by the public with comments or collected by the agency in a continuing effort to give the regulations a more accurate foundation. The agency should be encouraged to use such information in its final calculations without thereby risking the requirement of a new comment period. Thus, the public is not entitled to review and comment on every piece of information utilized during rule making." *See Kern County Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006).

In this regard, an agency may use "supplementary" data, unavailable during the notice and comment period, that "expands on and confirms" information contained in the proposed rulemaking or addresses "alleged deficiencies" in the pre-existing data. *See, e.g., Community Nutrition Institute v. Block*, 749 F.2d 50, 57-58

39

(D.C. Cir. 1984) (no violation of APA notice and comment requirements when unavailable supplemental studies were a response to comments which discussed a methodological flaw in prior studies); *see also, Competitive Enter. Inst. v. United States Dept. of Transp.,* 863 F.3d 911 (D.C. Cir. 2017); *Solite Corp. v. E.P.A.,* 952 F.2d 473, 484 (D.C. Cir. 1991). Indeed, there is no requirement that the agency reopen the public comment period when using "supplemental" data that is consistent with the information presented in the proposed rulemaking. *Alaska v. Lubchenco*, 825 F. Supp. 2d 209 (D.C. Cir. 2011), citing *Solite Corp. v. E.P.A.*, 952 F.2d 473, 484, 293 U.S. App. D.C. 117 (D.C. Cir. 1991) and *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006). Were it otherwise, an agency could find itself stuck in an infinite feedback loop of public comments on responses to public comments. *Id*.

Here**,** it is clear the two documents that Petitioners take issue with are supplemental in nature and did not require a further round of public notice and comment.

First, as to the revision in hard clam density, the revised calculation relies on the same underlying benthic data that was previously disclosed during Transco's prior 2019 WQC Application. *See* September 24, 2025 correspondence from Transco to FERC [A1018-A1019.] Contrary to Petitioners' assertion, there is no "new" data. Petitioners' Brief at p. 47. Instead, the revised calculation continued to

40

rely upon Transco's 2016 Benthic Survey, data that was incorporated into Transco's 2019 WQC Application and that was subject to public comment during the comment period held between May 29, 2019 through July 13, 2019. [*Id.*]; *see also*, 2020 Denial [A0434.] The revision in hard clam density was merely submitted to address an error in the calculation of the number of hard shell clams per square foot that was recently identified. [*Id.*]; *see also* Transco Response to NYSDEC [A1011-A1012.] Insofar as the revision in hard clam density relies on the same 2016 Benthic Survey and simply corrects an error in extrapolating from that data the number of hard clams per square foot, NYSDEC appropriately determined that further public comment was unnecessary.

The same holds true for the Sediment Loss Rate Memorandum submitted by Transco. *See* Sediment Loss Rate Memorandum [A0917-A0921.] In Transco's 2019 WQC Application Transco proposed a 5% sediment loss rate for jet trenching activities. *See* 2020 Denial [A0440.] This 5% sediment loss rate was also subject to public comment during the comment period held between May 29, 2019 through July 13, 2019. [*Id.* at A0434.] In denying Transco's 2019 WQC Application, NYSDEC concluded that "without further documentation, the Department cannot accept the modeled sediment loss rate of 5% . . ." [*Id.* at A0440.] Thereafter, in connection with the instant WQC Application, Transco supplied the Sediment Loss Rate Memorandum which provides further background information to justify the 5%

sediment loss rate that it previously proposed. *See* Responsiveness Summary [A1100, A1106]; *see also* Sediment Loss Rate Memorandum [A0917-A0921.] There was no difference in the proposed sediment loss rate from the 2019 WQC Application: it remained 5%. Thus, there was nothing new or unique about the Sediment Loss Rate Memorandum provided to NYSDEC; it merely 'expands on and confirms' information that was previously subject to notice and comment. *Community Nutrition Institute*, 749 F.2d at 57-58. NYSDEC appropriately determined that the proposed 5% sediment loss rate need not be subjected to another round of public notice and comment.

The cases cited by Petitioners in support of their contention that NYSDEC was required to submit the revision in hard clam density and the Sediment Loss Rate Memorandum for public comment are not binding and entirely distinguishable. *See generally* Petitioners' Brief at pp. 40-47. Initially, the only Second Circuit case cited by Petitioners does not involve the Clean Water Act in any capacity. *See United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240 (2d Cir. 1977). Further, none of the cases cited by Petitioners involve the notice and comment requirements for a WQC. Finally, the case law cited by Petitioners is easily distinguishable on essential facts from those presented in this matter.

*Ohio Valley Envtl. Coalition v. United States Army Corps of Eng'rs.*, 674 F. Supp. 2d 783 (W. Va. 2009), involved a challenge to a decision by the U.S. Army

42

Corps to issue a discharge permit pursuant to Section 404 of the Clean Water Act based on a theory that the Army Corps failed to provide adequate notice and comment on the permit application. *Id.* at 787. Insofar as the claim involved a challenge to a federal agency's decision to issue a Section 404 permit, it was deemed to be challenging a federal agency involved in informal rulemaking, and as such, was subject to review under the Administrative Procedure Act. *Id.* at 802. The West Virginia court initially noted that "compensatory mitigation is the single most important 'material issue[] related to the justification" of a Section 404 discharge permit. *Id.* at 804. Insofar as there was no substantive information submitted on compensatory mitigation contained in the notice that was issued, the Court concluded that the notice provided deprived the public of the right to comment intelligently. *Id.* Unlike the present case, where all of the underlying data was disclosed, the submission of information on this "single most important" issue of a Section 404 permit after the comment period had closed "had the effect of shielding the essential data and the agency's rationale from public hearing and comment." *Id.* at 807.

Likewise, in *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240 (2d Cir. 1977), a case which does not involve the Clean Water Act in any capacity, a food processor and trade association challenged the U.S. Food and Drug Administration's issuance of a regulation pertaining to the processing of whitefish.

43

Again, the case involved a federal agency deemed to be involved in rulemaking. *Nova Scotia Food Products Corp*, 568 F.2d at 246-248. Unlike here, *Nova Scotia Food Products Corp.* involved a federal agency that, during the rulemaking process, collected all of the scientific research on which it relied and disclosed none of it to interested parties. *Id*. at 251 (noting "all the scientific research was collected by the agency, and none of it was disclosed to interested parties . . ." (emphasis added)). The case has nothing to do with the issuance of a WQC and further does not address supplemental information designed to clarify data that was already disclosed for public comment. Indeed, *Nova Scotia Food Products Corp.* recognizes that "a proceeding might never end" if later submissions required "a reply ad infinitum" and that "the exposure of the scientific research relied on simply would have required a single round of comment addressed thereto." *Id*. at 251 n.15.

Similarly, in *Idaho Farm Bureau Fed'n. v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995), another case that does not involve the Clean Water Act, a United States Geological Survey report central to the agency's decision to list Springs Snail as an endangered species was not made available to the public before the close of the final comment period. *Id*. at 1396-97. The report at issue provided unique information that was not duplicated in other prior reports. *Id*. at 1403. The court held that although an agency may use "'supplementary' data, unavailable during the notice and comment period, that 'expands on and confirms' information contained in the

44

proposed rulemaking and addresses 'alleged deficiencies' in the pre-existing data, the data in the report at issue was unique and had not been previously disclosed. *Id*. at 1402-1403. Moreover, it was "the only scientific information" on a central question. *Id*. at 1403. Additionally, the need for public comment was exacerbated by the questionable accuracy of the new study. *Id*. at 1403.

In *National Wildlife Federation v. Marsh*, 568 F. Supp. 985 (D.C. Cir. 1983), Petitioners challenged the issuance of a Section 404 discharge permit on the grounds that the discharge permit was issued in violation of notice and comment requirements when a Staff Evaluation on which the agency relied was not placed into the administrative record until after the comment period. *Id*. at 991. Moreover, the underlying data employed in the Staff Evaluation was never incorporated into the Final Environmental Impact Statement. *Id*. The Court found that including the Staff Evaluation in the administrative record *after* the close of the comment and hearing period had the effect of shielding the essential data and the agency's rationale from public hearing and comment . . . because the pivotal analysis of the refinery's benefits in terms of reductions of transportation costs was absent from the administrative record as initially amassed." *Id*. at 994.

Here, unlike the cases cited by Petitioners, *all* of the underlying data upon which the revision in hard clam density and Sediment Loss Rate Memorandum were

based were already disclosed for public notice and comment. Thus, NYSDEC cannot be said to have shielded the essential data upon which it relied from public input.

### B. Petitioners Have Not Demonstrated Any Prejudice

Even if this Court were to find that the revision in hard clam density and Sediment Loss Rate Memorandum were somehow not supplemental in nature, which Transco respectfully submits that they are, Petitioners' claim should still fail due to their failure to demonstrate any prejudice.

Unlike the *Idaho Farm Bureau* case cited by the Petitioners, where the court noted that the opportunity for public comment is particularly crucial when the accuracy of important material in the record is in question (*Idaho Farm Bureau*, 58 F.3d at 1403), here Petitioners do not allege that the clarification in hard clam density or Sediment Loss Rate Memorandum are inaccurate. *See generally* Petitioners' Brief. Here, the only prejudice Petitioners arguably identify is a speculative claim that they "might have" engaged experts to address the validity of the "new" data associated with the revision in hard clam density. Petitioners' Brief at p. 47.[5] This claim is unfounded for two reasons. First, Petitioners' argument is misleading in the sense that there is no "new data" associated with either the Revised Hard Clam Shell Study or Sediment Loss Rate Memorandum. As set forth above, the revision in hard

---

[5] Tellingly, despite the underlying data being publicly available as part of Transco's 2025 WQC Application, Petitioners' comments to NYSDEC during the comment period are noticeably silent on this issue.

clam density relies on the same underlying benthic data that was used as part of the 2019 WQC Application, which was previously subject to public notice and comment. *See* September 24, 2025 correspondence from Transco to FERC [A1018-A1019.] Likewise, the proposed sediment loss rate remained unchanged at 5%. The revision in hard clam density merely revises the mathematical calculation that was derived from this same underlying data. *Id*. Second, Petitioners' assertion that they "might have" engaged an expert to review the data is entirely speculative and particularly specious given that Petitioners already had access to this same data as part of the 2019 WQC Application such that they could have engaged an expert previously to review the data. *See* 2020 Denial [A0436, A0442-A0444.]

In sum, because the clarification in hard clam density and the Sediment Loss Rate Memorandum were supplemental documents that expand on information previously disclosed as part of the prior 2019 WQC Application, NYSDEC was not required to hold a further public notice and comment period related to these supplemental documents; it's decision not to is entitled to deference. Tellingly, NYSDEC regulations specifically permit NYSDEC to request information up until permit issuance. 6 NYCRR § 621.2(g) ("*Complete application* means an application for a permit which is in an approved form and is determined by the department to be complete for the purpose of commencing review of the application, but which may need to be supplemented during the course of review to enable the department to

47

make the findings and determinations required by law."). Moreover, the limited nature of a WQC and the statutory limit on the time in which NYSDEC has to act on a certification request or risk a waiver (a reasonable period of time not to exceed one year), necessarily refutes Petitioners' assertions that seriatim public comment is required.

## IV. NYSDEC DID NOT VIOLATE THE CLEAN WATER ACT BY REQUIRING THE SUBMISSION AND APPROVAL OF FUTURE COMPLIANCE PLANS AS PART OF ITS WQC

Petitioners argue that NYSDEC's issuance of the WQC violated the Clean Water Act because NYSDEC conditioned the issuance of the WQC upon its approval of plans to be submitted by Transco of ways to minimize, mitigate, and monitor the project's water quality impacts. In particular, Petitioners allege: first, that NYSDEC could not rationally conclude that Transco would comply with state water quality standards without the necessary plans already in place; and second, that NYSDEC's deferral of its compliance plans violated requirements for public participation. *See* Petitioners' Brief at pp. 48-67. Once again, Petitioners' arguments are without merit. NYSDEC did not "condition" its water quality certification on future plans. Rather, as part of its water quality certification (and Article 15 state permit), NYSDEC required Transco to submit certain plans for NYSDEC review and approval prior to commencement of any Authorized Activities.[6]

---

[6] Authorized Activities is used herein in the same manner as set forth in the WQC.

Petitioners' argument effectively ignores the detailed administrative record before NYSDEC (which included many draft plans), its extensive technical review of Transco's application and assessment of the Project's compliance with New York's water quality standards as well as the robust conditions detailed by NYSDEC in the WQC, including specific construction windows and detailed water quality standards broken down by mile-post. Rather than challenging this review, to which NYSDEC used its technical expertise and experience, Petitioners cherry-pick the WQC's requirement that Transco also provide certain plans for NYSDEC's review and approval. Petitioners' selective argument not only ignores the fulsome record before the Court but also mischaracterizes the nature of the required plans.

While NYSDEC issued the WQC for the Project with requirements to submit certain compliance plans and monitoring measures for NYSDEC's review and approval, including a Dredge Management Plan;[7] a Suspended Sediment and Water Quality Monitoring Plan; a Sturgeon Acoustic Monitoring Plan; and three mitigation plans, these required plans were not a deferral of NYSDEC's obligation to ensure that the Project met water quality standards. *See* WQC [A1031, A1043, A1045, A1047, A1056.] Rather, these plans were *additional* protections incorporated into the WQC – not the basis for NYSDEC's determination. The administrative record,

---

[7] Condition 40 of the WQC specifies in detail the required components of the requited Dredge Management Plan. WQC [A1056].

including Transco's complete application, as supplemented and clarified, and the specific conditions in the WQC are what underlie NYSDEC's decision-making.

Notwithstanding, the required plans are binding requirements of the WQC, with specific submission dates to ensure ample time for NYSDEC's review and approval prior to the start of any authorized activities. *See* WQC [A1065.] Likewise, these binding conditions were also incorporated into other orders and permits that were necessary for the Project. *See* 2025 FERC Order, Environmental Condition 4 [A0981] (all conditions attached to the water quality certifications constitute mandatory conditions of the Certificate Order)*; see also,* Final 404 Permit, p. 4 ("All work shall be performed in accordance with . . . the New York State Department of Environmental Conservation Water Quality Certificate Number 2-9902-00109/00009 which are all hereby made part of this permit.").

Not only are the compliance and mitigation plans binding conditions incorporated into the WQC and other relevant permits, these plans also must be approved by NYSDEC prior to starting any construction activities in New York associated with the Project. *See* Permit Cover Letter [A1031] ("The applicable mitigation plans must be approved by NYSDEC prior to commencement of any Authorized Activities."); *see also*, WQC [A1043, A1045, A1047, A1056.]

To further ensure compliance with the water quality standards, Transco is required to conduct water quality monitoring, including visual turbidity monitoring

50

and real-time, in-situ TSS estimates. *See* Responsiveness Summary [A1099-A1100]; *see also* WQC [A1049.] This monitoring will be detailed, for NYSDEC review and approval, in a Sediment Sampling and Water Quality Monitoring Plan that must be approved by NYSDEC prior to the commencement of any construction. *See* Responsiveness Summary [A1100]; *see also* WQC [A1047.]

Further, per the WQC, Transco is required to employ an independent third-party monitor to conduct sampling and analysis and who will have "stop work" authority to be exercised if water quality monitoring demonstrates any issues. *See* Responsiveness Summary [A1091, A1100]; *see also* WQC [A1041.] Additionally, as a requirement of the WQC, Transco is required to implement NYSDEC-approved corrective actions in such instances. *See* Responsiveness Summary [A1100]; *see also* WQC [A1055.] The foregoing establish that the necessary guardrails are in place for NYSDEC to ensure that its certification of the Project, which was based on its review of Transco's application and supplemental submissions, translates into compliance once actual authorized activities and construction of the Project commences.

Plaintiff repeatedly relies on *Waterkeeper Alliance* for the proposition that reliance on future compliance plans cannot ensure compliance with water quality standards, however, this case is readily distinguishable. Initially, *Waterkeeper Alliance* is a case that involved the issuance of a Section 404 discharge permit – a

51

separate requirement of the Clean Water Act – and does not involve the issuance of a WQC. *See Waterkeeper Alliance*, 399 F.3d at 491. That case also centered on the preparation of a future "nutrient management plan" that was a requirement of the NPDES permit. *Id*. at 498-99. The future nutrient management plan yet to be promulgated was not subject to agency review nor were the terms of the plan included in the NPDES permit itself. *Id.* On these facts, the Court determined that the future nutrient management plan was an impermissible self-regulating permitting regime that empowered the agency to issue permits in the absence of any meaningful review of the terms of the plans to be developed. *Id.*

Unlike the nutrient management plan at issue in *Waterkeeper Alliance,* a water quality certificate is not a permit. Moreover, here, the compliance and mitigation plans remain subject to NYSDEC review and approval prior to the commencement of construction. Further, the Project remains subject to monitoring and oversight during construction to ensure ongoing compliance with water quality standards. In contrast to the future plans in *Waterkeeper Alliance*, there is nothing "self-regulating" about the future compliance and mitigation plans at issue.

Nor is there anything unusual about the manner in which the WQC was issued. For example, courts have upheld issuance of a WQC contingent upon acquisition of future permits and recognizes that doing so does not violate the CWA nor fail to ensure compliance with water quality standards. As articulated by the Third Circuit,

"[w]hen the Department conditions a Certification on the later acquisition of other permits, the agency may issue the Certification without engaging in the substantive review that will eventually be required to grant the permits." *See e.g., Del. Riverkeeper Network v. Sec'y Pa. Dep't. of Envtl. Prot*., 903 F.3d 65 (3d Cir. 2018) ("*Riverkeeper III*"), citing *Riverkeeper I*, 833 F.3d 360 (3d Cir. 2016).

In *Riverkeeper III*, the petitioners asserted that Pennsylvania's decision to issue a WQC for Transco's Atlantic Sunrise Project, conditioned on Transco obtaining substantive permits in the future, was arbitrary, capricious, or otherwise not in accordance with law. *Riverkeeper III*, 903 F.3d at 76. The petitioners claimed the agency's decision was arbitrary because it certified Atlantic Sunrise's water quality compliance based on a pledge that Transco would demonstrate substantive compliance in a future permit application rather than in the application for the WQC itself. *Id*. Like here, the petitioners argued that without a present demonstration of compliance, the agency's decision that Atlantic Sunrise would comply with Pennsylvania water quality standards could not have been based on anything but guesswork. *Id*. The Third Circuit rejected this argument noting that the agency's preferred procedure for considering Certifications along with other permits was not arbitrary or capricious in part because no construction could begin before the agency grants the substantive permits. *Id.*, citing *Riverkeeper I* at 386-87.

53

Insofar as the process of issuing a WQC contingent upon future submittals is customary, and because there is nothing "self-regulating" about NYSDEC retaining approval authority and oversight on these future compliance and mitigation plans, NYSDEC's decision to issue a WQC with specific permit conditions requiring Transco's submission and obtaining approval of specific compliance and mitigation plans was entirely rational.

It was also rational for NYSDEC to not subject these plans to public comment – many of which were available in draft form during the public comment period. NYSDEC has rules and procedures applicable to water quality certificates. *See generally* 6 N.Y.C.R.R. § 621; 6 N.Y.C.R.R. § 621.1(d) (including water quality certifications as an agency approval covered by Part 621). These rules and procedures require only that NYSDEC provide public notice and comment once an application is deemed complete. 6 N.Y.C.R.R. § 621.7(a). An application is "complete" where it "is in an approved form and is determined by the department to be complete for the purpose of commencing review of the application." 6 N.Y.C.R.R. § 621.2(g).[8] Here, NYSDEC did just that and allowed the public more time to comment than that which is required under Section 621 (45 days versus the

---

[8] Even after deeming an application "complete," NYSDEC reserves the right to require "supplement[ation] during the course of review to enable the department to make the findings and determinations required by law." 6 N.Y.C.R.R. § 621.2(g).

required 30 day minimum). The Clean Water Act does not mandate anything additional. *See* 33 U.S.C. §§ 1251(e) ("public participation . . . shall be provided for . . . by the States"), 1341(a)(1) (requiring only that each "State" "establish procedures for public notice . . . and hearings"). Nor does the case Petitioners cited suggest that NYSDEC had an obligation to do so given that the case does not involve a WQC. *Waterkeeper Alliance*, 399 F.3d 486 (2d Cir. 2005).

Petitioners' demands for additional public comment would result in unnecessary delay or successive public comment periods that would effectively prevent the NYSDEC from complying with Section 401's strict timing constraints which require action "within a reasonable period of time (which shall not exceed one year) after receipt of such request." 33 U.S.C. § 1341(a)(1).

## CONCLUSION

For the foregoing reasons, this Court should deny the petition *in toto*.

Dated: April 20, 2026                              Respectfully Submitted,

**BARCLAY DAMON, LLP**
By:    s\Yvonne E. Hennessey
Yvonne E. Hennessey
*Attorneys for Intervenor-Respondent,*
*Transcontinental Gas Pipe Line Company,*
*LLC*
80 State Street
Albany, New York 12207
(518) 429-4293
yhennessey@barclaydamon.com

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 12,867 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using MS Word in 14 pt Times New Roman.

Dated:  April 20, 2026                                    BARCLAY DAMON LLP

/S/ *Yvonne E. Hennessey*
YVONNE E. HENNESSEY
*Attorneys for Intervenor-Respondent,*
*Transcontinental Gas Pipe Line Company,*
*LLC*
80 State Street, 6th Floor
Albany, New York 12207
(518) 429-4200

56