# 25-2938

## United States Court of Appeals
*for the*
### Second Circuit

RARITAN BAYKEEPER, INC., FOOD & WATER WATCH, PROTECTORS OF PINE OAK WOODS, INC., SIERRA CLUB, SURFRIDER FOUNDATION, NATURAL RESOURCES DEFENSE COUNCIL, INC.,

*Petitioners,*

v.

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, AMANDA LEFTON, COMMISSIONER, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

*Respondents.*

ON PETITION FOR REVIEW FROM THE NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

## PETITIONERS' FINAL FORM BRIEF

SUSAN J. KRAHAM
NICHOLAS LOH
MONEEN NASMITH
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
212-284-8035
skraham@earthjustice.org

*Counsel for Petitioners Raritan Baykeeper, Inc., Food & Water Watch, Protectors of Pine Oak Woods, Inc., Sierra Club, and Surfrider Foundation*

*Additional counsel listed inside front cover*

ANN JAWORSKI
Earthjustice
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
773-245-0837
ajaworski@earthjustice.org

*Counsel for Petitioners Raritan Baykeeper, Inc., Food & Water Watch, Protectors of Pine Oak Woods, Inc., Sierra Club, and Surfrider Foundation*

JARED E. KNICLEY
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
202-513-6242
jknicley@nrdc.org

JACKSON P. GARRITY
Natural Resources Defense Council
20 North Wacker Drive Suite 1600
Chicago, IL 60606
312-995-5909
jgarrity@nrdc.org

MARK A. IZEMAN
Natural Resources Defense Council
40 West 20th Street 11th Floor
New York, NY 10011
212-727-4453
mizeman@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure, Petitioners make the following disclosures:

Petitioner Raritan Baykeeper, Inc., d/b/a NY/NJ Baykeeper is a nonprofit membership-based organization with a mission to protect, preserve, and restore the ecological integrity and productivity of the NY-NJ Harbor Estuary. NY/NJ Baykeeper has no parent companies, and there are no publicly held companies that have a ten percent (10%) or greater ownership interest in NY/NJ Baykeeper.

Petitioner Food & Water Watch is a 501(c)(3) not-for-profit organization founded in 2005 to ensure access to clean drinking water, safe and sustainable food, and a livable climate. Food & Water Watch has no parent companies, and there are no publicly held corporations that have a ten percent or greater ownership interest in Food & Water Watch.

Protectors of Pine Oak Woods is a Staten Island-based 501(c)(3) non-profit environmental preservation organization established in 1975. Protectors of Pine Oak Woods has no parent companies, and there are

i

no publicly held companies with a 10% or greater ownership interest in Protectors of Pine Oak Woods.

Petitioner Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment. Sierra Club is a non-governmental corporate party with no parent corporation, and there are no publicly held corporations that have a ten percent or greater ownership in Sierra Club.

Petitioner Surfrider Foundation is a non-profit environmental organization dedicated to the protection and enjoyment of the world's ocean, waves, and beaches, for all people. Surfrider has no parent companies, and there are no publicly held companies that have a ten percent or greater ownership interest in Surfrider.

Petitioner Natural Resources Defense Council (NRDC) is a nonprofit environmental and public health membership organization committed to protecting the public and environment through research and advocacy. NRDC has no parent corporation, and no publicly owned corporation has a ten percent or greater ownership interest in NRDC.

Dated: April 20, 2026

/s/ *Susan J. Kraham*
Susan J. Kraham
Moneen Nasmith
EARTHJUSTICE
48 Wall Street, 15th Floor
New York, NY 10005
212-284-8035
skraham@earthjustice.org
mnasmith@earthjustice.org

## TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................i

TABLE OF CONTENTS ...................................................iv

GLOSSARY......................................................................xii

JURISDICTIONAL STATEMENT.............................................1

PRELIMINARY STATEMENT .........................................1

ISSUES PRESENTED ....................................................3

STATEMENT OF THE CASE ..........................................3

    A.    NESE and the New York-New Jersey Harbor Estuary Ecosystem.........................................................4

    B.    Legal Framework...........................................8

    C.    Transco's Initial Application to FERC............9

    D.    Transco's Initial Application for a WQC........9

    E.    Expiration of the Certificate. ......................16

    F.    Speculation Regarding a Deal to Revive NESE...........16

    G.    Transco Seeks to Revive NESE....................18

    H.    NYSDEC reversed its position and issued the WQC...23

SUMMARY OF ARGUMENT......................................26

STANDARD OF REVIEW ............................................28

ARGUMENT.............................................................30

I.    Petitioners Have Standing. ................................30

II.    NYSDEC's failure to adequately explain its change of position is arbitrary and capricious. ....................32

A.    NYSDEC's reversed its position based on untested facts that contradict those underlying the previous conclusions. ..............................................34

B.    NYSDEC reliance on documents it failed to subject to public comment is arbitrary, capricious, and contrary to law. ........................................................39

III.  NYSDEC's reliance on uncertain, future compliance plans was unlawful. ...................................................48

A.    NYSDEC's reliance on future, uncertain compliance plans violated the Clean Water Act and principles of reasoned decision making...........................................50

1.    NYSDEC's requirement for a future Dredge Management Plan does not assure compliance with New York's water quality standards..........51

2.    The requirement for a future Suspended Solid and Water Quality Monitoring Plan does not assure compliance with New York water quality standards...........................................................57

3.    The requirement for a future Sturgeon Acoustic Monitoring Plan does not assure compliance with New York water quality standards....................60

4.    The requirement for future Water Quality Impact Mitigation Plans does not assure compliance with New York water quality standards....................62

v

B.    NYSDEC's reliance on future, uncertain compliance plans violated the Clean Water Act's public participation requirements ........................................... 65

IV.   The Court should vacate the Water Quality Certification ... 67

CONCLUSION ............................................................................... 69

CERTIFICATE OF COMPLIANCE ............................................... 71

vi

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allina Health Servs. v. Sebelius,*
746 F.3d 1102 (D.C. Cir. 2014) ........................................................ 43

*Am. Radio Relay League, Inc. v. FCC,*
524 F.3d 227 (D.C. Cir. 2008) .......................................................... 43

*Banner Health v. Price,*
867 F.3d 1323 (D.C. Cir. 2017) ........................................................ 43

*Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.,*
448 F.3d 138 (2d Cir. 2006) ............................................................. 31

*Central Jersey Safe Energy Coalition et al. v. FERC,*
Docket No. 25-1252 (D.C. Cir. filed Oct. 30, 2025) .......................... 23

*City & Cnty. of S.F. v. EPA,*
604 U.S. 334 (2025) ................................................................... 49, 61

*Cooling Water Intake Structure Coal. v. EPA,*
905 F.3d 49 (2d Cir. 2018) .............................................................. 43

*Ctr. for Biological Diversity v. Bernhardt,*
982 F.3d 723 (9th Cir. 2020) ........................................................... 64

*Encino Motorcars, LLC, v. Navarro,*
579 U.S. 211 (2016) ........................................................... 30, 33, 38

*Env't Def. Ctr. v. EPA,*
344 F.3d 832 (9th Cir. 2003) ........................................................... 39

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ................................................................. *passim*

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) .............................................................. 32

*Greater Yellowstone Coal., Inc. v. Servheen*,
  665 F.3d 1015 (9th Cir. 2011) ............................................. 64

*Guertin v. United States*,
  743 F.3d 382 (2d Cir. 2014) ................................................ 67

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................ 30

*Huntington Hospital v. Thompson*,
  319 F.3d 74 (2d Cir. 2002) ............................................ 33, 38

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ......................................... 41, 44

*Islander E. Pipeline Co., LLC v. McCarthy*,
  525 F.3d 141 (2d Cir. 2008) .......................................... 28, 29

*Jimenez-Cedillo v. Sessions*,
  885 F.3d 292 (4th Cir. 2018) .............................................. 30

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................ 33, 64

*N.Y. Pub. Int. Rsch. Grp., Inc. v. Johnson*,
  427 F.3d 172 (2d Cir. 2005) ................................................ 29

*N.Y. Pub. Int. Rsch. Grp. v. Whitman*,
  321 F.3d 316 (2d Cir. 2003) ................................................ 32

*Nat. Res. Def. Council v. EPA*,
  658 F.3d 200 (2d Cir. 2011) ................................................ 29

*Nat. Res. Def. Council v. EPA*,
  808 F.3d 556 (2d Cir. 2015) ........................................ *passim*

*Nat'l Audubon Soc'y v. Hoffman*,
132 F.3d 7 (2d Cir. 1997) ........................................................ *passim*

*National Wildlife Federation v. Marsh*,
568 F. Supp. 985 (D.D.C. 1983) ........................................................ 44

*New Jersey v. Bessent*,
149 F.4th 127 (2d Cir. 2025) ........................................................ 29

*New York v. FERC*,
783 F.3d 946 (2d Cir. 2015) ........................................................ 36

*O'Reilly v. U.S. Army Corps of Eng'rs*,
477 F.3d 225 (5th Cir. 2007) ........................................................ 62

*Ohio Valley Env't Coal. v. U.S. Army Corps of Eng'rs*,
674 F. Supp. 2d 783 (S.D.W.Va. 2009) ........................................................ 41

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ........................................................ 34

*Solite Corp. v. EPA*,
952 F.2d 473 (D.C. Cir. 1991) ........................................................ 41, 46

*U.S. Lines, Inc. v. Fed. Mar. Comm'n*,
584 F.2d 519 (D.C. Cir. 1978) ........................................................ 42

*United States v. Nova Scotia Food Prods. Corp.*,
568 F.2d 240 (2d Cir. 1977) ........................................................ 27, 46

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ........................................................ 67

*Waterkeeper All., Inc. v. EPA*,
399 F.3d 486 (2d Cir. 2005) ........................................................ *passim*

*World Shipping Council v. Fed. Mar. Comm'n*,
152 F.4th 215 (D.C. Cir. 2025) ........................................................ 59

## Statutes

Administrative Procedure Act, 5 U.S.C. §706(2)(A) .............................. 29

Natural Gas Act, 15 U.S.C.
§ 717f(e) ............................................................................................. 9
§ 717r(d)(1) ...................................................................................... 28

Clean Water Act, 33 U.S.C.
§ 1251(e) ........................................................................................... 66
§ 1311(b)(1)(C) ................................................................................. 48
§ 1313(c)(2)(A) ................................................................................. 40
§ 1341(a) ........................................................................... 10, 40, 51, 52
§ 1341(a)(1) ...................................................................... 28, 40, 48, 67
§ 1341(d) ................................................................................... *passim*
§ 1342(a)(2) ................................................................................ 48, 55
§ 1342(b) ........................................................................................... 48
§ 1344(h)(1)(A)(i), (B) ...................................................................... 49

National Environmental Policy Act, 422 U.S.C. § 4321 .......................... 9

N.Y. Env't Conserv. Law 70-0103(4) .................................................... 42

## Regulations

40 C.F.R. § 121.7(d) .............................................................................. 48

6 N.Y.C.R.R. 608.9(a) ........................................................................... 10

6 N.Y.C.R.R. 701.10, 701.11 ................................................................. 10

6 N.Y.C.R.R. 703 ................................................................................... 10

6 N.Y.C.R.R. 621.7 ................................................................................ 40

## Administrative Agency Proceedings

*Transcon. Gas Pipe Line Co.*,
187 FERC ¶ 61,145 (June 10, 2024) ................................................. 16

## GLOSSARY

| | |
|---|---|
| Certificate | Certificate of Public Convenience and Necessity |
| FEIS | Final Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| NESE | Northeast Supply Enhancement pipeline project |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| NYSDEC | New York State Department of Environmental Conservation |
| Project | Northeast Supply Enhancement pipeline project |
| Transco | Transcontinental Gas Pipe Line Company, LLC |
| WQC | Water Quality Certification |

xii

## JURISDICTIONAL STATEMENT

This petition seeks review of the New York State Department of Environmental Conservation's ("NYSDEC") November 7, 2025, water quality certification ("WQC"), under Clean Water Act § 401, 33 U.S.C. § 1341, that discharges related to Transcontinental Gas Pipe Line Company, LLC's ("Transco") proposed Northeast Supply Enhancement pipeline project ("NESE" or "Project") will not violate water quality standards. Because the NESE pipeline requires approval under Section 7 of the Natural Gas Act ("NGA"), this Court has jurisdiction under NGA Section 19(d)(1), 15 U.S.C. § 717r(d)(1).

## PRELIMINARY STATEMENT

Twice before, in 2019 and 2020, NYSDEC denied Transco's application for a WQC under Section 401 of the Clean Water Act for a gas pipeline called the NESE Project. NESE's construction would tear up over seventeen miles of sea floor in state waters in the New York Harbor, releasing sediment and toxic pollutants into the waters many important marine species and many millions of people rely on. In its prior denials, NYSDEC found that Transco could not ensure that the Project would comply with the state's water quality standards and

1

would in fact violate those standards. NYSDEC also found that that any proposed measures to minimize or mitigate the impacts were insufficient.

Five years later, buoyed by support from the Trump Administration, Transco applied again. What had changed in that time? Not the statute: The Clean Water Act still required the agency to affirmatively conclude the Project "will comply" with all state water quality standards before issuing a WQC. Not the state's standards: They still include limits for suspended solids and toxins like mercury and copper to protect marine ecosystems and human health. And not the Project itself: Transco admitted its 2025 application was essentially identical to the ones NYSDEC rejected five years earlier. Public comments emphasized that, with no material change in fact or law, NYSDEC had no choice but to again deny the application. Yet this time, NYSDEC granted the application.

NYSDEC's reversal was arbitrary and contrary to law. NYSDEC failed to rationally justify a change in outcome for an essentially identical project, instead taking arbitrary and unlawful actions: (1) relying on late-submitted "corrected" data on hard clam density from

2

Transco that it failed to subject to public comment to suggest that impacts could be managed and mitigated, and (2) punting the hard work of how to minimize those impacts to a later, equally non-public process in which Transco would submit plans detailing how it would limit pollution from dredging, monitor water quality, and mitigate harms to hard clams. The Clean Water Act and basic principles of rational decision making required much more. The Court should vacate the WQC.

## ISSUES PRESENTED

1. Did NYSDEC act arbitrarily and capriciously and in a manner contrary to law when it reversed its position that the NESE project would not comply with the Clean Water Act?

2. Did NYSDEC act arbitrarily and capriciously and in a manner contrary to law when it relied on uncertain, future compliance plans to find that the NESE project will comply with the Clean Water Act?

## STATEMENT OF THE CASE

This case seeks review of NYSDEC's decision to grant a Section 401 WQC for the NESE Project (Permit ID 2-9902-00109/00009, signed

by Karen M. Gaidasz) after previously denying the same application multiple times.

### A. NESE and the New York-New Jersey Harbor Estuary Ecosystem.

NESE is a proposed expansion of the Williams Company's Transco Pipeline that includes constructing a 26-inch-diameter pipeline loop off the New York and New Jersey coast. Project construction will tear up the sea floor, destroying habitats, increasing turbidity and sedimentation (i.e., the depositing of soil and silt into water), and resuspending buried contaminants including mercury, copper and arsenic.[1] This disturbance will increase suspended solids in the water column, which can impact sensitive species. Those impacts include copper's potential for drastic and immediate effects on aquatic life and mercury's bioaccumulative nature.[2]

---

[1] *See generally*, Final Environmental Impact Statement Part Two, *Transcontinental Gas Pipe Line Co., LLC*, FERC Docket No. CP17-101-000, Accession No. 20190125-3001 (January 25, 2019); Final Environmental Impact Statement Part One, *Transcontinental Gas Pipe Line Co., LLC*, FERC Docket No. CP17-101-000, Accession No. 20190125-3001, ES-10–ES-13 (January 25, 2019) ("FEIS") [A0325–A0328].
[2] *See* Letter from Daniel Whitehead, Director, Division of Environmental Permits, NYSDEC, to Joseph Dean, Manager,

The 17.4-mile New York portion of the pipeline would be buried in the seabed offshore in Queens and Richmond Counties, just south of Staten Island, Coney Island, and the Rockaways, in three connected waterbodies—Raritan Bay, Lower New York Bay, and the New York Bight section of the Atlantic Ocean.[3] NESE would then connect to an existing offshore pipeline at the Rockaway Transfer Point in Queens, New York.

The offshore pipeline construction's trenching, pipelaying, mooring and other activities will directly disturb 88 acres of seafloor.[4] The Project would require a 14,166 acre work area as well and a construction right-of-way ranging from 125 feet to 5,000 feet wide.[5] By Transco's own estimates, another 947 acres of the seafloor would be indirectly impacted by the suspension and redeposition of the sediments that churned up from the excavation and backfilling activities needed to bury the pipeline.[6]

---

Environmental Health and Safety, Transco 8–9 (May 15, 2020) ("2020 Denial") [A0441–A0442].

[3] FEIS at 4-50 [A0375].

[4] FEIS at 2-11 [A0354].

[5] *Id.*

[6] *Id.*

The bodies of water the Project will cross are collectively known as the New York-New Jersey Harbor Estuary ("Estuary") and provide important ecological services, host endangered and threatened species, and support a wide variety of recreational activities. There are public and private mechanized and non-mechanized boating.[7] Residents living in the area enjoy walking on the waterside, spending time on the beach, and activities like kitesurfing, surfing, bodysurfing, paddleboarding, kayaking, swimming, and sailing.[8] Recreational and sport fishing are also popular activities in the Project area,[9] and many people regularly consume locally-caught seafood.[10] People enjoy watching wildlife, including birds, dolphins, and whales that frequent the area.[11] Wildlife are also the subject of ongoing scientific study.[12] The Estuary's

---

[7] FEIS at 4-240, 4-265–4-266 [A0412, A0414–A0415].
[8] Braunwell Decl. ¶¶ 3–8; Carroll Decl. ¶¶ 6, 13; Flynn Decl. ¶¶ 5–11; McFarland Decl. ¶¶ 3–4; Mikaitis Decl. ¶¶ 3–4, 8–9; Pochan Decl. ¶¶ 4–5; Scarcella Decl. ¶ 8; Zandoli Decl. ¶ 4.
[9] FEIS at 4-265 [A0414].
[10] Braunwell Decl. ¶¶ 10, 14; Flynn Decl. ¶ 13; Leung Decl. ¶ 7; Mikaitis Decl. ¶ 11; Scarcella Decl. ¶ 9.
[11] FEIS at 4-265 [A0414]; Braunwell Decl. ¶ 9; Carroll Decl. ¶¶ 9–10; Flynn Decl. ¶¶ 5–11; Leung Decl. ¶¶ 3–5; McFarland Decl. ¶ 5; Mikaitis Decl. ¶ 9; Pochan Decl. ¶¶ 10–12; Ramírez-Garofalo Decl. ¶ 12; Scarcella Decl. ¶¶ 10–11; Stark Decl. ¶ 10; Zandoli Decl. ¶¶ 2, 4–5;
[12] Ramírez-Garofalo Decl. ¶¶ 4–8.

6

environment also supports various commercial activities, such as tour operators that offer kayaking and whale-watching excursions.[13]

The Project's construction will stretch across the entire Estuary and last for months, if not longer. Construction activities will make certain parts of the Estuary inaccessible, and the noise and disruption will drive away wildlife and boaters. Construction will involve large-scale disturbances of the seabed floor. The trenching, churning, and excavating activities required to bury the pipeline would threaten many species in the Project area including the clams, oysters, and mollusks and more than 200 fish species that together provide important ecosystem services[14] as well as ecological, commercial, and recreational value.[15] In particular, the Raritan Bay segment of the Project area is host to both a "sensitive habitat" and a "critical resource area" for hard

---

[13] FEIS at 4-265 [A0414]; Carroll Decl. ¶¶ 4–6; Flynn Decl.¶ 8; Pochan Decl. ¶ 11.

[14] NRDC et al., Comments on the Water Quality Certification Application for Transco's NESE Project, ID No. 2-9902-00109/00009 at 3 n.20, 4 n.28 (Aug. 15, 2025) ("Petitioners' Comments") (citing New York-New Jersey Harbor & Estuary Program, The State of the Estuary 2018 (2018), https://www.hudsonriver.org/NYNJHEPStateoftheEstuary.pdf) [A0896, A0897].

[15] FEIS at 4-98–4-99 [A0378–A0379].

clams.[16] According to NYSDEC, hard clams will face one hundred percent mortality from the trenching.[17] Other species of concern including the endangered Atlantic sturgeon and declining winter flounder are also found in the Project area.[18] Pipeline construction will also interfere with the hard-fought improvements in water quality and enhanced shoreline access that have contributed to a notable revitalization of recreational activities in the New York Harbor.[19]

### B.   Legal Framework.

To proceed with the Project, Transco was required to obtain a Certificate of Public Convenience and Necessity ("Certificate") from the Federal Energy Regulatory Commission ("FERC") under the NGA. To grant a Certificate, FERC must determine that the Project is required

---

[16] *Id.*; Letter from Daniel Whitehead, Director, Division of Environmental Permits, NYSDEC, to Joseph Dean, Manager, Environmental Health and Safety, Transco, at 7 (May 15, 2019) ("2019 Denial") [A0428].

[17] E-mail from Debra A. Barnes, Chief, Bureau of Shellfisheries, Division of Marine Resources, NYSDEC, to Sita Crounse et al., NYSDEC at 1 (Sept. 19, 2025, 02:59 PM EST) [A0999] ("We expect that there will be a 100% mortality of all clams (juveniles and adults) in the area of the trench . . .").

[18] FEIS at 4-118, 4-162, 4-184 [A0398, A0408, A0410].

[19] Petitioners' Comments at 4 n.31 [A0897].

by the present or future public convenience and necessity. 15 U.S.C.
§ 717f(e). FERC must also analyze the Project's potential
environmental impacts under the National Environmental Policy Act
("NEPA"). 42 U.S.C. § 4321 *et seq*. The Project also required Water
Quality Certifications under Section 401 of the Clean Water Act from
the States of New York and New Jersey and the Commonwealth of
Pennsylvania.

### C.     Transco's Initial Application to FERC.

On March 27, 2017, Transco submitted an application to FERC
for a Certificate to permit construction and operation of the NESE
pipeline.[20] On January 25, 2019, FERC issued the Final
Environmental Impact Statement ("FEIS") for the Project as was
required by NEPA. On May 3, 2019, FERC issued the Certificate to
Transco.[21]

### D.     Transco's Initial Application for a WQC.

On June 30, 2017, Transco submitted a Joint Permit Application
to NYSDEC seeking, among other permits, a WQC under Clean Water

---

[20] 2019 Denial at 2 [A0423].
[21] *Id*. at 2 n.7 [A0423].

9

Act Section 401 and related state regulations.[22] To issue a WQC, NYSDEC must determine that a project will "demonstrate compliance" with New York's water quality standards, 6 N.Y.C.R.R. 608.9(a), in particular, those designating best uses of each water body, 6 N.Y.C.R.R. 701.10, 701.11, and those establishing numeric and narrative standards, 6 N.Y.C.R.R. 703; *accord* 33 U.S.C. § 1341(a) (requiring finding the project "will comply" with water quality standards).

On April 20, 2018, NYSDEC denied the WQC application without prejudice, citing "incomplete information and the ongoing environmental review by FERC" relating to the Certificate application.[23] A month later, Transco submitted a new WQC application to NYSDEC.[24] Like the first application, this one included an environmental report and supporting resource reports Transco had submitted to FERC in support of its Certificate application. Based on sampling along the Project route, Transco established that in the most

---

[22] 2019 Denial at 1 n.2 [A0422].
[23] *Id.* at 3 (citing DEC Notice of Denial/Notice of Incomplete Application (April 20, 2018)) [A0424].
[24] *Id.*

10

productive hard clam area in Raritan Bay, hard clams occurred at an average density of 69.6 clams per square foot.[25]

Transco's obligatory modeling demonstrated that it could not meet the water quality standards without relying on a 500-foot mixing zone. A "mixing zone" is an area in a water body surrounding a discharge point where a regulator "will accept temporary exceedances of water quality standards resulting from short-term disruptions to the water body caused by dredging."[26] The premise is that the pollution will dissipate as it moves away from the discharge point towards the edges of the mixing zone. In technical guidance documents, NYSDEC highlights the need to avoid impairment to critical resource areas when determining the limits of a mixing zone and recognizes that where there is critical water use or sensitive habitat, its default 500-foot mixing zone is not appropriate.[27]

After Transco submitted several responses to NYSDEC requests

---

[25] FEIS at 4-101–4-102 [A0381–A0382]; 2019 Denial at 9–10 [A0430–A0431].

[26] NYSDEC, Division of Water, Technical & Operational Guidance Series (TOGS) 5.1.9: In-Water and Riparian Management of Sediment and Dredged Material 35–36 (Nov. 2004) [A0069–A0070].

[27] *Id.* at 36–37 [A0070–A0071].

for information,[28] NYSDEC noticed the application for public comment. Following the comment period, on May 15, 2019, NYSDEC denied the 2018 Application for a water quality certification without prejudice.[29]

NYSDEC determined that Transco was unable to demonstrate compliance with all applicable state water quality standards.[30] Referencing Transco's benthic survey and the FEIS, NYSDEC emphasized that "Raritan Bay is one of [the] last known highly productive hard clam beds in the State, and its benthic habitat is particularly critical and sensitive."[31] NYSDEC reviewed impacts described in the FEIS, including "suspension of sediments in the water column, which could clog fish gills . . . bury benthic and demersal species, resulting in mortality of eggs and other life stages."[32] Based on the record, NYSDEC "determined that . . . the construction of [NESE] would likely have significant water quality impacts in New York State"—particularly due to the resuspension of sediments and other

---

[28] 2019 Denial at 3 [A0424].
[29] *See id.* at 1 [A0422].
[30] *Id.* at 4 [A0425].
[31] *Id.* at 7 [A0428].
[32] FEIS at ES-11 [A0326].

12

contaminants, including mercury and copper—and found that, as proposed, NESE would "cause impacts to habitats due to the disturbance of shellfish beds and other benthic resources."[33] In addition, NYSDEC explained why it was rejecting a 500-foot mixing zone and questioned Transco's proposal to slow its rate of dredging, doubting Transco's ability to do so in light of time-of-year restrictions on construction required to protect sensitive species.[34]

Two days later, Transco submitted another WQC application to NYSDEC.[35] Transco stated that it was re-submitting all of the materials from its first and second WQC applications, including all attachments and supplements.[36] Transco's applications included modeling that showed that the construction would resuspend highly contaminated sediment in the Project area, releasing mercury and copper back into the water column.[37] In an attempt to show that it could comply with water quality standards, Transco continued to rely

---

[33] 2019 Denial at 3–4 [A0424–A0425].
[34] *Id.* at 6–8 [A0427–A0429].
[35] 2020 Denial at 1 [A0434].
[36] *Id.* at 3 [A0436].
[37] *Id.* at 6 [A0439].

on the 500-foot mixing zone and pollution dispersion modeling that assumed both a slower dredging rate and a slack tide pause—both of which would purportedly limit the amount of resuspension. But Transco failed to explain how it could adopt those measures in light of its proposed construction schedule and the time-of-year restrictions on construction required to protect sensitive species in the Project area.[38] Transco also assumed that sediments would be suspended at much lower rates than the rates assumed for other similar construction activities, thus artificially reducing the water quality impacts from resuspension.[39]

Petitioners and thousands of other interested parties submitted comments opposing the Application.[40] And once again, on May 15, 2020, NYSDEC denied Transco's application for a WQC without prejudice.[41] Again citing concerns regarding resuspension of sediments and contaminants and adverse impacts to hard shell clams and other habitats, NYSDEC determined that Transco had failed to demonstrate

---

[38] 2020 Denial at 11–12 [A0444–A0445].
[39] *Id.* at 7 [A0440].
[40] *See id.* at 1 [A0434].
[41] *Id.*

14

that NESE would comply with all applicable water quality standards,[42] and instead "determined that the construction of the [NESE] project would have adverse water quality impacts in New York State."[43]

NYSDEC's decision turned on its determination that "[g]iven the severity of the potential adverse impact to the unique natural resource of the hard clam critical resource area, Transco's proposed use of a default 500-foot mixing zone is not appropriate in this location."[44] NYSDEC also rejected the WQC, finding that because Transco's modeling showed exceedances of water quality standards at the edge of the mixing zone and that a mixing zone was inappropriate, NYSDEC "lack[ed] reasonable assurances that the Project would comply with applicable water quality standards, particularly without the use of a default 500-foot mixing zone for mercury and copper."[45]

In its denial, NYSDEC rejected the rate Transco used in its modeling to estimate how much sediment loss its jet trenching would cause. Finding that similar projects using the same trenching method

---

[42] 2020 Denial at 3–4 [A0436–A0437].

[43] *Id.* at 4 [A0437].

[44] *Id.* at 11 [A0444].

[45] *Id.* at 3–4 [A0436–A0437].

assumed much higher sediment loss rate and therefore more dispersion of contaminants,[46] NYSDEC concluded that it could not verify Transco's assumptions regarding the rates which, unless correct, would impact the water quality projections. Likewise, NYSDEC dismissed Transco's proposal to slow the dredging rate because "Transco has not provided sufficient documentation to the Department that any identified need to reduce the rate of dredging to comply with water quality standards would be possible within applicable work windows to protect important biological species."[47]

### E.    Expiration of the Certificate.

Transco did not appeal the 2020 denial. Instead, it withdrew its additional state permit applications, and the Certificate issued to Transco by FERC lapsed.[48] In June 2024, FERC officially vacated the Certificate.[49]

### F.    Speculation Regarding a Deal to Revive NESE.

After Transco's FERC certification lapsed, NESE was presumed

---

[46] *Id.* at 7 [A0440].
[47] *Id.* at 12 [A0445].
[48] *Transcon. Gas Pipe Line Co.,* 187 FERC ¶ 61,145, P 2 (June 10, 2024).
[49] *Id.* at P 3.

dead. That changed in Spring 2025 when the Trump Administration began pressuring New York to approve pipelines. On April 16, 2025, the U.S. Department of Interior issued a stop-work order for the Empire Wind offshore wind project,[50] which was fully permitted and on schedule to provide clean power to half a million homes in New York by early 2026. New York's Governor Hochul opposed the stop-work order and, on May 19, 2025, appeared to have negotiated a resolution with President Trump that would allow Empire Wind to proceed.[51] That day Secretary Burgum posted on X, "I am encouraged by Governor Hochul's comments about her willingness to move forward on critical pipeline capacity."[52] Several days later a White House spokesperson issued a

---

[50] Letter from Walter D. Cruickshank, Acting Director, Bureau of Ocean Energy Mgmt., U.S. Dep't of the Interior, to Matthew Brotmann, Secretary, Empire Offshore Wind LLC (April 16, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Director%26%23039%3Bs%20Order%20Empire%20Wind.pdf.

[51] Jennifer A. Dlouhy et al., *Trump Reverses NY Wind Farm Stance in Pipeline Deal With Hochul*, Bloomberg (May 20, 2025), https://www.energyconnects.com/news/utilities/2025/may/trump-reverses-ny-wind-farm-stance-in-pipeline-deal-with-hochul/.

[52] Secretary Doug Burgum (@Secretary Burgum), X (May 19, 2025, 9:32 PM EST), https://perma.cc/Y7SV-UJRT?type=image.

statement to Politico asserting that Governor Hochul had "caved on allowing two natural gas pipelines to advance in New York."[53]

### G. Transco Seeks to Revive NESE.

Several days later, on May 29, 2025, and more than eight years after its initial application, Transco submitted a Petition for Expedited Reissuance of Certificate Authority to FERC, requesting that the Certificate be reissued, permitting Transco to construct and operate NESE.[54] On May 30, 2025, five years after NYSDEC's third and most recent denial of Transco's WQC application, Transco again sought a section 401 WQC for the NESE pipeline from NYSDEC.[55] In its cover letter, Transco stated *"Transco is now resubmitting its application as it existed at the time of the [2020] Denial with substantially the same*

---

[53] E-mail from Harrison Fields, Special Assistant to the President and Principal Deputy Press Secretary, White House Office of the Press Secretary (May 23, 2025 at 01:44 PM EST).

[54] Petition of Transcontinental Gas Pipe Line Company, LLC. for Expedited Reissuance of Certificate Authority (Northeast Supply Enhancement Project), *Transcontinental Gas Pipe Line Co., LLC*, FERC Docket Nos. CP17-101-007 & CP20-49-001, Accession No. 20250529-5275 (May 29, 2025).

[55] *See* Letter from Jospeh Dean, Permitting Manager, Transco, to Karen M. Gaidasz, Director, Division of Environmental Permits, NYSDEC (May 30, 2025) ("Joint Application Filing Letter") [A0452].

*information.*"[56] The application continued to rely on the 2019 FEIS, which in turn relied on the resource reports prepared in 2016.[57]

On July 2, 2025, NYSDEC issued a notice of complete application and announced a 30-day public comment period.[58] In its notice, NYSDEC directed the public to Transco's website hosting the application documents and subsequent submissions. On July 23, 2025, NYSDEC extended the comment period for an additional two weeks.[59]

On August 15, 2025, based on its extensive review of Transco's application and supporting documents made available to the public, Petitioners submitted comments.[60] Petitioners' comments addressed both the substantive reasons that required NYSDEC to again deny the

---

[56] Joint Application Filing Letter at 3 (emphasis added) [A0454].
[57] *Id.*
[58] NYSDEC, *Notice of Complete Application* (July 2, 2025) [A0749, A0751].
[59] *Queens and Richmond Counties - Extension of Public Comments for the Northeast Supply Enhancement Project SPDES, Article 15 Permit, and Water Quality Certification Applications*, NYSDEC (July 23, 2025), https://dec.ny.gov/news/environmental-notice-bulletin/2025-07-23/public-notice/queens-and-richmond-counties-extension-of-public-comments-for-the-northeast-supply-enhancement-project-spdes-article-15-permit-and-water-quality-certification-applications.
[60] NRDC et al., Attachment Email Mariana Lo Subject: Comments on the Water Quality Certification Application for Transco's NESE Project, ID No. 2-9902-00109/00009 (Aug. 15, 2025) [A0893].

19

WQC and the fact that no new information had been provided that undermined NYSDEC's prior denials. Petitioners highlighted the fact that in its 2020 denial, NYSDEC found, on the record before it, that a 500-foot mixing zone was not appropriate given the density of hard clams, the sensitivity of the hard clam habitat, the bioaccumulative nature of the contaminants, and that Transco could not meet the water quality standards without a mixing zone. Petitioners also highlighted the absence of any new data or other information in the record before the public that would support a change of position.

The Administrative Record reflects that even staff within NYSDEC were puzzled by renewed discussion of a mixing zone. When asked on August 6, 2025—mere days before the public comment period closed—whether a 500-foot mixing zone for mercury could be problematic for hard claims, the Chief of Shellfisheries stated: "I thought the previous denial for the project was based on the calculations provided by TRANSCO that the project would exceed [water quality] standards for mercury and copper in areas along the pipeline route using the default 500 ft mixing zone that were

20

documented as important hard clam habitat."[61] But nonetheless, at some point after issuing public notice, NYSDEC decided to reverse itself and accept the use of mixing zones for measuring Total Suspended Solids, Mercury, Copper, and other contaminants.[62]

Curiously, nearly 10 years after conducting its benthic survey, submitting its resource reports, having the data incorporated into the FEIS, relying on that survey data at FERC and in multiple applications to NYSDEC and other agencies, and after the close of the comment period,[63] Transco suddenly announced that its assessment of hard clam density in the Project area was wrong. It was not 69.6 clams per square foot, but 3.0.[64] Transco did not know and could not explain

---

[61] E-mail from Debra A. Barnes, Chief, Bureau of Shellfisheries, Division of Marine Resources, NYSDEC, to Rhianna Bozzi, Marine Biologist II, Division of Marine Resources, NYSDEC at 1 (Aug. 6, 2025 11:33 AM EST) [A0891].

[62] *See* NYSDEC, Permit Under the Environmental Conservation Law (ECL): Excavation & Fill in Navigable Waters – ECL Article 15, Title 5 & Water Quality Certification – Under Section 401 – Clean Water Act, ECL Article 15 at ¶ 33(d)–(e) (Nov. 7, 2025) ("NESE WQC") [A1050].

[63] NYSDEC, NESE Timeline [A1127].

[64] Transco initially restated the clam density at 3.4 hard clams per square foot but explained that after digitizing a map and readjusting the sampling stations along the route, the density was 3.7 clams per square foot. Transcontinental Gas Pipe Line Co., LLC, Williams/Transco Response to NYSDEC Question During Meeting on

21

how it got the number wrong the first time.[65] But NYSDEC did not question the new number and did not make this information available to the public. Petitioners never had the opportunity to vet the dramatic data revision or provide relevant responsive material to NYSDEC.

Similarly, after the close of the comment period, Transco submitted information that it claimed would support the sediment loss rate it used in its modeling—the same rate that NYSDEC had rejected in 2020.[66] This information was not made available to the public, and Petitioners never had the opportunity to assess it or provide any relevant responsive material.

While the WQC application was pending before NYSDEC, FERC granted Transco's petition to reissue the Certificate. *Transcontinental Gas Pipe Line Co., LLC,* 192 FERC ¶ 61,184 (Aug. 28, 2025). A Petition

---

September 19, 2025 (Request Paraphrased) and Data Clarification 4 (Sept. 22, 2025) ("Williams/Transco Response") [A1008]. However, in an email submitted to NYSDEC explaining its transmission to FERC regarding the "correction," Transco stated that the density was 3.0 clams per square foot. E-mail from Joseph Dean, Transco, to Cheryl Sandrow et al., NYSDEC (Sept. 24, 2025, 06:14 PM EST) [A1017].

[65] Williams/Transco Response at 3 n.1 [A1007].

[66] Daniel Mendelsohn, Innovative Environmental Science, Jet Trencher Sediment Loss Rate Memorandum (August 20, 2025) ("Loss Rate Memorandum") [A0917].

for Review of that decision is pending at the U.S. Court of Appeals for the District of Columbia Circuit. *See Central Jersey Safe Energy Coalition et al. v. FERC*, Docket No. 25-1252 (D.C. Cir. filed Oct. 30, 2025).

## H.   NYSDEC reversed its position and issued the WQC.

On November 7, 2025, NYSDEC issued the WQC.[67] Though its prior denials had concluded, based on the record, that the adverse impact on hard clam habitat could not be mitigated; that mixing zones were not appropriate; and that it could not rely on the proffered sediment loss rate, this time, NYSDEC gave the greenlight. In attempting to explain its complete reversal, NYSDEC relied specifically on the "correction to the hard clam density."[68] NYSDEC concluded that due to the reduction in density, "impacts to the hard clam area can be minimized to a level that can be adequately mitigated

---

[67] NYSDEC, Northeast Supply Enhancement Project Section 401 Water Quality Certification and Article 15 Excavation and Fill Permit Cover Letter (Nov. 7, 2025) ("Nov. 7, 2025 Permit Cover Letter") [A1029].
[68] NYSDEC, Responsiveness Summary: Northeast Supply Enhancement (NESE) Pipeline Project NYSDEC Permit ID 2-9902-00109 SPDES NY 0296457 at 21 (Nov. 7, 2025) ("Responsiveness Summary") [A1105].

for through the imposition of various conditions in the WQC."[69]

NYSDEC changed position on other findings as well. Despite its prior determination that mixing zones were inappropriate in the hard clam area, this time, and without explanation, NYSDEC called the 500-foot mixing zone "conservative" and "protective."[70] NYSDEC also appeared to discount the need for strict adherence to water quality standards. Despite having determined twice previously that the Project could not meet the water quality standards, NYSDEC asserted that it could now grant the certification because it learned in the interim "that even with conservative conditions in place, limit exceedances can occur."[71]

Though NYSDEC relied on the protections of the WQC's time-of-year restrictions for endangered and threatened species, it simultaneously gave Transco permission to violate those provisions provided Transco mitigates for impacts after the fact[72]—failing to determine in advance whether mitigation after the fact is possible.

---

[69] *Id.*

[70] *Id.* at 15, 21 [A1099, A1105].

[71] *Id.* at 21 [A1105].

[72] NESE WQC ¶ 21 [A1043– A1044].

NYSDEC also accepted Transco's sediment loss rate, which it previously rejected, based on "additional correspondence with the applicant," but again without the benefit of any public comment on the issue.[73]

Recognizing that the WQC's explicit terms were not enough, NYSDEC also required Transco to develop plans to help ensure the Project's compliance with water quality standards. This included plans NYSDEC considered necessary to minimize water quality impacts and maintain "best usages of the waterbody;"[74] to "mitigate for impacts to water quality and maintain the best usages of the waterbody;"[75] and to evaluate and ensure compliance with water quality standards and permit limits.[76] NYSDEC did not, however, include the substance of those plans in the WQC. The WQC instead simply required Transco to submit proposed plans for NYSDEC's review at later dates.[77] Despite

---

[73] Responsiveness Summary at 16 [A1100].

[74] NESE WQC ¶¶ 20, 40 [A1043, A1056].

[75] *Id.* ¶ 25 [A1045].

[76] *Id.* ¶ 29 [A1047].

[77] NYSDEC, Northeast Supply Enhancement Project Section 401 Water Quality Certification and Article 15 Excavation and Fill Permit Appendix A at 1 (Nov. 7, 2025) [A1035].

the asserted importance of these compliance plans to NYSDEC's decision to issue the WQC, NYSDEC did not know—or at least did not publicly disclose—the substantive content of these plans when it issued the WQC.

On November 18, 2025, Petitioners filed this Petition for Review.

## SUMMARY OF ARGUMENT

NYSDEC's decision to grant the WQC for NESE, after denying it twice before based on Transco's failure to show it could comply with the state's water quality standards, was arbitrary, capricious, and contrary to law.

The central piece of information the agency cites to justify its change in position—Transco's twenty-fold revision of its own, nearly-decade-old calculation of hard clam density along the Project's path—was given to NYSDEC more than a month after public comment closed. NYSDEC's uncritical acceptance of that "corrected" clam data failed to provide the detailed justification needed to support its change in position. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And its failure to subject that "corrected" data to public comment was itself unlawful, *see Waterkeeper All., Inc. v. EPA*, 399 F.3d

26

486, 503 (2d Cir. 2005), and effectively precluded the agency's consideration of all relevant factors when making its decision, *see United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 251 (2d Cir. 1977).

NYSDEC's WQC also violated the Clean Water Act because NYSDEC unlawfully punted the details of numerous "plans" defining how Transco would allegedly comply with New York's water quality standards to later, non-public processes. *See Waterkeeper All.*, 399 F.3d at 498–99. Rather than finalizing the terms of these important plans—which would include how Transco would limit pollution from dredging, monitor water quality, and mitigate harms to hard clams—before issuing the WQC, NYSDEC left it to Transco to propose plans later. The WQC's requirement for uncertain, future plans does nothing to ensure the compliance with water quality standards that the Clean Water Act requires. *See Waterkeeper All.*, 399 F.3d at 499; *see also* 33 U.S.C. § 1341(d). For the same reason, NYSDEC could not rationally rely on those future, uncertain plans to conclude that NESE will comply with the state's water quality standards. *See Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 16–17 (2d Cir. 1997).

These significant errors require vacatur of the WQC. NYSDEC's reliance on critical information it did not subject to public comment, as well as its deferral of numerous key compliance plans until later, non-public processes, leaves Petitioners and this Court without any way to meaningfully evaluate the agency's conclusion, this time around, that Transco "will comply" with state water quality standards. 33 U.S.C. § 1341(a)(1). Vacatur is the only way to ensure NYSDEC cures these significant errors before the Project is built and before the damage from dredging causes the exact pollution that NYSDEC inadequately considered and controlled when it granted the WQC.

## STANDARD OF REVIEW

In reviewing Section 401 water quality certifications under NGA Section 19(d)(1), 15 U.S.C. § 717r(d)(1), this Court uses a two-step process. First, the Court reviews *de novo* whether the state complied with the relevant legal requirements. *See Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 150 (2d Cir. 2008). "If no illegality is uncovered during such a review," the Court examines the findings and conclusions in the water quality certification under the federal Administrative Procedure Act (APA)'s arbitrary-and-capricious

standard of review. *Id.* (quoting *Islander E. Pipeline Co., LLC v. Conn. Dep't. of Env't Prot.*, 482 F.3d 79, 94–95 (2d Cir. 2006)) (internal quotation marks and citation omitted).

The APA requires the Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). To survive arbitrary and capricious review, an agency must articulate "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *New Jersey v. Bessent*, 149 F.4th 127, 152 (2d Cir. 2025) (quoting *New York v. Raimondo*, 84 F.4th 102, 106–107 (2d Cir. 2023)) (internal citations omitted). An agency decision is arbitrary and capricious if it "offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat. Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

An agency action also is arbitrary and capricious where the agency fails to explain adequately a reversal of position. *See N.Y. Pub.*

29

*Int. Rsch. Grp., Inc. v. Johnson*, 427 F.3d 172, 182 (2d Cir. 2005) (setting aside EPA determination where "EPA failed to supply a reasoned basis for the 180[degree] turn"). In changing its position, an agency must demonstrate awareness that it is changing its position and provide a reasoned explanation for the change. *Encino Motorcars, LLC, v. Navarro*, 579 U.S. 211, 221 (2016). "An 'unexplained inconsistency' in agency policy indicates that the agency's action is arbitrary and capricious, and therefore unlawful." *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018) (citing *Encino Motorcars*, 885 F.3d at 222).

## ARGUMENT

### I.   Petitioners Have Standing.

Petitioners have standing to bring this case on behalf of their members who would be harmed by the Project's construction and operation and would otherwise have standing to sue in their own right. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The suit is germane to Petitioners' organizational interests. *See* Fed. R. App. P. 26.1. Neither the claims asserted, nor the relief requested, require participation of individual members in this lawsuit.

30

*See Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v.*

*Downtown Dev., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006).

The construction of NESE's offshore pipeline will harm Petitioners' members. If the pipeline were constructed, members would reduce their water-based recreation or travel to different, less convenient locations to recreate to avoid exposure to construction-related pollution that would harm their health. Braunwell Decl. ¶¶ 11–13; Carroll Decl. ¶ 14; Mikaitis Decl. ¶ 10; McFarland Decl. ¶¶ 6–7; Pochan Decl. ¶¶ 6–7; Scarcella Decl. ¶ 12; Zandoli Decl. ¶ 6. Members worry that the pollution and disturbance from construction of the offshore pipeline will decrease their recreational and aesthetic enjoyment of the New York Harbor by disrupting the aquatic ecosystem and harming the species that they enjoy watching on or near the water. Braunwell Decl. ¶ 15; Carroll Decl. ¶¶ 9–10; Flynn Decl. ¶¶ 12; Leung Decl. ¶ 6; Mikaitis Decl. ¶ 10; McFarland Decl. ¶ 8; Pochan Decl. ¶¶ 13–14; Ramírez-Garofalo Decl. ¶ 14; Scarcella Decl. ¶ 11; Stark Decl. ¶¶ 11–12; Zandoli Decl. ¶ 6. The Project poses a risk to one member's canoe and kayak tour business because construction will make the Bay a less desirable location to kayak and drive away his customers. Carroll Decl.

31

¶¶ 7–12. An ecologist member worries that habitat disturbance from pipeline construction, including resuspension of sediment and heavy metals, will negatively impact species that he studies, impeding his ability to observe and research them. Ramírez-Garofalo Decl. ¶¶ 9–11. Members will reduce or stop their consumption of locally-caught seafood if the offshore portion of NESE is constructed because of fears the pollution will taint the seafood. Braunwell Decl. ¶¶ 10, 14; Flynn Decl. ¶ 13; Leung Decl. ¶ 7; Mikaitis Decl. ¶ 11; Scarcella Decl. ¶¶ 11–12.

These harms to the members' recreational, aesthetic, economic, academic, and health-based interests constitute concrete injuries in fact. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184–85 (2000); *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 325–326 (2d Cir. 2003). Because these injuries are traceable to NESE, and redressable by a Court order vacating the WQC, Petitioners have standing to sue on behalf of these members.

## II. NYSDEC's failure to adequately explain its change of position is arbitrary and capricious.

NYSDEC reviewed the NESE application for a water quality certification four times. The first three times, it rejected the application.

32

Case: 25-2938, 04/20/2026, DktEntry: 69.1, Page 47 of 191

In the latter two rejections, it found decisively that Transco had not demonstrated that it could comply with New York's water quality standards. On the fourth application, which rested on "substantially the same"[78] information and materials, NYSDEC reversed its position. And while an agency may change its position, it must adequately explain the basis for doing so. NYSDEC did not do so here.

An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm,* 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). When an agency changes its position, it must provide reasoned analysis for the later inconsistent decision. *See Encino Motorcars*, 579 U.S. at 221; *Huntington Hospital v. Thompson*, 319 F.3d 74, 79 (2d Cir. 2002). An agency must acknowledge that it has changed its position and demonstrate that there are good reasons to do so. *See Fox,* 556 U.S. at 515. The explanation must wrestle with the facts that supported the initial position. Where the factual basis for the agency's

---

[78] Joint Application Filing Letter at 3 [A0454].

change of position contradicts the basis for its earlier position, the agency is obligated to offer an even "more substantial justification," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015), to justify "disregarding facts and circumstances that underlay or were engendered" by the earlier position, *Fox*, 556 U.S. at 516.

While NYSDEC acknowledged its change of position, its explanation falls far short of the "more substantial justification" the law requires. *Perez*, 575 U.S. at 106. To the extent that NYSDEC "explained" its change of position in its decision documents, it relied on information that contradicted the underlying facts and information it failed to subject to public comment. These compounded failures undermine any purported explanation of the change of position, are arbitrary, capricious, or contrary to law and require vacatur of the WQC.

### A. NYSDEC's reversed its position based on untested facts that contradict those underlying the previous conclusions.

In its prior denials, NYSDEC explained in detail that the Project would have significant adverse impacts on hard clams and their critical habitat and that, because of those impacts and the nature of the

34

contaminants resuspended by the Project, a mixing zone was not appropriate.[79] Without a mixing zone, the Project could not comply with New York's water quality standards.

Transco conceded that its May 30, 2025, application was "its application as it existed at the time of the [2020] [d]enial with substantially the same information."[80] That application continued to rely on the FEIS and the underlying benthic studies and sampling data that were nearly ten years old. And then, on September 22, 2025, nearly four months after submitting its 2025 application and more than a month after the public comment period closed, Transco informed NYSDEC that "the 2019 [FEIS] presents an incorrect overestimate of hard clam density value."[81] Transco had no explanation for the more than twenty-fold "discrepancy"—it simply stated that the reason for the mistake was not yet clear.[82] But despite this egregious error, NYSDEC never investigated the underlying sampling and never confirmed its accuracy or whether there were other errors. NYSDEC did not require

---

[79] 2019 Denial at 7 [A0428]; 2020 Denial at 4 [A0437].
[80] Joint Application Filing Letter at 3 [A0454].
[81] Williams/Transco Response at 3 [A1007].
[82] *Id.*

any additional sampling or ground truthing of the actual hard clam density.

This revision in hard clam density was a fundamental, material change and was the basis for NYSDEC's about face—in fact, it was the key determinant. Explaining its reversal of its most recent denial, NYSDEC said:

> *As a threshold matter, since the time of the 2020 WQC denial, Transco identified and corrected an error in the underlying FEIS . . .* **with the correction to the hard clam density, NYSDEC has now determined that impacts to the hard clam area can be minimized to a level that can be adequately mitigated for through the imposition of various conditions in the WQC.**[83]

That "correction" allowed NYSDEC to conclude that Transco could mitigate adverse impacts and that it could allow a mixing zone.[84]

Since NYSDEC's change of position rested on factual findings that contradicted its prior position, it was required to "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox*, 556 U.S. at 515; *see also New York v. FERC*, 783

---

[83] Responsiveness Summary at 20–21 (emphasis added) [A1104–A1105].
[84] *Id.*

F.3d 946, 958 (2d Cir. 2015) (noting that a new decision is not arbitrary and capricious when it is "supported by reasoned decisionmaking and there are no circumstances requiring further explanation, such as contradictory findings of fact or substantial reliable interests on the old rule"). But it did not do so.

Nowhere in its decisional documents did NYSDEC explain the contradiction or indicate any substantial investigation to accurately determine the hard clam density. Having accepted the "reported discrepancy," NYSDEC was obliged to, but failed to, confirm the validity of the data and all other conclusions drawn from it. Nowhere in its decision documents did NYSDEC explain why, despite Transco's significant calculation error, NYSDEC continued to rely on Transco's initial sampling. Instead, it simply acquiesced to the unexplained assertion that for nearly 10 years Transco had repeatedly relied on, and induced state and federal agencies to rely on, incorrect calculations that it was now correcting.[85]

---

[85] While NYSDEC stated in the Responsiveness Summary that "NYSDEC staff has evaluated the raw data Transco relied upon in making this conclusion and has confirmed its accuracy," Responsiveness Summary at 21 [A1105], the only document in the record that suggests

37

Equally important, NYSDEC did not explain why, based on the new density calculation, impacts to the species would be reduced to a level that was now acceptable under the state's water quality standards.[86] In its prior decision, DEC denied the WQC because Transco had not shown mitigation would be possible or sufficient. DEC then reversed this finding[87] without providing a reasoned analysis for the later inconsistent decision. *See Encino Motorcars*, 579 U.S. at 221; *Huntington Hospital*, 319 F.3d at 79. Even on a blank slate, NYSDEC could not rely on an aspirational mitigation plan to conclude the project "will comply" with water quality standards. *See infra* Argument Section III.

NYSDEC's explanation, without a "more detailed justification," cannot carry the weight of the agency's complete change of position from its prior denials. *See Fox*, 556 U.S. at 515.

---

any investigation is a copy of two pages from Appendix J to Transco's application with a handwritten note that says "D.Barnes Calculations" and on which there are handwritten numbers that appear to calculate the number of clams and find an average density. Barnes HC density Calculations for Revised Clam Density (2025) [A1108].

[86] Responsiveness Summary at 21 [A1105].

[87] *Compare* Responsiveness Summary at 21 [A1105], and 2019 Denial at 4 [A0425].

### B. NYSDEC reliance on documents it failed to subject to public comment is arbitrary, capricious, and contrary to law.

NYSDEC cannot justify its change of position when it did not disclose the dispositive data to the public for comment. NYSDEC failed to make information material—indeed, apparently dispositive—to its decision available to the public for comment, running afoul of bedrock requirements of the Clean Water Act and administrative procedure. This fundamental procedural error alone requires setting aside the WQC. That failure also renders NYSDEC's use of the "corrected" hard clam data as its justification for changing position arbitrary and capricious.

The Clean Water Act as well as federal and state administrative law mandate robust public comment in agency permitting decisions. Public participation is a core component of the Clean Water Act. *See Waterkeeper All.,* 399 F.3d at 503 ("Congress clearly intended to guarantee the public a meaningful role in the implementation of the Clean Water Act."); *see also Env't Def. Ctr. v. EPA*, 344 F.3d 832, 856 (9th Cir. 2003) ("Congress identified public participation rights as a critical means of advancing the goals of the Clean Water Act in its

39

primary statement of the Act's approach and philosophy."). Indeed "[p]ublic participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this Act shall be provided for, encouraged, and assisted by the Administrator and the States." *Waterkeeper All.*, 399 F.3d at 503 (quoting 33 U.S.C. § 1251(e)) (internal quotation marks omitted).

These principles apply equally to Section 401 of the Act. Section 401 requires states to certify that a discharge from a proposed project "will comply" with the Clean Water Act, 33 U.S.C. § 1341(a), which, due to the Act's embrace of cooperative federalism, includes a state's water quality standards and effluent limitations. *See id.* § 1313(c)(2)(A). Reflecting the Clean Water Act's mandate that States "provide[] for, encourage[], and assist[]" robust public participation, *id.* § 1251(e), Section 401 requires states to establish procedures for public notice, *id.* § 1341(a)(1). For this purpose, New York adopted the requirements in its uniform application procedures. *See* 6 N.Y.C.R.R. § 621.7.

Courts assessing the adequacy of notice and comment in Clean Water Act permitting have required "adequate public notice and

40

comment and predecisional public involvement." *Ohio Valley Env't Coal. v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783, 788 (S.D.W.Va. 2009). In *Ohio Valley*, the Army Corps materially relied on a mitigation plan submitted after the close of the public comment when issuing a permit under Section 404 of the Clean Water Act. *Id.* at 794–95. The Court concluded that the Corps had failed to meet the public comment requirements. It specifically explained that "disclosure is necessary because it is this detail and data that allow the public to generate meaningful criticism, which serves as the basis for meaningful comment." *Id.* at 802. Particularly because the mitigation plan was a central factor in the Corps' decision, the lack of public notice of those plans prior to the permit's entry "deprived" the plaintiffs "of an existing procedural right—the right to comment intelligently." *Id.* at 804. Other courts have reached similar conclusions. *See also Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (holding that "[f]ailure to provide the public with an opportunity to review" a report pivotal to the agency's determination "constitutes a significant procedural error"); *Solite Corp. v. EPA*, 952 F.2d 473, 499 (D.C. Cir. 1991) (citing *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1028–31 (D.C.

41

Cir. 1978)) (remand required when "neither the new data nor the calculations of the new factors had been opened for public comment").

Federal administrative law accords great weight to "the right to comment" and "the opportunity to be heard." *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 540 (D.C. Cir. 1978). So does New York law. *See* N.Y. Env't Conserv. Law 70-0103(4) ("It is the intent of the legislature to encourage public participation in government review and decision-making processes and to promote public understanding of all government activities."). But these requirements are "of little or no significance when [the public] is not apprised of the issues and positions to which argument is relevant," thus preventing "any exchange of views and any real dialogue as to the final decision" and reducing public participation to mere "illusion." *U.S. Lines*, 584 F.2d at 540. This is the case whether the agency withholds a key document or relies on a key document submitted after the comment period because the result—no meaningful opportunity to comment on those threshold issues—is the same.

The same holds true in the analogous rulemaking context. There, the D.C. Circuit has "held for many years that an agency's failure to

42

disclose *critical* material, on which it relies, deprives commenters of a right . . . 'to participate in rulemaking.'" *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (emphasis in original) (citing *Air Transp. Ass'n of Am. v. F.A.A.,* 169 F.3d 1, 7 (D.C. Cir. 1999) (quoting 5 U.S.C. § 553). Indeed, this critical-material doctrine provides that "'among the information that must be revealed for public evaluation are the technical studies and data upon which the agency relies in its rulemaking.'" *Banner Health v. Price*, 867 F.3d 1323, 1336 (D.C. Cir. 2017) (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008)). Without providing this data, commenters cannot "point out where . . . information is erroneous or where the agency may be drawing improper conclusions." *Am. Radio Relay League*, 524 F.3d at 236; *cf. Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 78 (2d Cir. 2018) (noting that if scientific material were the basis for an agency decision, the public would be entitled to review and comment).

Where, as here, information is critical to the agency decision, there can be no question that it must be subject to public scrutiny and comment. Considering the extent of public participation required for a

dredge-and-fill permit under Section 404 of the Clean Water Act, the court in *National Wildlife Federation v. Marsh,* 568 F. Supp. 985 (D.D.C. 1983), determined that the public had a right to the disclosure of "the rationale and pivotal data underlying [the Corps'] proposed action *before* the close of the comment and hearing period." *Id.* at 994 (emphasis in original). The *Marsh* court found that inclusion of a staff evaluation—"perhaps the most important document influencing the [Corps'] decision"—only "after the close of the comment and hearing period had the effect of shielding the essential data and the agency's rationale from public hearing and comment." *Id.* at 994–95; *see also Idaho Farm Bureau*, 58 F.3d at 1403 (need for notice and comment "greatly heightened" where document was central to agency determination).

In this case, NYSDEC denied the public the opportunity to comment on a fundamental, material change in the hard clam data that was dispositive. It was, in NYSDEC's words, the "threshold" basis for its decision to issue the WQC that it had denied several times before.[88]

---

[88] *See* Responsiveness Summary at 20 [A1104].

44

In doing so, NYSDEC violated the basic public participation requirements of the Clean Water Act and administrative law. This approach would violate the law even if NYSDEC had been considering the application on a blank slate. Withholding key information from public comment is even more problematic when—as here—NYSDEC had an obligation to provide a "more detailed justification" for its about-face from the earlier denials. *Fox*, 556 U.S. at 515.

NYSDEC also denied the public an opportunity to comment on another important issue: the sediment loss rate for jet trenching activities. In its 2020 Denial, NYSDEC had concluded that there was no basis provided for Transco's proposed 5% rate, and that other projects it had reviewed assumed a 25% or 30% sediment loss rate.[89] Transco did not provide new information regarding the sediment loss rate in its 2025 application. Nor did it provide any additional information before the public comment period started. Only in late August, after public comment had closed, did Transco submit a memorandum with data to support its 5% sediment loss rate.[90] NYSDEC again accepted that

---

[89] 2020 Denial at 7 [A0440].
[90] Loss Rate Memorandum [A0917].

information uncritically and (with minimal explanation) relied upon that information in its decisional documents, all without subjecting it to public comment.[91]

NYSDEC's failures to provide public comment on key information are not solely procedural. A central purpose of robust public participation is to promote rational decision making. As this Court has explained, "the failure to notify interested persons of the scientific research upon which the agency was relying" can be tantamount to the failure to "consider[] all 'the relevant factors.'" *Nova Scotia Food Prods.*, 568 F.2d at 251. Indeed, without public comment on key information, a reviewing court cannot be certain that "further and ultimately convincing public criticism" of the undisclosed data "would not have been forthcoming had it been invited." *Solite Corp.*, 952 F.2d at 500 (quoting *Weyerhaeuser*, 590 F.2d at 1031).

That is the case here. For instance, NYSDEC's failure to provide the public an opportunity to comment on purportedly "corrected" hard clam density calculations that were key to its decision prevented

---

[91] Responsiveness Summary at 16 [A1100].

46

Petitioners from meaningfully commenting on the application. Had NYSDEC disclosed the exponential revision of the clam density and its intention to rely on it, Petitioners would have raised significant concerns in their comments. Petitioners might have engaged experts to address the validity of the "new" data, whether it supported the conclusions NYSDEC drew from it, whether the impacts could be mitigated and any number of other issues. Petitioners' comments would have provided significant information relevant to the agency's decision-making and its explanation for changing its position. Instead, NYSDEC denied Petitioners the opportunity to meaningfully participate and denied itself the benefits of considering Petitioners' comments on this important issue. So too for the sediment loss rate.

For the same reasons, NYSDEC cannot rely on the purportedly "corrected" information to "explain" its change of position. NYSDEC's issuance of the WQC was arbitrary and capricious because NYSDEC failed to discharge its obligations to meaningfully engage the public; it precluded consideration of all relevant factors; and it failed to adequately explain its change of position.

47

### III. NYSDEC's reliance on uncertain, future compliance plans was unlawful.

"The Clean Water Act demands regulation in fact, not only in principle." *Waterkeeper All.*, 399 F.3d at 498. Section 401(a) fulfills this demand by requiring that a state agency issuing a water quality certification make an affirmative finding that the project "will comply" with applicable water quality standards. 33 U.S.C. § 1341(a)(1). If the agency determines that additional requirements are necessary to make that finding, the agency may grant the certification "with conditions." 40 C.F.R. § 121.7(d). In those circumstances, Section 401(d) requires that the certification "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that [the project] will comply" with applicable water quality standards. 33 U.S.C. § 1341(d).

On these basic points, Section 401's structure mirrors other permitting provisions in the Clean Water Act. Those provisions similarly require that permits "assure compliance" with applicable water quality requirements. *See* 33 U.S.C. § 1342(a)(2); *see also id.* § 1311(b)(1)(C) ("necessary to meet"); *id.* § 1342(b) ("insure

48

compliance"); *id.* § 1344(h)(1)(A)(i), (B) ("assure compliance"). To do so, a permit must do more than "state[] the desired result"—that is, compliance. *See City & Cnty. of S.F. v. EPA*, 604 U.S. 334, 347 (2025). Instead, it must "set[] out actions that must be taken," *id.*, or otherwise provide "specific guidelines" on how to comply, *see Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 578 (2d Cir. 2015) (rejecting requirement to control discharges "as necessary to meet applicable water quality standards"). And those terms must be included in the permit itself, not plans developed outside of the permit process. *Waterkeeper All.*, 399 F.3d at 502.

NYSDEC violated these requirements by issuing a WQC that relies on Transco's *future* submission of plans to minimize, mitigate, and monitor the project's water quality impacts. Although NYSDEC found that these plans were necessary to assure compliance with state water quality standards, the WQC deferred Transco's submission and the agency's consideration of these plans to a future process. But without those necessary compliance plans in place, NYSDEC could not rationally conclude that Transco would comply with the state's water quality standards. NYSDEC's figure-it-out-later approach violated the

49

Clean Water Act's requirement that the terms of the WQC assure compliance, as well as the Act's requirements for meaningful public participation.

## A. NYSDEC's reliance on future, uncertain compliance plans violated the Clean Water Act and principles of reasoned decision making.

NYSDEC's decision to issue the WQC based, in part, on Transco's future submission of six plans—a "Dredge Management Plan"; a "Suspended Sediment and Water Quality Monitoring Plan"; a "Sturgeon Acoustic Monitoring Plan"; and three "Water Quality Mitigation" plans for marine species—was arbitrary and contrary to law.[92] Section 401(d) required that any "limitations" and "monitoring requirements" that are "necessary to assure" compliance be included as part of the WQC. 33 U.S.C. § 1341(d). NYSDEC could not, as it did here, defer its consideration (let alone approval) of the limitations and requirements in those plans until *after* it issued the WQC. Nor could NYSDEC, without

---

[92] NYSDEC's reliance on a seventh future plan—the "Environmental Compliance Plan," NESE WQC ¶ 18 [A1042], is also unlawful, as that plan would incorporate terms from and explain how Transco would implement other future plans, including the Dredge Management Plan, NESE WQC ¶ 18(d)(iv) [A1042].

knowledge of the specific substance of those future plans, rationally rely on those plans to conclude that NESE "will comply" with the applicable water quality standards. *Id.* § 1341(a).

### 1. NYSDEC's requirement for a future Dredge Management Plan does not assure compliance with New York's water quality standards.

The principal water quality impacts from NESE stem from the dredging needed to install and bury the more than 17 miles of underwater pipeline in New York state waters. The lynchpin of the WQC's controls on these impacts is its requirement that Transco prepare a Dredge Management Plan "[t]o minimize, to the greatest extent practicable, water quality impacts and maintain best usages of the waterbody."[93]

NYSDEC relied heavily on its requirement for a Dredge Management Plan when it issued the WQC. The agency described the plan as a reflection of "new information relating to in-water construction-related water quality impacts and measures to appropriately avoid and minimize such impacts."[94] It explained that the

---

[93] NESE WQC ¶ 40 [A1056].
[94] Nov. 7, 2025 Permit Cover Letter Cover Letter at 3 [A1031].

51

plan was a "measure[]" to "maintain water quality" during construction by detailing "BMPs" (best management practices) to avoid water quality exceedances, and "adaptive management procedures" to respond when potential exceedances were detected.[95] And it claimed the plan justified its change-in-position on dredging rates, because the plan "needs to include reduced dredge rates as necessary to comply with water quality standards."[96] In short, NYSDEC considered the plan necessary for Transco "to meet the New York State water quality standards,"[97] especially where Transco's modeling "predicted the potential for [total suspended solid] concentrations to exceed [water quality] limits."[98]

The WQC's mere requirement of a future Dredge Management Plan, however, does not "assure" compliance with water quality standards. 33 U.S.C. § 1341(d). Nor could NYSDEC rely on such an uncertain plan to conclude NESE "will comply" with those standards. *Id.* § 1341(a). Indeed, the WQC left important details about dredge

---

[95] Responsiveness Summary at 15 [A1099].
[96] *Id.* at 21 [A1105].
[97] *Id.* at 17 [A1101].
[98] NYSDEC, NESE Fact Sheet Appended to the NYSDEC SPDES Permit 10 (Nov. 7, 2025) [A1076].

52

management for Transco to develop *after* the WQC was issued. For example, it requires Transco's plan to "[d]escribe . . . details of the dredging rate"; to "discuss[] proposed controls to comply with" water quality standards; to "[d]escribe procedures for complying with dredging requirements"; and to "[d]escribe operational controls and adaptive management options that may be implemented for potential exceedances and corrective action scenarios."[99] But the Clean Water Act required that the WQC contain "specific guidelines" for these rates, controls, procedures, and adaptive management practices needed to assure (or regain) compliance, *see Nat. Res. Def. Council*, 808 F.3d at 578, not punt those details to a future plan outside of the Section 401 permitting process.

The generality of other dredging requirements in the WQC underscores the problem with NYSDEC's approach. While the WQC contains some specific conditions for dredging,[100] many conditions just direct Transco to operate in ways that minimize impacts. For example,

---

[99] NESE WQC ¶ 40(a), (d), (e) [A1056].
[100] NESE WQC at ¶ 41(e) [A1057] (prohibiting "use of a dragline for dredging").

53

Transco must: operate equipment "in a manner that minimizes re-suspension of sediments"; limit "potential acoustic impacts . . . to the minimum necessary"; and investigate and repair "[e]xcessive loss of water/material from the bucket."[101] The WQC leaves it to Transco, through the later Dredge Management Plan, to fill in the details of *how* it will "comply[] with" those vague "dredging requirements."[102] And with so much of the *how* left up in the air, NYSDEC could not rationally assess *how effective* any actual dredge management would be.

This Court's decision in *Waterkeeper Alliance* is illustrative. That case considered an EPA rule requiring certain agricultural operations seeking a permit under Clean Water Act Section 402 to prepare a "nutrient management plan" that addressed how the operation would apply nutrients on fields in a way that "minimize[d] nitrogen and phosphorous movement to surface waters." *Waterkeeper All.*, 399 F.3d at 499. The rule, however, required neither EPA review of the plan before the permit issued nor inclusion of the plan's terms in the permit. *Id.* at 498.

---

[101] *Id.* ¶ 41(a), (c), (h) [A1057].
[102] *Id.* ¶ 40(d) [A1056].

The Court struck down the rule on both counts as arbitrary and contrary to the Clean Water Act. *Id.* The Court explained that, because the rule did not require EPA to "review the nutrient management plans developed by [permittees] *before issuing a permit,*" the rule did "nothing to *ensure*" compliance with water quality standards. *Id.* at 499 (first emphasis added). And the Court held that the failure to include the terms of the plans in the permit violated the Clean Water Act's mandate that "all applicable effluent limitations must be included in each [Section 402] permit." *Id.* at 502. Rather than ensuring compliance, the rule's decision to punt material limitations to separate plans prevented anyone—EPA, the public, or the Court—from determining that compliance was assured when a permit was issued.

So too here. Section 401, like Section 402, requires that permits include the conditions needed to "assure compliance with" water quality standards. *Compare* 33 U.S.C. § 1341(d), *with* 33 U.S.C. § 1342(a)(2). While NYSDEC required Transco to submit its Dredge Management Plan for agency review, it did not require that this happen *before*

55

issuing the WQC.[103] Nor did (or could) the agency include the terms of that as-yet-prepared plan in the WQC.

NYSDEC therefore failed "to fulfill its duty to regulate in fact, not only in principle." *Nat. Res. Def. Council*, 808 F.3d at 578 (citing *Waterkeeper All.*, 399 F.3d at 498) (internal quotation marks omitted). The WQC's requirement of the future, uncertain plan "does nothing to ensure" compliance with water quality standards. *Waterkeeper All.*, 399 F.3d at 499. And because the purpose of the Dredge Management Plan is to explain *how* Transco will ensure compliance with water quality standards (and other limits), NYSDEC could not rely on that future, uncertain plan to affirmatively conclude NESE will comply. *See id.*; *see also Nat'l Audubon Soc'y*, 132 F.3d at 17 (requiring that "mitigation measures be supported by substantial evidence" to support a finding of no significant impact under NEPA). NYSDEC's issuance of the WQC, in

---

[103] Unlike with other plans required by the WQC, the terms of the WQC do not require NYSDEC to approve the Dredge Management Plan before construction starts. *See* NESE WQC ¶ 40 [A1056]; *contra* Responsiveness Summary at 15 [A1099] (stating the plan "must be approved" before construction can start).

56

reliance on the requirement for a Dredge Management Plan, was thus arbitrary and contrary to Section 401.

> ### 2. The requirement for a future Suspended Solid and Water Quality Monitoring Plan does not assure compliance with New York water quality standards.

Effective monitoring is just as important as specific permit limitations for ensuring compliance with applicable standards. *See Nat. Res. Def. Council*, 808 F.3d at 581 (citing *Nat. Res. Def. Council v. Cnty. of L.A.*, 725 F.3d 1194, 1208 (9th Cir. 2013)). Recognizing this, the WQC required that Transco prepare a Suspended Solid and Water Quality Monitoring plan to ensure NESE would "meet New York state water quality standards."[104] But NYSDEC also deferred this Plan until after it issued the WQC. This again violated the Clean Water Act and was arbitrary and capricious.

As with the Dredge Management Plan, NYSDEC acknowledged the importance of the Monitoring Plan when it issued the WQC.[105] And

---

[104] *See* Responsiveness Summary at 16–17 [A1100–A1101].

[105] *See* NESE WQC ¶ 29 [A1047] (requiring the Monitoring Plan "[i]n order to measure compliance"); Responsiveness Summary at 16 [A1100] (requiring the Monitoring Plan "[t]o comply with the [applicable] water quality standards").

as with the Dredge Management Plan, NYSDEC punted the "details" of the Monitoring Plan to a later date.[106]

It was arbitrary for NYSDEC to conclude the WQC would assure compliance when basic monitoring details were deferred to a later, non-public process. *See Waterkeeper All.*, 399 F.3d at 499. These missing details go to fundamental aspects of the monitoring program for NESE, like "how sampling and monitoring will take place, including the sample location, depth of samples, frequency of sampling," and "methodologies for the sampling," as well as "how Transco will conduct turbidity monitoring to comply with the narrative standard," and what Transco will do "if exceedances occur."[107]

And these details are far from academic. For example, while Transco plans to work "24/7," it told NYSDEC it did not intend to conduct "visual turbidity monitoring" during overnight hours.[108] Yet the WQC delays resolution of "how [Transco] will ensure compliance . . .

---

[106] Responsiveness Summary at 16 [A1100].
[107] *Id.*; *see also* NESE WQC ¶ 29(a)(b), (d), (g)–(h), (k), (m)–(n) [A1047].
[108] Transcontinental Gas Pipe Line Co., Attachment 1: Responses to Request for Additional Information dated July 15, 2025 Revised July 28, 2025 at 16 (July 28, 2025) [A0775].

58

during nightwork," if not by visual monitoring,[109] to the future Monitoring Plan.[110]

The deferral of the Monitoring Plan violated the Clean Water Act's requirement that plans necessary to ensure compliance be subject to prior agency review and incorporated into the terms of the permit. *Waterkeeper All.*, 399 F.3d at 502–03. On this point, Section 401(d) could not be clearer: A water quality certificate "shall set forth any . . . monitoring requirements necessary to assure that [the project] will comply." 33 U.S.C. § 1341(d). The WQC's failure to do so was contrary to law.

---

[109] *See* NESE WQC ¶ 29(k) [A1047].

[110] Complicating things further, NYSDEC relies on an assertion that "all in-water construction and removal activities would be conducted during daylight hours"—that is, there would be *no* nighttime work—to justify its conclusion that certain other impacts will be minimal. Responsiveness Summary at 12 [A1096]. Such unexplained, internal inconsistencies are a hallmark of arbitrary agency action. *See, e.g.*, *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 220–22 (D.C. Cir. 2025).

### 3. The requirement for a future Sturgeon Acoustic Monitoring Plan does not assure compliance with New York water quality standards.

The WQC's reliance on future a "Sturgeon Acoustic Monitoring Plan,"[111] is unlawful for the same reasons as the Dredge Management and Water Quality Monitoring Plans.

To "minimize impacts to Atlantic and shortnose Sturgeon," the WQC generally forbids construction during half the year: March through June, and October through November.[112] Presumably recognizing that Transco would not be able to build the project under those time restrictions,[113] the WQC offers Transco a ticket of out those restrictions if it "develop[s]" the Sturgeon Plan.[114] It states that this future plan must "detail[] the methodology for detecting" sturgeon during the restricted times and the "best management practices upon detection of sturgeon."[115] The WQC provides no additional detail on

---

[111] *See* NESE WQC ¶ 20 [A1043].

[112] *Id.* ¶ 19(a) [A1043].

[113] *Cf.* 2019 Denial at 8–9 [A0429–A0430].

[114] *See* NESE WQC ¶ 19(b) [A1043].

[115] *See* NESE WQC ¶ 20(a)–(b) [A1043]. The latter term is a significant (and unexplained) change from 2020, when NYSDEC had determined (in its application denial) that *no* construction could occur during

60

what monitoring methodology will be required, nor what Transco must do to protect sturgeon when detected.

The WQC's vague requirements fall short of the specificity the Clean Water Act requires. *City & Cnty. of S.F.*, 604 U.S. at 347; *Nat. Res. Def. Council,* 808 F.3d at 578. And NYSDEC could not cure that defect by deferring the details to a post-WQC plan. *See Waterkeeper All.*, 399 F.3d at 499.

The WQC also violates the distinct requirement that mitigation measures relied on to justify a statutory finding—here, that Transco "will comply" with water quality standards related to sturgeon—must be specific and supported by the record. As the Court explained in *National Audubon Society*, agencies can rely on proposed mitigation to reduce impacts enough to satisfy a legal standard (there, "no significant impacts" under NEPA), but only if "the adequacy of [those] proposed mitigation measures is supported by substantial evidence." 132 F.3d at 17. The Court rejected the agency's proposed mitigation (closing of a road) because it was not backed up by agency studies and did not

---

restricted times when sturgeon were present. *See* 2020 Denial at 12 [A0445].

include conditions to ensure it reduced the relevant impacts (all-terrain vehicle use). *Id.* at 16–17.

The record here provides no evidence—much less "substantial evidence"—to support the adequacy of the envisioned Sturgeon Plan. The WQC's inclusion of "only cursory detail as to what those measures" in the Sturgeon Plan might be, and "how they serve to reduce [relevant] impacts" to sturgeon to permissible levels, is not enough. *See O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 234 (5th Cir. 2007). NYSDEC's reliance on the Sturgeon Plan to purportedly "assure" compliance with the state's water quality standards, *see* 33 U.S.C. § 1341(d), was therefore arbitrary and contrary to law.

### 4. The requirement for future Water Quality Impact Mitigation Plans does not assure compliance with New York water quality standards.

The WQC's reliance on future mitigation plans for sturgeon, hard clam, and winter flounder "to mitigate impacts to water quality and maintain the best usages of the waterbody,"[116] was also arbitrary and contrary to law.

---

[116] NESE WQC ¶ 25 [A1045]; *see also* Responsiveness Summary at 12–13 [A1096–A1097].

NYSDEC's requirement for mitigation recognizes that NESE will have "unavoidable water quality impacts, including those to sturgeon, winter flounder, and hard clams."[117] Indeed, when it issued the WQC, NYSDEC estimated mitigation costs potentially exceeding $23 million for those species.[118]

The WQC, however, leaves until later the development of any mitigation measures. For sturgeon and winter flounder, Transco must submit plans "demonstrating proposed mitigation measures that will result in an overall benefit" to those species.[119] And for hard clams, it must submit a plan "demonstrating proposed mitigation measures that will result in an overall benefit to hard clams" not in the Project area, but "in New York State" as a whole.[120] These general requirements do

---

[117] Nov. 7, 2025 Permit Cover Letter at 2 [A1030].

[118] *Id.* at 3 [A1031]. Before NYSDEC accepted the "corrected" hard clam density, *supra* pp. 22, its staff estimated the mitigation required for hard clams alone would be far higher—with one estimate exceeding $100 million. NYSDEC, NESE Hard Clam Mitigation 1 (2025) [A1107]. Without explaining why, however, NYSDEC "tried to stay within the $24–30 million range" to keep mitigation costs down. *See* E-mail from Debra A. Barnes, Chief, Bureau of Shellfisheries, Division of Marine Resources, NYSDEC, to Sita Crounse et al., NYSDEC at 1 (Sept. 19, 2025, 03:07 PM EST) [A0999].

[119] NESE WQC ¶ 25(a), (c) [A1045].

[120] NESE WQC ¶ 25(b) [A1045].

not provide the type of specific, "substantial evidence" needed to show that these plans, once proposed and adopted, will be adequate to mitigate water quality impacts and maintain the best uses of the waterbody. *Nat'l Audubon Soc'y*, 132 F.3d at 17; *see also Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) ("[M]itigation measures cannot refer only to generalized contingencies or gesture at hopeful plans.").

To be sure, NYSDEC may not be able to finalize the precise mitigation measures required (and their costs) until after NESE is complete, and its full impacts on protected species are understood.[121] But citing "uncertainty" alone does not constitute rational decision making. *See Nat. Res. Def. Council*, 808 F.3d at 578; *State Farm*, 463 U.S. at 51–52. While NYSDEC did not need to finalize exact details before granting a WQC, it needed to provide "more specific" information about what the mitigation projects "might be" and "why they would be reasonably likely to mitigate" the Project's harms to the protected species. *See Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015,

---

[121] *See* Nov. 7, 2025 Permit Cover Letter at 3 [A1031].

64

1029 (9th Cir. 2011). Or, as NYSDEC explained in its 2019 Denial, it needed enough information to "conclude that mitigation of these impacts is possible, and, if so, that such mitigation is sufficient."[122]

NYSDEC's failure to provide those details leaves the public—and this Court—without any way to evaluate the "adequacy" of the hypothetical mitigation and renders NYSDEC's reliance on the mitigation plans arbitrary and contrary to law. *See Nat'l Audubon Soc'y*, 132 F.3d at 17.

### B. NYSDEC's reliance on future, uncertain compliance plans violated the Clean Water Act's public participation requirements.

NYSDEC's deferral of its compliance plans also violated the Clean Water Act's separate requirements for public participation.

*Waterkeeper Alliance* again controls. In addition to holding that the EPA rule at issue in that case violated the Clean Water Act's mandate to "regulat[e] in fact, not only in principle," 399 F.3d at 498, the Court also held that it violated the Act's "public participation

---

[122] 2019 Denial at 4 [A0425].

requirements." *Id.* at 503. The Court explained that "Congress clearly intended to guarantee the public a meaningful role" in the Act's implementation. *Id.* And the Court explained that EPA's failure to include the terms of the nutrient management plans at issue in the permits themselves, and failure to guarantee the public would have access to those plans once submitted, "deprive[d] the public of the opportunity for the sort of regulatory participation that the Act guarantees" by "effectively shield[ing]" those plans "from public scrutiny and comment," *Waterkeeper All.,* 399 F.3d at 503, and deprived the public of its enforcement role. *Id.* at 503–04.

So too here. The Clean Water Act's mandate for meaningful public participation extends to Section 401. *See* 33 U.S.C. §§ 1251(e) ("public participation . . . shall be provided for . . . by the States"), 1341(a)(1) (requiring each "State" to "establish procedures for public notice . . . and hearings"), 1365(a)(1), (f) (allowing private enforcement of water quality certificates). The compliance plans are—under NYSDEC's own theory— "a critical[ly] indispensable feature" of the WQC. *Waterkeeper All.*, 399 F.3d at 504. Yet NYSDEC's deferral of those compliance plans "forestalls—rather than 'provid[es] for, encourag[es], and assist[s]'—

66

public participation in the development and enforcement of" the plans. *Id.* (quoting 33 U.S.C. § 1251(e)). This approach was arbitrary and violated the "plain dictates" of the Clean Water Act. *Id.*

## IV.   The Court should vacate the Water Quality Certification.

Vacatur is the "usual" remedy when agency action is found to be arbitrary, capricious or contrary to law. *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)). There is no reason to depart from the default remedy here.

Here, NYSDEC's failures go to the heart of the Section 401 process. The agency's failure to allow the public to comment on key information that it relied on to justify the WQC, and the punting of key compliance plans to a later, non-public process, were contrary to law. And what limited rationale the agency did provide fell far short of the "substantial justification" needed for such a stark change in position after the three prior WQC denials. The agency's hide-the-ball approach leaves the public and this Court without any way to meaningfully evaluate the agency's conclusion, this time around, that Transco "will comply" with state water quality standards. 33 U.S.C. § 1341(a)(1).

67

Vacatur and remand of the WQC is the only way to ensure NYSDEC is required to cure these significant errors—to take comment on the clam density data, verify the data's accuracy, and consider the comments and results; develop detailed enough compliance plans to decide whether those plans would effectively protect water quality; and better explain any change in position it retains—before the Project is built and dredging causes the pollution that NYSDEC has failed to ensure "will comply" with water quality standards. For this reason, the Court should apply the default remedy and vacate.

## CONCLUSION

For the reasons above, this Court should grant the petition and vacate and remand NYSDEC's decision to grant a water quality certification for the NESE pipeline.

Dated: April 20, 2026

Respectfully submitted,

*/s/ Susan J. Kraham*
Susan J. Kraham
Nicholas Loh
Moneen Nasmith
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
212-284-8035
skraham@earthjustice.org
mnasmith@earthjustice.org

Ann Jaworski
Earthjustice
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
773-245-0837
ajaworski@earthjustice.org

*Counsel for Petitioners Raritan Baykeeper, Inc., Food & Water Watch, Protectors of Pine Oak Woods, Inc., Sierra Club, and Surfrider Foundation*

69

*/s/ Jared E. Knicley*
Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
202-513-6242
jknicley@nrdc.org

Jackson P. Garrity
Natural Resources Defense Council
20 North Wacker Drive Suite 1600
Chicago, IL 60606
312-995-5909
jgarrity@nrdc.org

Mark A. Izeman
Natural Resources Defense Council
40 West 20th Street 11th Floor
New York, NY 10011
212-727-4453
mizeman@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

# CERTIFICATE OF COMPLIANCE

I, Susan J. Kraham, do hereby certify, pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure as follows:

1.      This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A), because it contains 12,796 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: April 20, 2026

*/s/ Susan J. Kraham*
Susan J. Kraham

*Counsel for Petitioners Raritan Baykeeper, Inc., Food & Water Watch, Protectors of Pine Oak Woods, Inc., Sierra Club, and Surfrider Foundation*

71

# 25-2938

## United States Court of Appeals
### *for the*
### Second Circuit

RARITAN BAYKEEPER, INC., FOOD & WATER WATCH,
PROTECTORS OF PINE OAK WOODS, INC., SIERRA CLUB,
SURFRIDER FOUNDATION, NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

*Petitioners,*

v.

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION, AMANDA LEFTON, COMMISSIONER, NEW
YORK STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION, TRANSCONTINENTAL GAS PIPE LINE
COMPANY, LLC,

*Respondents.*

ON PETITION FOR REVIEW FROM THE NEW YORK STATE DEPARTMENT
OF ENVIRONMENTAL CONSERVATION

## ADDENDUM TO PETITIONERS' FINAL FORM BRIEF

SUSAN J. KRAHAM
NICHOLAS LOH
MONEEN NASMITH
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
212-284-8035
skraham@earthjustice.org

*Counsel for Petitioners Raritan
Baykeeper, Inc., Food & Water
Watch, Protectors of Pine Oak
Woods, Inc., Sierra Club, and
Surfrider Foundation*

*Additional counsel listed inside
front cover*

ANN JAWORSKI
Earthjustice
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
773-245-0837
ajaworski@earthjustice.org

*Counsel for Petitioners Raritan Baykeeper, Inc., Food & Water Watch, Protectors of Pine Oak Woods, Inc., Sierra Club, and Surfrider Foundation*

JARED E. KNICLEY
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
202-513-6242
jknicley@nrdc.org

JACKSON P. GARRITY
Natural Resources Defense Council
20 North Wacker Drive Suite 1600
Chicago, IL 60606
312-995-5909
jgarrity@nrdc.org

MARK A. IZEMAN
Natural Resources Defense Council
40 West 20th Street 11th Floor
New York, NY 10011
212-727-4453
mizeman@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

## ADDENDUM TABLE OF CONTENTS

**Page number**

**STATUTES**

**Administrative Procedure Act**

5 U.S.C. § 706 ................................................................AD003

**Clean Water Act**

33 U.S.C. § 1251 ...........................................................AD004

33 U.S.C. § 1311 ...........................................................AD004

33 U.S.C. § 1313 ...........................................................AD007

33 U.S.C. § 1341 ...........................................................AD007

33 U.S.C. § 1342 ...........................................................AD012

33 U.S.C. § 1344 ...........................................................AD016

33 U.S.C. § 1365 ...........................................................AD031

**National Environmental Policy Act**

42 U.S.C.A. § 4321.........................................................AD032

**Natural Gas Act**

15 U.S.C. § 717f.............................................................AD033

15 U.S.C. § 717r.............................................................AD033

**New York Environmental Conservation Law**

N.Y. Env't Conserv. Law § 70-0103 ......................................AD034

**REGULATIONS**

**Code of Federal Regulations**

40 C.F.R. § 121.7 ...........................................................AD035

**New York Codes, Rules, and Regulations**

6 N.Y.C.R.R. 608.9.........................................................AD036

6 N.Y.C.R.R. 621.7.........................................................AD037

1

AD001

6 N.Y.C.R.R. 701.10.................................................................AD044

6 N.Y.C.R.R. 701.11.................................................................AD044

6 N.Y.C.R.R. 703.1...................................................................AD044

6 N.Y.C.R.R. 703.2...................................................................AD045

6 N.Y.C.R.R. 703.3...................................................................AD047

**STANDING DECLARATIONS**

Declaration of Lisa Braunwell.............................................AD050

Declaration of Daniel Carroll...............................................AD056

Declaration of Joan Flynn....................................................AD061

Declaration of Katie Leung..................................................AD066

Declaration of Taylor McFarland .........................................AD069

Declaration of Susan Mikaitis .............................................AD074

Declaration of Saylor Pochan...............................................AD078

Declaration of José Ramírez-Garofalo...................................AD084

Declaration of James Scarcella............................................AD090

Declaration of Judith C. Stark..............................................AD096

Declaration of Valerie Zandoli.............................................AD102

2

AD002

## STATUTES

### Administrative Procedure Act, 5 U.S.C. Ch. 7

### 5 U.S.C. § 706: Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   (B) contrary to constitutional right, power, privilege, or immunity;

   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

   (D) without observance of procedure required by law;

   (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

   (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

3

AD003

**Clean Water Act, 33 U.S.C. Ch. 26**

**33 U.S.C. § 1251: Congressional declaration of goals and policy**

. . .

**(d)  Administrator of Environmental Protection Agency to administer chapter**

Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") shall administer this chapter.

**(e)  Public participation in development, revision, and enforcement of any regulation, etc.**

Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

**(f)  Procedures utilized for implementing chapter**

It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

**33 U.S.C. § 1311: Effluent limitations**

. . .

**(b)  Timetable for achievement of objectives**

4

AD004

In order to carry out the objective of this chapter there shall be achieved--

**(1)**

    **(A)** not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 1314(b) of this title, or (ii) in the case of a discharge into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, which shall require compliance with any applicable pretreatment requirements and any requirements under section 1317 of this title; and

    **(B)** or publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 1283 of this title prior to June 30, 1974 (for which construction must be completed within four years of approval), effluent limitations based upon secondary treatment as defined by the Administrator pursuant to section 1314(d)(1) of this title; or,

    **(C)** not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title) or any other Federal law or regulation, or required to

5

AD005

implement any applicable water quality standard established pursuant to this chapter.

**(2)**

    **(A)**  for pollutants identified in subparagraphs (C), (D), and (F) of this paragraph, effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which (i) shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(2) of this title, which such effluent limitations shall require the elimination of discharges of all pollutants if the Administrator finds, on the basis of information available to him (including information developed pursuant to section 1325 of this title), that such elimination is technologically and economically achievable for a category or class of point sources as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(2) of this title, or (ii) in the case of the introduction of a pollutant into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, shall require compliance with any applicable pretreatment requirements and any other requirement under section 1317 of this title;

6

AD006

**33 U.S.C. § 1313: Water quality standards and implementation plans**

    **(c)**    **Review; revised standards; publication**

        **(1)**    The Governor of a State or the State water pollution control agency of such State shall from time to time (but at least once each three year period beginning with October 18, 1972) hold public hearings for the purpose of reviewing applicable water quality standards and, as appropriate, modifying and adopting standards. Results of such review shall be made available to the Administrator.

        **(2)**

            **(A)**    Whenever the State revises or adopts a new standard, such revised or new standard shall be submitted to the Administrator. Such revised or new water quality standard shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation.

**33 U.S.C. § 1341: Certification**

    **(a)**    **Compliance with applicable requirements; application; procedures; license suspension**

7

AD007

**(1)** Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

8

AD008

**(2)** Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirements in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such a hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such agency, based upon the recommendations of such State, the Administrator, and upon any additional evidence, if any, presented to the agency at the hearing, shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

**(3)** The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or

9

AD009

permit, the State, or if appropriate, the interstate agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(4)** Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the operation of any such federally licensed or permitted facility or activity

10

AD010

will violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is received from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(5)** Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(6)** Except with respect to a permit issued under section 1342 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

**(b)** **Compliance with other provisions of law setting applicable water quality requirement**

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or

11

AD011

applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

**(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees**

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

**(d) Limitations and monitoring requirements of certification**

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

**33 U.S.C. § 1342: National pollutant discharge elimination system**

**(a) Permits for discharge of pollutants**

    **(1)** Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for

12

AD012

public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

**(2)** The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

**(3)** The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

**(4)** All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

**(5)** No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under

13

AD013

section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objectives of this chapter to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(i)(2) of this title, or the date of approval by the Administrator of a permit program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

## (b)  State permit programs

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have

14

AD014

independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each submitted program unless he determines that adequate authority does not exist:

**(1)** To issue permits which—

    **(A)** apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

    **(B)** are for fixed terms not exceeding five years; and

    **(C)** can be terminated or modified for cause including, but not limited to, the following:

        **i.** violation of any condition of the permit;

        **ii.** obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

        **iii.** change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

    **(D)** control the disposal of pollutants into wells;

**(2)**

    **(A)** To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or

    **(B)** To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

**(3)** To insure that the public, and any other State the waters of which may be affected, receive notice of each

15

AD015

application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

**(4)** To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

**(5)** To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

## 33 U.S.C. § 1344: Permits for dredged or fill material

**(a) Discharge into navigable waters at specified disposal sites**

The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites. Not later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit under this subsection, the Secretary shall publish the notice required by this subsection.

**(b) Specification for disposal sites**

Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary, which

16

AD016

guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

**(c)    Denial or restriction of use of defined areas as disposal sites**

The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

**(d)    "Secretary" defined**

The term "Secretary" as used in this section means the Secretary of the Army, acting through the Chief of Engineers.

**(e)    General permits on State, regional, or nationwide basis**

    **(1)**    In carrying out his functions relating to the discharge of dredged or fill material under this section, the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving

17

AD017

discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment. Any general permit issued under this subsection shall (A) be based on the guidelines described in subsection (b)(1) of this section, and (B) set forth the requirements and standards which shall apply to any activity authorized by such general permit.

**(2)** No general permit issued under this subsection shall be for a period of more than five years after the date of its issuance and such general permit may be revoked or modified by the Secretary if, after opportunity for public hearing, the Secretary determines that the activities authorized by such general permit have an adverse impact on the environment or such activities are more appropriately authorized by individual permits.

**(f) Non-prohibited discharge of dredged or fill material**

**(1)** Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material—

**(A)** from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;

**(B)** for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as

18

AD018

dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures;

**(C)** for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;

**(D)** for the purpose of construction of temporary sedimentation basins on a construction site which does not include placement of fill material into the navigable waters;

**(E)** for the purpose of construction or maintenance of farm roads or forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained, in accordance with best management practices, to assure that flow and circulation patterns and chemical and biological characteristics of the navigable waters are not impaired, that the reach of the navigable waters is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized;

**(F)** resulting from any activity with respect to which a State has an approved program under section 1288(b)(4) of this title which meets the requirements of subparagraphs (B) and (C) of such section.

is not prohibited by or otherwise subject to regulation under this section or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title).

19

AD019

**(2)** Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

**(g)** **State administration**

**(1)** The Governor of any State desiring to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program.

**(2)** Not later than the tenth day after the date of the receipt of the program and statement submitted by any

20

AD020

State under paragraph (1) of this subsection, the Administrator shall provide copies of such program and statement to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service.

**(3)** Not later than the ninetieth day after the date of the receipt by the Administrator of the program and statement submitted by any State, under paragraph (1) of this subsection, the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such program and statement to the Administrator in writing.

**(h)** **Determination of State's authority to issue permits under State program; approval; notification; transfers to State program**

 **(1)** Not later than the one-hundred-twentieth day after the date of the receipt by the Administrator of a program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall determine, taking into account any comments submitted by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, pursuant to subsection (g) of this section, whether such State has the following authority with respect to the issuance of permits pursuant to such program:

  **(A)** To issue permits which--

   **(i)** apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines

21

AD021

established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title;

**(ii)** are for fixed terms not exceeding five years; and

**(iii)** can be terminated or modified for cause including, but not limited to, the following:

    **(I)** violation of any condition of the permit;

    **(II)** obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

    **(III)** change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge.

**(B)** To issue permits which apply, and assure compliance with, all applicable requirements of section 1318 of this title, or to inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title.

**(C)** To assure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application.

**(D)** To assure that the Administrator receives notice of each application (including a copy thereof) for a permit.

22

AD022

**(E)** To assure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing.

**(F)** To assure that no permit will be issued if, in the judgment of the Secretary, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby.

**(G)** To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement.

**(H)** To assure continued coordination with Federal and Federal-State water-related planning and review processes.

**(2)** If, with respect to a State program submitted under subsection (g)(1) of this section, the Administrator determines that such State--

**(A)** has the authority set forth in paragraph (1) of this subsection, the Administrator shall approve the program and so notify (i) such State and (ii) the Secretary, who upon subsequent notification

23

AD023

from such State that it is administering such program, shall suspend the issuance of permits under subsections (a) and (e) of this section for activities with respect to which a permit may be issued pursuant to such State program; or

**(B)** does not have the authority set forth in paragraph (1) of this subsection, the Administrator shall so notify such State, which notification shall also describe the revisions or modifications necessary so that such State may resubmit such program for a determination by the Administrator under this subsection.

**(3)** If the Administrator fails to make a determination with respect to any program submitted by a State under subsection (g)(1) of this section within one-hundred-twenty days after the date of the receipt of such program, such program shall be deemed approved pursuant to paragraph (2)(A) of this subsection and the Administrator shall so notify such State and the Secretary who, upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsection (a) and (e) of this section for activities with respect to which a permit may be issued by such State.

**(4)** After the Secretary receives notification from the Administrator under paragraph (2) or (3) of this subsection that a State permit program has been approved, the Secretary shall transfer any applications for permits pending before the Secretary for activities with respect to which a permit may be issued pursuant to such State program to such State for appropriate action.

24

AD024

**(5)** Upon notification from a State with a permit program approved under this subsection that such State intends to administer and enforce the terms and conditions of a general permit issued by the Secretary under subsection (e) of this section with respect to activities in such State to which such general permit applies, the Secretary shall suspend the administration and enforcement of such general permit with respect to such activities.

**(i) Withdrawal of approval**

Whenever the Administrator determines after public hearing that a State is not administering a program approved under subsection (h)(2)(A) of this section, in accordance with this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, the Administrator shall so notify the State, and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days after the date of the receipt of such notification, the Administrator shall (1) withdraw approval of such program until the Administrator determines such corrective action has been taken, and (2) notify the Secretary that the Secretary shall resume the program for the issuance of permits under subsections (a) and (e) of this section for activities with respect to which the State was issuing permits and that such authority of the Secretary shall continue in effect until such time as the Administrator makes the determination described in clause (1) of this subsection and such State again has an approved program.

**(j) Copies of applications for State permits and proposed general permits to be transmitted to Administrator**

Each State which is administering a permit program pursuant to this section shall transmit to the Administrator (1) a copy of each permit application received by such State and provide notice to

25

AD025

the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State, and (2) a copy of each proposed general permit which such State intends to issue. Not later than the tenth day after the date of the receipt of such permit application or such proposed general permit, the Administrator shall provide copies of such permit application or such proposed general permit to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service. If the Administrator intends to provide written comments to such State with respect to such permit application or such proposed general permit, he shall so notify such State not later than the thirtieth day after the date of the receipt of such application or such proposed general permit and provide such written comments to such State, after consideration of any comments made in writing with respect to such application or such proposed general permit by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, not later than the ninetieth day after the date of such receipt. If such State is so notified by the Administrator, it shall not issue the proposed permit until after the receipt of such comments from the Administrator, or after such ninetieth day, whichever first occurs. Such State shall not issue such proposed permit after such ninetieth day if it has received such written comments in which the Administrator objects (A) to the issuance of such proposed permit and such proposed permit is one that has been submitted to the Administrator pursuant to subsection (h)(1)(E), or (B) to the issuance of such proposed permit as being outside the requirements of this section, including, but not limited to, the guidelines developed under subsection (b)(1) of this section unless it modifies such proposed permit in accordance with such comments. Whenever the Administrator objects to the issuance of a permit under the preceding sentence such written objection shall

26

AD026

contain a statement of the reasons for such objection and the conditions which such permit would include if it were issued by the Administrator. In any case where the Administrator objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing or, if no hearing is requested within 90 days after the date of such objection, the Secretary may issue the permit pursuant to subsection (a) or (e) of this section, as the case may be, for such source in accordance with the guidelines and requirements of this chapter.

**(k)  Waiver**

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (j) of this section at the time of the approval of a program pursuant to subsection (h)(2)(A) of this section for any category (including any class, type, or size within such category) of discharge within the State submitting such program.

**(l)     Categories of discharges not subject to requirements**

The Administrator shall promulgate regulations establishing categories of discharges which he determines shall not be subject to the requirements of subsection (j) of this section in any State with a program approved pursuant to subsection (h)(2)(A) of this section. The Administrator may distinguish among classes, types, and sizes within any category of discharges.

**(m)  Comments on permit applications or proposed general permits by Secretary of the Interior acting through Director of United States Fish and Wildlife Service**

27

AD027

Not later than the ninetieth day after the date on which the Secretary notifies the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service that (1) an application for a permit under subsection (a) of this section has been received by the Secretary, or (2) the Secretary proposes to issue a general permit under subsection (e) of this section, the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such application or such proposed general permit in writing to the Secretary.

**(n) Enforcement authority not limited**

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

**(o) Public availability of permits and permit applications**

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or portion thereof, shall further be available on request for the purpose of reproduction.

**(p) Compliance**

Compliance with a permit issued pursuant to this section, including any activity carried out pursuant to a general permit issued under this section, shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1317, and 1343 of this title.

**(q) Minimization of duplication, needless paperwork, and delays in issuance; agreements**

Not later than the one-hundred-eightieth day after December 27, 1977, the Secretary shall enter into agreements with the

28

AD028

Administrator, the Secretaries of the Departments of Agriculture, Commerce, Interior, and Transportation, and the heads of other appropriate Federal agencies to minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of permits under this section. Such agreements shall be developed to assure that, to the maximum extent practicable, a decision with respect to an application for a permit under subsection (a) of this section will be made not later than the ninetieth day after the date the notice for such application is published under subsection (a) of this section.

**(r)    Federal projects specifically authorized by Congress**

The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress, whether prior to or on or after December 27, 1977, is not prohibited by or otherwise subject to regulation under this section, or a State program approved under this section, or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title), if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

**(s)    Violation of permits**

> **(1)**    Whenever on the basis of any information available to him the Secretary finds that any person is in violation of any condition or limitation set forth in a permit issued by the Secretary under this section, the

29

AD029

Secretary shall issue an order requiring such person to comply with such condition or limitation, or the Secretary shall bring a civil action in accordance with paragraph (3) of this subsection.

**(2)** A copy of any order issued under this subsection shall be sent immediately by the Secretary to the State in which the violation occurs and other affected States. Any order issued under this subsection shall be by personal service and shall state with reasonable specificity the nature of the violation, specify a time for compliance, not to exceed thirty days, which the Secretary determines is reasonable, taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements. In any case in which an order under this subsection is issued to a corporation, a copy of such order shall be served on any appropriate corporate officers.

**(3)** The Secretary is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction for any violation for which he is authorized to issue a compliance order under paragraph (1) of this subsection. Any action under this paragraph may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such acton[1] shall be given immediately to the appropriate State.

---

[1] So in original. Probably should be "action"

30

AD030

**(4)**    Any person who violates any condition or limitation in a permit issued by the Secretary under this section, and any person who violates any order issued by the Secretary under paragraph (1) of this subsection, shall be subject to a civil penalty not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

**(t)    Navigable waters within State jurisdiction**

Nothing in this section shall preclude or deny the right of any State or interstate agency to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State, including any activity of any Federal agency, and each such agency shall comply with such State or interstate requirements both substantive and procedural to control the discharge of dredged or fill material to the same extent that any person is subject to such requirements. This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation.

**33 U.S.C. § 1365: Citizen suits**

**(a)    Authorization; jurisdiction**

Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf--

**(1)**    against any person (including (i) the United States, and (ii) any other governmental instrumentality or

31

AD031

agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

**(2)** against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

. . .

**(f)    Effluent standard or limitation**

For purposes of this section, the term "effluent standard or limitation under this chapter" means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) a standard of performance or requirement under section 1322(p) of this title; (6) a certification under section 1341 of this title; (7) a permit or condition of a permit issued under section 1342 of this title that is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title); or (8) a regulation under section 1345(d) of this title.

## National Environmental Policy Act, 42 U.S.C. Ch. 55

### 42 U.S.C.A. § 4321: Congressional declaration of purpose

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health

32

AD032

and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

**Natural Gas Act, 15 U.S.C. Ch. 15B**

**15 U.S.C. § 717f: Construction, extension, or abandonment of facilities**

. . .

**(e) Granting of certificate of public convenience and necessity**

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**15 U.S.C. § 717r: Rehearing and review**

. . .

**(d) Judicial review**

**(1) In general**

33

AD033

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**New York Environmental Conservation Law, ECL Ch. 43-B**

**N.Y. Env't Conserv. Law § 70-0103: Legislative findings and declarations**

The legislature finds and declares that:

1.  It is the intent of the legislature to assure the fair, expeditious and thorough administrative review of regulatory permits.

2.  It is the intent of the legislature that, to the extent feasible and appropriate, statutory and regulatory procedures shall be made uniform and inconsistencies and redundancies shall be eliminated.

3.  It is the intent of the legislature to establish reasonable time periods for administrative agency action on permits.

4.  It is the intent of the legislature to encourage public participation in government review and decision-making processes and to promote public understanding of all government activities.

5.  It is the intent of the legislature that, to the maximum extent feasible, a comprehensive project review approach

shall replace separate and individual permit application reviews.

## REGULATIONS

## Code of Federal Regulations, 40 C.F.R. Ch. I

## 40 C.F.R. § 121.7(d): Certification decisions.

**(a)** A certifying authority may act on a request for certification in one of four ways: grant certification, grant certification with conditions, deny certification, or expressly waive certification.

**(b)** A certifying authority shall act on a request for certification within the scope of certification and within the reasonable period of time.

**(c)** A grant of certification shall be in writing and should include the following:

**(1)** Identification of the decision as a grant of certification;

**(2)** Identification of the applicable Federal license or permit;

**(3)** A statement that the activity will comply with water quality requirements; and

**(4)** An indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1).

**(d)** A grant of certification with conditions shall be in writing and should include the following:

**(1)** Identification of the decision as a grant of certification with conditions;

**(2)** Identification of the applicable Federal license or permit;

35

AD035

**(3)** A statement explaining why each of the included conditions is necessary to assure that the activity will comply with water quality requirements; and

**(4)** An indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1).

## New York Codes, Rules, and Regulations

### 6 N.Y.C.R.R. 608.9(a): Water quality certifications

**(a)** Water quality certifications required by section 401 of the Federal Water Pollution Control Act, Title 33 United States Code 1341 (see subdivision [c] of this section). Any applicant for a Federal license or permit to conduct any activity, including but not limited to the construction or operation of facilities that may result in any discharge into navigable waters as defined in section 502 of the Federal Water Pollution Control Act (33 USC 1362), must apply for and obtain a water quality certification from the department. The applicant must demonstrate compliance with sections 301-303, 306 and 307 of the Federal Water Pollution Control Act, as implemented by the following provisions:

**(1)** effluent limitations and water quality-related effluent limitations set forth in section 750-1.11 of this Title;

**(2)** water quality standards and thermal discharge criteria set forth in Parts 701, 702, 703 and 704 of this Title;

**(3)** standards of performance for new sources set forth in section 750-1.11 of this Title;

**(4)** effluent limitations, effluent prohibitions and pretreatment standards set forth in section 750-1.11 of this Title;

36

AD036

**(5)** prohibited discharges set forth in section 750-1.3 of this Title; and

**(6)** state statutes, regulations and criteria otherwise applicable to such activities.

**(b)** The department may issue Statewide water quality certifications for certain types or sizes of activities that it deems to have an insignificant effect on water quality. Projects meeting criteria so established will not require individual water quality certifications.

**(c)** The Federal Water Pollution Control Act (33 USC 1251 et seq.), as amended effective October 1, 1984, is available from the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402. This document was filed with the New York State Department of State on November 5, 1984 and is available for inspection and copying at the New York State Department of Environmental Conservation, 625 Broadway, Albany, NY 12233.

## 6 N.Y.C.R.R. 621.7: Public notice and comment

**(a)** Upon determining that an application is complete and is for a major project, the department must:

**(1)** provide notice to the chief executive officer of the municipality in which the proposed project is to be located, and to any person who has previously expressed in writing an interest in receiving such notification; and

**(2)** publish a notice of complete application in the Environmental Notice Bulletin no more than 10 days after the date of notice to the applicant.

**(b)** The notice must contain the following information:

**(1)** The applicant's name.

37

AD037

**(2)** A brief description of the proposed project and its location.

**(3)** A list of all department permits for the project for which application has been made, and identification numbers for those applications.

**(4)** Department contact information including telephone number, e-mail address and contact person.

**(5)** The status of environmental reviews conducted under SEQR, including identification of the following: name of the lead agency, the classification of the action as listed in Part 617 or 618 of this Title, whether coordinated review occurred, and the determination of significance if the action was classified as Type I or Unlisted.

**(6)** The deadline for submission of written comments on the application, including any request for a public comment hearing or an adjudicatory proceeding pursuant to Part 624 of this Title. The minimum timeframes for review and comment are as follows:

> **(i)** applications supported by a SEQR negative declaration, or where SEQR is preempted by Federal statute, not less than 15 days after the date of publication unless otherwise specified in this paragraph;

> **(ii)** applications supported by a SEQR draft environmental impact statement, not less than 30 days after the date of publication;

> **(iii)** Mined land reclamation, solid waste management facility, and non-delegated air pollution control permit applications, not less than 30 days after the date of publication;

38

AD038

**(iv)** Delegated SPDES and delegated air pollution control permits, not less than 30 days after the date of publication;

**(v)** Hazardous waste management facility permit applications and remedial action plan applications, not less than 45 days after the date of publication; or

**(vi)** Where notices must be published in multiple publications, and the publication dates fail to coincide such that the deadline dates for submission of written comments to the department differ, the final deadline for comments must be the latest of the published deadline dates.

**(7)** For delegated permits, the availability of either the draft permit or notice of intent to deny as set forth below:

**(i)** If a draft permit has been prepared it must contain the following information:

**(a)** for SPDES, information required to be in permits as provided in Part 750 of this Title;

**(b)** for HWMF, information required under section 373-1.4(d) of this Title or for RAPs set forth in section 373-1.11(d)(2) of this Title; and

**(c)** for air pollution control, information required under New Source Non-Attainment Review or Prevention of Significant Deterioration Review pursuant to Parts 231 and 201 of this Title for

39

AD039

projects subject to title V facility permit requirements.

**(ii)** If the determination is to deny the permit, the department must issue a notice of intent to deny.

**(iii)** If, after issuing a notice of intent to deny a permit, the department determines, based on additional information or further consideration, that the permit may be issued, the department may with the applicant's consent:

    **(a)** withdraw the notice of intent to deny;

    **(b)** issue a draft permit; and

    **(c)** provide public notice of the intent to issue a permit in accordance with this Part.

**(8)** For delegated permits, the notice of complete application will serve as a fact sheet for projects or facilities on a list agreed to by the department and the U.S. Environmental Protection Agency (EPA) or for projects that the department finds are the subject of significant public interest or raise substantive and significant issues. For delegated SPDES permits, the notice of complete application must include notice of availability of a fact sheet developed in accordance with section 750-1.9 of this Title. The notice of complete application must include the information required under:

**(i)** section 750-1.7 of this Title for SPDES permits (through the notice or by reference to the draft permit and fact sheet);

**(ii)** Part 373 of this Title for HWMF permits or RAP permits;

40

AD040

**(iii)** for air pollution control permits subject to Subpart 231-2 of this Title, the notice must state that information regarding the demonstration of the Lowest Achievable Emission Rate (LAER) or Best Available Control Technology (BACT)or both are available from the department and may be reviewed upon request; and

**(iv)** for SPDES permit applications or renewals within an area designated pursuant to any Federal or state statute as a sole source aquifer, the project description must include the names and addresses of all public water purveyors with a service area or portion thereof located within a three-mile radius of the applicant's facility.

**(9)** For title V facility permits, the notice of complete application must state that the EPA has the authority to bar issuance of the subject permit (see Part 201 of this Title).

**(c)** For all major projects, a notice of complete application must be published in a newspaper in the area in which the project is proposed to be located.

**(d)** Public announcement broadcast over local radio stations is required for complete applications on all HWMF permits or RAPs.

**(e)** The department may provide or require the applicant to provide other reasonable public notice of complete application. Such notice may include, but is not limited to, the distribution or posting of information about the proposed project in the area in which the proposed project is to be located, conduct of public information meetings, translation of notices for non-English speaking communities and the

41

AD041

establishment of document repositories in the area in which the proposed project is to be located, and must contain the information specified in section 621.7(b)(1) through (9) of this Part.

**(f)** Notice of complete application required under this section must also be provided to:

**(1)** all agencies which have jurisdiction to fund, approve or are directly undertaking the project;

**(2)** agencies the department must consult before its determination of completeness, including those responsible for historic preservation and coastal zone management;

**(3)** the United States Environmental Protection Agency and other persons and agencies as required for federally delegated permits;

**(4)** any affected states and Indian governments for new projects, major permit modifications and permit renewals subject to air Title V facility permit requirements;

**(5)** for sources subject to air New Source Review permit requirements pursuant to Part 231 of this Title:

**(i)** affected states and Indian governments;

**(ii)** the Federal land manager of Federal class 1 areas whose air may be affected by the proposed source; and;

**(iii)** the county chief executive, any local air pollution control agency and any comprehensive regional land use planning agency where the proposed source would be located;

42

AD042

**(6)** for Mined Land Reclamation permits, on lands not previously permitted pursuant to article 23, title 27 of the ECL, the department must send a notice by certified mail return receipt requested to the chief administrative officer of the political subdivision in which the proposed mine is to be located. This notice must:

    **(i)** be accompanied by copies of all documents comprising the complete application;

    **(ii)** state whether the application is for a major or minor project pursuant to section 621.4(h) of this Part; and

    **(iii)** allow 30 days for the chief administrative officer to provide comments on the application in regard to:

        **(a)** appropriate setbacks from property boundaries or public thoroughfare rights-of-way;

        **(b)** fabricated or natural barriers designed to restrict access if needed, and, if affirmative the type, length, height, and location thereof;

        **(c)** the control of dust;

        **(d)** hours of operation; and

        **(e)** whether mining is prohibited at that location.

43

AD043

## 6 N.Y.C.R.R. 701.1: General Conditions Applying to All Water Classifications

The discharge of sewage, industrial waste or other wastes shall not cause impairment of the best usages of the receiving water as specified by the water classifications at the location of discharge and at other locations that may be affected by such discharge.

## 6 N.Y.C.R.R. 701.10: Class SA Saline Surface Waters

The best usages of Class SA waters are shellfishing for market purposes, primary and secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish and wildlife propagation and survival.

## 6 N.Y.C.R.R. 701.11: Class SB Saline Surface Waters

The best usages of Class SB waters are primary and secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish and wildlife propagation and survival.

## 6 N.Y.C.R.R. 703.1: Substance form

A water quality standard, guidance value or groundwater effluent limitation includes all (total) forms of the substance, unless indicated otherwise. Where a standard or guidance value is for a specific form of the substance, water quality-based effluent limitations for SPDES permits may include other forms of the substance to account for changes in the substance that occur in the receiving water.

44

AD044

Compilation of Codes, Rules and Regulations of the State of New York
Title 6. Department of Environmental Conservation
Chapter X. Division of Water Resources
Subchapter A. General
Article 2. Classifications and Standards of Quality and Purity
Part 703. Surface Water and Groundwater Quality Standards and Groundwater Effluent Limitations (Refs & Annos)

6 NYCRR 703.2

Section 703.2. Narrative Water Quality Standards

Currentness

Narrative standards for specific water classes are provided in this section. Narrative standards for classes N and AA-Special are provided in Part 701 of this Title.

| Parameter | Classes | Standard |
| --- | --- | --- |
| Taste-, color-, and odor-producing, toxic and other deleterious substances | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special, GA, GSA, GSB | None in amounts that will adversely affect the taste, color or odor thereof, or impair the waters for their best usages. |
| Turbidity | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special | No increase that will cause a substantial visible contrast to natural conditions. |
| Suspended, colloidal and settleable solids | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special | None from sewage, industrial wastes or other wastes that will cause deposition or impair the waters for their best usages. |
| Oil and floating substances | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special | No residue attributable to sewage, industrial wastes or other wastes, nor visible oil film nor globules of grease. |
| Garbage, cinders, ashes, oils, sludge and other refuse | SA, SB, SC, I, SD | None in any amounts. |
| Phosphorus and nitrogen | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special | None in amounts that will result in growths of algae, weeds and slimes that will impair the waters for their best usages. |
| Radioactivity | A-Special | Should be kept at the lowest practicable levels, and in any event should be controlled to the extent necessary to prevent harmful effects on health. |

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

AD045

| Thermal discharges | GA, GSA, GSB | None in amounts that will impair the waters for their best usages. |
| Thermal discharges | AA, A, B, C, D, SA, SB, SC, I, SD, A-Special | See Part 704 of this Title. |
| Flow | AA, A, B, C, D, A-Special | No alteration that will impair the waters for their best usages. |

**Credits**

Sec. filed March 20, 1967; repealed, new filed: April 28, 1972; Aug. 2, 1978; Aug. 2, 1991 eff. 30 days after filing; amd. filed Jan. 17, 2008 eff. Feb. 16, 2008.

Current with amendments included in the New York State Register, Volume XLVIII, Issue 5, dated February 4, 2026. Some sections may be more current, see credits for details.

N.Y. Comp. Codes R. & Regs. tit. 6, § 703.2, 6 NY ADC 703.2

---

**End of Document**　　　　　　　　　　　© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. AD046

Compilation of Codes, Rules and Regulations of the State of New York
   Title 6. Department of Environmental Conservation
      Chapter X. Division of Water Resources
         Subchapter A. General
            Article 2. Classifications and Standards of Quality and Purity
               Part 703. Surface Water and Groundwater Quality Standards and Groundwater Effluent Limitations (Refs & Annos)

6 NYCRR 703.3

Section 703.3. Water Quality Standards for pH, Dissolved Oxygen, Dissolved Solids, Odor, Color and Turbidity

Currentness

Standards for specific classes are provided in this section.

| Parameter | Classes | Standard |
|---|---|---|
| pH | AA, A, B, C, AA-Special, A-Special, GA | Shall not be less than 6.5 nor more than 8.5. |
| | D | Shall not be less than 6.0 nor more than 9.5. |
| | SA, SB, SC, I, SD | The normal range shall not be extended by more than one-tenth (0.1) of a pH unit. |
| Dissolved oxygen (DO) | A-Special | In rivers and upper waters of lakes, not less than 6.0 mg/L at any time. In hypolimnetic waters, it should not be less than necessary for the support of fishlife, particularly cold water species. |
| | AA, A, B, C, AA-Special | For trout spawning waters (TS) the DO concentration shall not be less than 7.0 mg/L from other than natural conditions. For trout waters (T), the minimum daily average shall not be less than 6.0 mg/L, and at no time shall the concentration be less than 5.0 mg/L. For nontrout waters, the minimum daily average shall not be less than 5.0 mg/L, and at no time shall the DO concentration be less than 4.0 mg/ L. |
| | D | Shall not be less than 3.0 mg/L at any time. |
| | SA, SB, SC | Chronic: Shall not be less than a daily average of 4.8 mg/L[*] |

AD047

$$DO_i = {}^{13.0}/2.80 + 1.84e^{-0.1t}{}_i$$

where $DO_i$ = DO

concentration in mg/L between 3.0-4.8 mg/L and $t_i$ = time in days. This equation is applied by dividing the DO range of 3.0-4.8 mg/L into a number of equal intervals. $DO_i$ is the lower bound of each interval (i) and $t_i$ is the allowable number of days that the DO concentration can be within that interval. The actual number of days that the measured DO concentration falls within each interval (i) is divided by the allowable number of days that the DO can fall within interval ($t_i$). The sum of the quotients of all intervals (i...n) cannot exceed 1.0: *i.e.,*

Remark:* The DO concentration may fall below 4.8 mg/L for a limited number of days, as defined by the formula:

$$\sum_{i=1}^{n} \frac{t_i\ (actual)}{t_i\ (allowed)} < 1.0$$

The DO concentration shall not fall below the acute standard of 3.0 mg/L at any time.

| | | |
|---|---|---|
| | SA, SB, SC, SD | Acute: Shall not be less than 3.0 mg/L at any time. |
| | I | Shall not be less than 4.0 mg/L at any time. |
| Dissolved solids | A-Special | Shall not exceed 200 mg/L. |
| | AA, A, B, C, AA-Special, GA | Shall be kept as low as practicable to maintain the best usage of waters but in no case shall it exceed 500 mg/L. |
| Odor | GA | Shall not exceed a threshold odor number of 3. |
| Color | GA | Shall not exceed 15 color units (platinum-cobalt method). |
| Turbidity | GA | Shall not exceed 5 nephelometric units. |

**Credits**
Sec. filed March 20, 1967; repealed, new filed: April 28, 1972; Aug. 2, 1978; Aug. 2, 1991 eff. 30 days after filing; amd. filed Jan. 17, 2008 eff. Feb. 16, 2008.

Current with amendments included in the New York State Register, Volume XLVIII, Issue 5, dated February 4, 2026. Some sections may be more current, see credits for details.

AD048

AD049

**Footnotes**

Remark:\* The DO concentration may fall below 4.8 mg/L for a limited number of days, as defined by the formula:

N.Y. Comp. Codes R. & Regs. tit. 6, § 703.3, 6 NY ADC 703.3

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

## DECLARATION OF LISA BRAUNWELL

I, Lisa Braunwell declare the following:

1. I am over eighteen years of age and do not suffer from any legal incapacity. I have personal knowledge of the following facts.

2. I am a member and volunteer with Surfrider Foundation. I first became involved with Surfrider Foundation about 12 years ago as a volunteer. I am currently the treasurer of the Jersey Shore Chapter of Surfrider Foundation and was previously the volunteer coordinator. I've been on the board for about seven years.

3. I live on Long Beach Island, New Jersey, where I've lived since the early 1990s, except for a few years when I lived inland from 1998-2000. Whenever I'm not at work, I'm in the ocean. I travel to Seattle for work as a pediatric hospitalist for two weeks at a time, then have two and a half weeks off at home to play in the water. Spending time in the water is why I haven't moved and why I have the schedule that I do—so that I don't have to work every day and have the opportunity to go in the water.

4. I mostly surf and kitesurf, and sometimes I paddleboard. When I'm home, I usually get out in the water three times a week on average, though this depends on the weather. If the wind conditions are good during the summer, I might be able to get out every day of the week. I'm usually

1

AD050

out for about 10 months of the year. I own 12 wetsuits and will only stop going out when it's brutally cold. That usually means that I'm out all year except for January and February, and even in January and February, if we get a nice day I might go out and paddleboard. I probably own about $15,000 of equipment, including 5 kites, 2 kiteboards, and multiple surfboards.

5.      When I'm in the ocean, nothing else matters, none of the turmoil in my life. I work in a hospital and spending time in the water is my release. The sports I do are pretty extreme. I really have to focus on them, and one of the few times I'm really focused is when I'm in the ocean. I'm focused on what I'm doing–not drowning, making the jump, catching the wave. It really makes me feel alive.

6.      I will often surf on Long Beach Island or Bradley Beach, sometimes at Sandy Hook, and I go kitesurfing at Sandy Hook and Long Beach Island. I also surf at Long Beach on Long Island, or kitesurf off Long Island in Great South Bay, Tobay Beach, or Gilgo Beach.

7.      For safety, I do not kitesurf alone. I will frequently go to different launches so there is at least one other person to launch and land with. Sandy Hook is halfway between my home and my significant other's home, so it is convenient for both of us. Other sites that are halfway between us,

such as Plum Beach in Brooklyn, are dirty. I have observed needles and other drug paraphernalia on the beach at Plum Beach, so I avoid kitesurfing there.

8. Due to my work schedule (2 weeks on/2.5 weeks off), I need to make use of whatever conditions and wind directions are available when I am not working, or I would not be able to kitesurf as often. It is important to have launches that can handle different wind directions. Sandy Hook is a good location to kite when the wind is out of the north or northwest. Sandy Hook is one of the most popular launches in New Jersey. Due to the geography, the water there is flat because it is sheltered from the ocean waves. About half the time that I go out kitesurfing, I go to Sandy Hook. My closer location, Long Beach Island, is good on days when there are south and southwest winds.

9. I enjoy viewing marine mammals. There's nothing cooler than when there are dolphins out there when you're surfing. When I'm in Seatle for work, I like to watch the orcas off the sound. I also volunteer with the Marine Mammal Stranding Center when I'm at home in New Jersey and have been doing that for the past ten years intermittently. I am on the Stranding Center's local call down list and am one of the people who will

respond when a marine mammal washes up on the beach. I don't like seeing these sentient beings get hurt, and I don't eat mammals.

10. I am a pescatarian and eat a lot of seafood. It's an important source of protein for me. I try to get seafood that's local to me, but I also try not to eat anything caught in polluted areas.

11. Working in healthcare, I'm acutely aware of all the things that happen to you from being exposed to contaminated water. I try to surf and kitesurf where the water is cleaner. There are some places I've kited that I don't go back to often because they are pretty polluted. I have gotten ear infections, sinus infections, and an infected foot wound after being in the water where there was bad water quality and debris in the water. I know that if you're in the water near where dredging is done to replenish beaches, you will come out of the water covered in muck and can get ear infections.

12. I am concerned that the NESE pipeline that is planned for the waters between New Jersey and New York will lead to pollution that will negatively affect my ability to continue to surf, kitesurf, and paddleboard in the area as I do now. I'm familiar with the impacts from less intensive dredging for beach restoration and am concerned about the impacts of the large-scale dredging of contaminated sediment for the pipeline. If the water

near me becomes polluted, I would have to go somewhere else I felt safer to be in the water. I don't want to lose the ability to be in the water, and I don't want to get sick from going into polluted water. I've been spending time in the water my whole life, and I like to say that I'm half fish. I've planned my whole work schedule around being able to have time in the water near my home in New Jersey. If I can't be in the water, that's a big deal for me.

13.     If the NESE pipeline were constructed, I would be especially concerned about kitesurfing at Sandy Hook, which is relatively close to the planned pipeline route. It would be very inconvenient for me if I were not able to kitesurf at Sandy Hook because that is the cleanest beach that is located halfway between my home and my significant other's home. It is also a good beach for kitesurfing when winds are coming from the north or the northwest. If I could not kitesurf at Sandy Hook when winds are coming from the north or northwest, then I would not be able to kitesurf at all on days with those wind conditions, which would cut my kitesurfing opportunities in half.

14.     I'm also concerned that pollution from the NESE pipeline would negatively impact my ability to consume locally-caught seafood. If this pipeline were constructed, I would be worried about what I could safely eat.

5

15.     I am also concerned that pollution and other impacts from the NESE pipeline will negatively affect marine mammals that call this water home. If marine animals avoid this area, then I won't get to enjoy seeing them when I'm in the water surfing. If instead the animals get sick or die because of the effects of pollution in their ecosystem, I may have to respond to more instances of sick or dying animals that have washed up through my volunteer work with the Marine Mammal Stranding Center. The ocean is these animals' home, and when we use the ocean, we're visitors in their home. We should be respecting the animals that live in the ocean. The thought of mucking up their home, or of having to see more sick or beached animals, makes me unhappy.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _December 10_, 2025.

_Lisa Braunwell_

6

AD055

## DECLARATION OF DANIEL CARROLL

I, Daniel Carroll, declare the following:

1.     I am over eighteen years of age and do not suffer from any legal incapacity. I have personal knowledge of the following facts.

2.     I currently live in Matawan, New Jersey, and have lived on the Bayshore all my life.

3.     I have been a member of NY/NJ Baykeeper for at least five years. I also run several watercraft tours for Baykeeper at Cheesequake Creek along with a naturalist.

4.     I own and run a business called A Canoe To You in the Raritan Bay. We rent stand-up paddleboards, canoes, and kayaks. I also take people out on paddling tours through my business in the Raritan Bay, including Keyport, up into Cheesequake Creek, Arthur Kill, and all over the western part of the Bay. I take people out on tours once or twice a week and many more rent from the business and go out on their own.

5.     The paddling tours I lead in Cheesequake Creek and in the immediately surrounding areas of the Raritan Bay are right where the NESE pipeline is proposed to cut through the water. We paddle right on

1

AD056

top of where the pipeline is proposed to go. All of the rest of the tours I run are within a few miles of that location.

6. The peak season for the business is May 1 through October 15. After that, the water starts getting colder. I continue to go out kayaking by myself and with friends on the off-season, from October through April.

7. I am concerned about the impact of the proposed NESE pipeline project to my paddling business. People go out paddling to enjoy the beauty of the water, the plants, and the wildlife. The digging through the tidal area and the dredging for the underwater pipeline will stir up the sediment, which has a lot of pollution, and this will impact the water quality and the clarity of the water. People don't want be out on the water with toxic stuff floating around.

8. During construction, there will also be a lot of noise from all of the machinery and equipment, and unsightly views of all of the work being done. This will also impact my business and make people not want to be out on the water, because people go out on the water to enjoy nature.

AD057

9. The water quality impacts and construction noise will also impact the birds, wildlife and vegetation, which people rent watercraft to go out and see. On the tours, we see dolphins, turtles, crabs, and cow nose rays that all swim in the water and will be directly impacted by the construction noise and sediment. They will likely leave the area during construction, and there may be less of them in the long term from exposure to the pollution from the sediment.

10. One of the highlights of the tours or when I am out on my own is when we see a bald eagle. They are starting to return to the area as water quality has improved. But if we start going backwards in terms of water quality and pollution, I am worried the birds will not be thriving like they seem to be right now. Ospreys are a big highlight as well. I would hate to see the birds and other wildlife harmed by this project.

11. I am very worried about pollution from this project impacting the whole area where I paddle and run my business. The water in this area is tidal and it flushes in and out of all of the creeks every six hours when the tide changes. In Mattawan and Cheesequake Creeks, for example, there is a two- to four-foot tidal range. There is a

3

AD058

lot of water movement between high and low tide, so the sediment can pretty much go everywhere. The stirred up pollution could infiltrate the whole area and degrade the natural environment over time.

12. I grew up here, and I know how bad the water was in the 1970's. Now the nature and the wildlife are changing and recovering and rebounding, which you can see from the bald eagles returning. I don't want it to return to the way it was, and I am concerned that this project and all the pollution it will stir up is a step in that direction.

13. For my own personal boating/paddling, I go out in the same areas that I lead tours. For example, I paddle Cheesequake Creek and that part of the Raritan Bay multiple times a year, which is right where the NESE pipeline is proposed to be built. In general, I go out on my own or with a friend about six times in the off season, between October and April. It's a lot more relaxing that time of the season. There are fewer boats and it is quieter on the water. That's my time. Being out on the water is my chance to see nature from a different and slower point of view.

14. For all the same reasons I described above—the construction noise and pollution, sediment being stirred up and impacting the water

4

and the wildlife, and my concern about leaks going forward—the NESE pipeline will also impact my personal enjoyment and ability to be out on the water.

15.　I see people crabbing in this area all the time—catching crabs to eat. I don't currently crab in this area, because I am already concerned about the pollution and contaminated sediment where the pipeline will go. I know there are limits on how much crab and fish you can eat that are caught in this area due to contamination and health impacts. I would like to crab if the water quality continued to improve like it has been. But if this project and dredging happens, it will set back the improvements and means I will not be comfortable crabbing here for a lot longer.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on 3/4 , 2026

Daniel Carroll

## DECLARATION OF JOAN FLYNN

I, Joan Flynn, declare the following:

1.     I am over eighteen years of age and do not suffer from any legal incapacity. I have personal knowledge of the following facts.

2.     I am a member of Food & Water Watch. I have been involved with Food & Water Watch since about 2019 and have been especially active in their opposition to the Williams Northeast Supply Enhancement (NESE) pipeline, a fracked gas pipeline proposed to run under the seafloor from New Jersey to the Rockaway peninsula and connect with an existing pipeline, the Rockaway Lateral, which runs under Jacob Riis Park and Jamaica Bay.

3.     I grew up in Brooklyn and, as a child, I always came to the beach at Riis Park on the Rockaway Peninsula, which is now part of Gateway National Recreation Area. At that time, I never saw whales, seals, turtles, or dolphins in the ocean.

4.     I moved to Rockaway with my family 53 years ago. At that time we lived in a bungalow that had an ocean view. I remember standing in my living room at that house in 1972, holding my son, and

1

AD061

seeing one whale in the ocean, which just knocked my socks off. That was the last whale I saw until about 2010.

5. I currently live in Rockaway Park, close to Gateway National Recreation Area and about three blocks away from the beach. During the winter, I usually walk on Rockaway Beach three or four times a week. During the summer, I often go down to the beach with my husband in the morning to eat breakfast on the beach and watch the beauty. Sometimes during the summer, we go back out to the beach later in the day with our dinner. We're retired, so we have the time to do this. Some of the reasons we live here are that we have a huge field nearby, we're close to the beach, we're two blocks from Jamaica Bay, and we have fresh sea air and lovely sunsets.

6. When I am at the beach, I enjoy watching the wildlife that lives in the ocean and along the shore, including dolphins, whales, seals, turtles, and many kinds of birds.

7. The first time I saw dolphins here, about 15 years ago, we were sitting on the beach, looking out at the ocean and saw what we thought at first were very large fish before realizing they were dolphins.

2

AD062

I was so excited that I jumped up from my chair and was yelling, "Dolphins, dolphins!" That was an historic moment for me.

8.     After that point, we started seeing dolphins all the time and started regularly being able to see whales, too. I could see dolphins almost daily, while sitting on the beach. You can sometimes see whales blowing and lunging, which is joyous. I've also gone out on whale watching cruises several times, though I prefer to sit on the beach and see the whales.

9.     During the past fifteen years or so, the shorebirds have also returned to this area in multitudes, including piping plovers, American oystercatchers, terns, several kinds of gulls, osprey, and sanderlings that run along the shore. Fifteen years ago, I probably didn't even know what an osprey was, and now we have around 25 nesting pairs of ospreys in the area that depend on the ocean for their food. I'm a bird lover. One of my favorite signs of spring is to hear the oystercatchers, which you can hear from our house on the third block back from the beach.

10.     It's my understanding that Gotham Whale, a local group that advocates for the marine mammals around NYC, started counting

3

AD063

whales about 15 years ago, at which point they counted about 8 whales in the New York area. In 2025 they counted over 400 whales. You can recognize individual whales from the markings on their tail. It's also my understanding that the New York Bight is an important year-round habitat for endangered fin whales.

11. From my perspective, what's changed from the time when we rarely saw these dolphins, whales, and birds until now, when they are much more common, is that we've seen the fruition of the Clean Water Act pf 1972 and the benefits of better water quality. We now have abundant menhaden and blue fish and the larger animals that eat them. It's miraculous what has happened since the benefits of cleaner water have been felt by the population of the Earth.

12. I'm concerned that the construction of the NESE pipeline, which includes the dredging up of sediment that's contaminated with toxic industrial pollution, will harm the dolphins, whales, and birds. I know that whales are also vulnerable to ocean noise pollution and ship strikes. Construction of the Northeast Supply Enhancement (NESE) pipeline would increase the risks of survival that these creatures face. The idea that all this increased biodiversity will be destroyed just

4

AD064

horrifies me. It would negatively impact my enjoyment of time on the beach if I were not able to see as many dolphins, seals, turtles, whales, and birds because the pollution has impacted their populations or they've moved to different areas to avoid pollution and ocean noise.

13.    I also occasionally eat fish that I know were caught locally by people who fish in the area. I would not eat locally caught fish if the NESE pipeline were built, however, because I would be concerned about the pollution the fish would take in from their environment if all that toxic sediment was resuspended.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January __13__ , 2026.

Joan Flynn

5

AD065

**DECLARATION OF KATIE LEUNG**

I, Katie Leung, declare as follows:

1. I am a member of the Natural Resources Defense Council (NRDC). I joined NRDC in 2020 because of its work protecting wildlife and ecosystems, particularly in the New York City area.

2. I currently work as the Senior Volunteer and Outreach Coordinator at Riverkeeper, which is a nonprofit focused on issues affecting the Hudson River. I previously worked at the New York City Department of Parks & Recreation. I submit this declaration in my personal capacity.

3. I was born and raised on Staten Island, near Rossville, and lived there for over 30 years. Since 2021, I have spent most of my time in Westchester County for work, but my home remains in Staten Island. I return to Staten Island multiple times monthly to see my parents, cousins, aunts, and uncles, and to enjoy the natural resources I grew up around, including the Raritan Bay and Conference House Park, on the southernmost tip of the Island. I return to Conference House Park several times each year to walk through its natural areas and observe wildlife on the beach. I also frequent parks on the interior of Staten Island, including Greenbelt and Fresh Kills. I particularly enjoy observing horseshoe crabs along Raritan Bay, which are an ecologically important local species and are living fossils, capturing the history of New York City's natural ecosystems.

AD066

4. Due in part to my previous work for New York City's Department of Parks & Recreation, I am passionate about New York City's various natural resources. This includes Rockaway Beach, which is home to a rare colony of endangered piping plovers. I enjoy visiting Rockaway Beach and Breezy Point to observe those birds and other wildlife off the coast, including ospreys, dolphins, and whales. I deeply value the biodiversity of New York City's parks, which has noticeably improved over the course of my lifetime.

5. I also am invested in New York's special places and wildlife with my growing extended family. My sister in Georgia has two children, a five- and one-year-old, and my sister-in-law in Westchester is currently pregnant and expecting a baby girl soon. I want to show all three children the natural areas I have grown to love and to teach them about the local wildlife.

6. I am concerned that the construction of the Northeast Supply Enhancement (NESE) pipeline would harm my interests in enjoying these special places and the wildlife that live there. I worry that the pipeline, if constructed along its proposed route, would irreparably damage New York City's biodiversity by contaminating the water in the Lower Bay, around the Rockaway Peninsula and Breezy Point, and in the New York Bight. All those areas have seen a return of wildlife as the legacy pollutants settled into the sediment on the ocean floor. The NESE pipeline's construction would re-release those harmful pollutants into the

2

AD067

water column. I worry that the damage to water quality in those areas would be so disruptive that the wildlife I love, and the ecosystems they rely on, would be at risk of disappearing. For similar reasons, I worry that the NESE pipeline would prevent me from introducing the children in my family to the natural ecosystems and wildlife that are so important to me.

7. I also currently enjoy eating locally sourced seafood. If the NESE pipeline is constructed, I would be concerned about eating any seafood from the Bay because of the risk of seafood containing the legacy contaminants stirred up by pipeline's construction.

8. I support NRDC's lawsuit challenging approvals for the NESE pipeline because I believe that the pipeline will cause devastating pollution to Raritan Bay, the Rockaway Peninsula, the Lower Harbor, and the New York Bight, harming the wildlife that I care deeply about and the larger New York City community that enjoys those special natural resources.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on _17_ November, 2025.


Katie Leung

AD068

# DECLARATION OF TAYLOR MCFARLAND

I, Taylor McFarland declare the following:

1. I am over eighteen years of age and do not suffer from any legal incapacity. I have personal knowledge of the following facts.

2. I have been an employee and a member of the Sierra Club, New Jersey Chapter, for over eight years. At the Sierra Club, I am the Conservation Program Manager, and I do organizing, lobbying, and educational activities aimed at protecting the environment, specifically, land, water, and wildlife.

3. I have lived in Keyport, New Jersey, since 2019 and my home is just two blocks away from the Raritan Bay. The NESE pipeline would be constructed about five miles offshore from my home and where I walk, play basketball, and paddleboard in and next to Veteran's Memorial Park and Cliffwood Beach. Some onshore components will be built about seven miles from my house. Construction for the NESE pipeline would also occur two miles from Old Bridge Waterfront Park, where I like to walk. I enjoy these areas because they are pleasant and not crowded, but the pipeline construction would undo decades of work to

improve these parks.

4. I enjoy walking my dog along the shores of the Raritan Bay, where I also paddleboard in the late spring and summer at least twice a month. I love how convenient and easy it is to get my paddleboard to the water, and the Raritan Bay is a great place to paddleboard because it's placid, beautiful, calm, and close to my home. My husband loves to fish, however would not fish in the Bay because of the ongoing pollution. Instead, he travels sometimes out of state to go fishing. I have lived near the ocean or water my entire life, so living near a clean waterbody is very important to me.

5. When I paddleboard, I like to watch the horseshoe crabs and various bird species in the Bay, including ospreys and egrets.

6. I am very concerned about how the NESE pipeline project will impact my ability to continue paddleboarding and enjoying the Raritan Bay. If the NESE pipeline is built, I would stop letting my dog go in the water because I'm afraid that the pollution from the project would harm her health, and I would stop walking on the beach entirely. I would also stop paddleboarding in the Bay entirely, and would have to travel to the Delaware River or out of state to paddleboard on waters

AD070

that are safe and calm like the Raritan Bay. The increased pollution and contamination that the pipeline will cause will deter my husband from ever going near the Bay to fish, despite living just two blocks away.

7. The proximity to Raritan Bay was a big reason why we moved to Keyport in 2019, and I would strongly consider moving out of Keyport if this pipeline is built to find a home near cleaner and safer waters.

8. The waters of the Raritan Bay are already murky, and I worry that pollution and sediment during construction of the pipeline would make it murkier and would negatively impact the water quality. I am also concerned that these water quality impacts would negatively impact the wildlife in the Bay, including the horseshoe crabs, birds, fish, and marine habitats. I fear that I would lose the ability to view the horseshoe crabs, birds like ospreys and egrets, and other wildlife because the NESE pipeline would negatively impact the wildlife in the Bay. The pollution from the pipeline would undo decades of work that has been done to clean up the water in the Bay.

9. I'm concerned about the impact the construction would have on the wetlands near Cheesequake Creek. The NESE project will cross

these wetlands, which have helped to significantly reduce local flooding in Keyport during Hurricane Sandy, and the loss of these wetlands would be likely to increase the impacts of flooding in my community. My basement has flooded several times and we have two sump pumps, and the local infrastructure is not equipped to handle more water. I am afraid that we will see more frequent and severe flooding in Keyport that could damage my home because of the impacts of the pipeline construction on these wetlands.

10. The construction from the Madison Loop portion of the pipeline would make traffic an absolute mess, because it is proposed to go under Route 9, Route 35, the New Jersey Parkway, under train tracks, and under a housing development. This would increase risks for gas leaks, fires, and explosions, in addition to increasing traffic congestion in these areas. I travel on Route 35 on a daily basis, and I frequently use the New Jersey Parkway, so the construction from the NESE pipeline would negatively impact my commutes and travel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 26, 2025

_____

Taylor McFarland

# DECLARATION OF SUSAN MIKAITIS

I, Susan Mikaitis declare the following:

1.      I am over eighteen years of age and do not suffer from any legal incapacity. I have personal knowledge of the following facts.

2.      I have been a member of Food & Water Watch (FWW) for about 4 years. As a member and volunteer for FWW, I engage with local municipalities by attending town council meetings to support environmentally positive actions and legislation, such as opposing the NESE pipeline, stopping the development of fossil fuel power plants, and garnering support for the Climate Superfund Law.

3.      I live in the Atlantic Highlands, which is a waterfront community, and have lived in the Bayshore area for most of my adult life.

4.      I have sailed on the Raritan Bay for over 42 years. My husband owns a boat-building business in the area, and our livelihood is connected to the health of the Raritan Bay. I sail less frequently now because we sold our boat, but I still go on boating trips with my husband and our friends who have boats.

AD074

5.     I worry that if the pipeline is built and negatively impacts the water quality in the Raritan Bay, people will buy fewer boats to go out on the Bay. Boat building is a very fragile industry to begin with. My husband is nearing retirement, so this is less of a concern than it once was, but it will still impact us.

6.     I am a long-time member of both Keyport Yacht Club (42 years) and the Atlantic Highlands Yacht Club (20 years). Both of these yacht clubs offer junior sailing programs, which I am involved in and contribute to financially. I am concerned that if the pipeline is built, it will impact water quality and make it unsafe for junior sailors to be on the water. This will mean I can no longer participate in these programs, which are meaningful to me.

7.     I have witnessed the Bay's water quality improve significantly in the past 10 years. I remember how awful the water quality was 40 years ago from all of the contamination in the water from industry. It is only in the last 10 years that the water has really miraculously improved. That has to do with all of the contaminated sediment settling down and being buried. Having a pipeline go through

AD075

would stir all of that sediment up and set things way back in terms of water quality.

8.    I walk along the shores of the Raritan Bay and Sandy Hook three to four times per week. I also have done beach cleanups in the area with Clean Ocean Action.

9.    When I go on boating trips and I walk along the Bay, I see a lot of wildlife including foxes, birds, pods of dolphins, and whales.

10.    If the NESE pipeline is built, I am very concerned that it would negatively impact the water quality and ecosystem in the Raritan Bay. I worry that the pipeline construction will kick up toxic, contaminated sediment at the bottom of the Bay. I may reduce or stop boating in the Bay and going for walks if the pipeline is built. I fear it would negatively impact the wildlife in the Bay and my ability to view it.

11.    I also enjoy eating the locally caught fish about once per week. We get the fish from our friends who are fishermen who fish the local waters. I will have to stop doing this if the pipeline is built out of fear that I would be impacted by the toxins they absorb from the proposed pipeline. We have a very dynamic fishing community in this

AD076

area and there will be terrible environmental and health impacts if this pipeline is built, because you won't know if the fish you are catching and eating is contaminated.

12. During the "storm of the century" in 1992, mine and my husband's home was destroyed due to flooding. A few years later, our boat that my husband built was destroyed and my husband's boat-building business sustained four feet of flooding during superstorm Sandy. Superstorm Sandy caused us significant financial losses, as all equipment and material in its path was destroyed.

13. I am adamantly opposed to any new fossil fuel projects because of how the burning of fossil fuels contributes to climate change and more extreme weather events.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _____12/8/2025_____, 2025

DocuSigned by:

*Susan Mikaitis*
0DCD5DC58D6A455...

Susan Mikaitis

AD077

**DECLARATION OF SAYLOR POCHAN**

I, Saylor Pochan declare the following:

1.      I am over eighteen years of age and do not suffer from any legal incapacity. I have personal knowledge of the following facts.

2.      I am a member of and longtime volunteer with the Surfrider Foundation. I have been involved with the Surfrider Foundation for about 15 years and have taken on various volunteer roles during that time. For example, for 8 years I ran a water testing program that tests for sewage in the water, and I have helped with the campaign for the establishment of a National Marine Monument to protect the Hudson Canyon, which is large underwater canyon carved out by the Hudson River, where hundreds of endemic species live. I was previously the Co-Chair of Surfrider New York City. I am a founding member of the Surfrider Foundation's organization-wide Justice, Equity, Diversity, and Inclusion committee, and was a founder of the Engagement Working Group. I've also done a lot of public speaking for the Surfrider Foundation. I currently help to train other Surfrider Foundation volunteers. I received the Surfrider Foundation's Wavemaker Award in 2022, which is an award for exceptional leadership, performance, dedication and support in fulfilling the Surfrider Foundation's mission.

1

AD078

3.  I live in Far Rockaway, Queens. I moved there in 2013, right after Superstorm Sandy.

4.  I have basically structured my whole life around being able to spend time at the beach and in the water. During the summer I go to the beach every day, spending hours a day at several beaches in Rockaway or in the water. In the winter I'm in the water at least once a week, wearing a thick wetsuit.

5.  I surf, boogie board, and open ocean swim, though most often I bodysurf. When you bodysurf, you're more connected to the ocean than when you're surfing on a surfboard. When you bodysurf, you're in the ocean up to your neck for hours and hours. Your head is often underwater. You end up touching a lot of fish.

6.  I am pretty aware of not swimming when the water is more contaminated. We have a combined stormwater and sewage system, which means that both stormwater running off the street and sewage from people's houses go into the same sewer system. Because of this, after a big rain that overwhelms the system, sewage contaminates the water. I usually wait for the tides to flush things out a bit before I go into the water after a big rain.

7.      I want to continue enjoying the beaches and waters in these same ways in the future, but the construction of the NESE gas pipeline would negatively impact my use of the beach and the water and my enjoyment of these activities. I am concerned that construction of the offshore portions of the NESE pipeline will expose me to pollution while I am in the water. I know that the construction, including trenching for the pipeline, will churn up sediment. I'm concerned about being exposed to the contaminants in that sediment, which I know include things like arsenic, dioxins, and PCBs. I don't want to have to stay out of the water for however long it would take for all the heavy metals from the construction to settle back down.

8.      I also spend a lot of time on beaches in Rockaway. Almost every morning I walk to the boardwalk to look at the ocean. I do beach cleanups with the Surfrider Foundation and also often go out on my own with a bag and pick up trash on the beach. I go for long walks looking at seashells and looking for sea glass or for antique glass that washes up on shore from an old garbage dump, Deadhorse Bay. Sometimes I sit with other locals on the beach and watch what's going on. My favorite thing is kind of observing everything, paying attention to the rhythms of everything on shore and in the water, thinking about the interconnectedness of life.

9.      I also visit Riis Beach about once a week during the summertime. Riis Beach is unique in that it historically has provided a safe spot in New York for the queer, trans, and BIPOC (black, indigenous, and people of color) communities. I have organized to help protect Riis Beach, which is currently very eroded. Riis Beach is located very close to the existing Rockway Lateral pipeline. The NESE pipeline will connect with the Rockaway Lateral almost directly offshore of Riis Beach, and the Lateral will carry more gas once the NESE pipeline is built. I am concerned that the fact that the Lateral will be carrying more gas will make it pose a greater safety risk to me and other people using Riis Beach.

10.     I enjoy watching wildlife while I am on the beach or in the water. I enjoy watching the shorebirds including the seagulls, piping plovers, and oystercatchers. Oystercatchers return to the same place every year to nest, and I get so happy when I hear them for the first time in the spring. I love watching the dolphins, which is such a powerful way to connect with the ocean. You can see dolphins from shore, and if you're surfing, they sometimes get really close. I also enjoy seeing horseshoe crabs on the beach. I think they're so amazing, with the fact that their species is millions of years old. I also enjoy seeing whales feeding offshore. Sometimes when the currents shift and a whirl of the Gulfstream comes up, we can get

4

AD081

creatures like seahorses and corals from the Hudson Canyon that wash up to the beach.

11. I also go whale watching with Gotham Whale. The whale watching boats leave from Sheepshead Bay in Brooklyn and then travel out along Long Island, past Rockaway and Long Beach. The Surfrider Foundation has an event for members once a year where we go whale watching with Gotham Whale. In addition to attending that annual Surfrider Foundation event, I personally go out whale watching once or twice a year and try to take others out with me.

12. In the time that I've lived here, I see that the harbor is cleaner now and there are more seals, dolphins, whales, and piping plovers than were previously here.

13. I am concerned that construction of the offshore NESE pipeline would negatively impact my ability to enjoy watching these animals because they will no longer come to the same areas and I will not be able to see them while walking on the beach, swimming, or bodysurfing. I'm also concerned that the construction of the NESE pipeline and the pollution it will cause will harm or kill the animals that I enjoy watching, which would be upsetting. I am a vegan, and I get very sad when I see a dead creature, such as a beached whale or beached dolphin. I've attended events where

the community mourns dead whales, including when elders from the Shinnecock Nation come to pay respect to the beached whales, and I find it really affecting.

14.     When you live on the beach like I do, you get very attuned to what's happening offshore, attuned to shifts in the environment because of what's washing up, reading the signs, the animals you're seeing. All the species I see onshore eat other creatures that are washed up from offshore. I don't want to see signs that creatures are dying offshore. The animals that live offshore can't speak up for themselves, and it gives me a lot of anxiety to know that they could be harmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _____7 December_____, 2025.

_____
Saylor Pochan

6

AD083

# DECLARATION OF JOSÉ RAMÍREZ-GAROFALO

I, José Ramírez-Garofalo declare the following:

1. I am over eighteen years of age and do not suffer from any legal incapacity. I have personal knowledge of the following facts.

2. I am the President of Protectors of Pine Oak Woods, a Staten Island-based 501(c)(3) non-profit environmental preservation organization established in 1975. I've been the President since April 2024. Before that, I was the Vice President from 2021 to 2024, and before that was a board member starting in 2018.

3. I am an ecologist and a life-long resident of Staten Island. Birding at the beach as a child and looking at the birds that come into Raritan Bay is how I got my start in ecology. My formative years going out as a recreational birder were key in all of this. At a young age I also spent time seining, which is catching fish in a net, on the beaches on Staten Island with my mom, who is a park ranger. Doing that recreationally as a child and teen has also turned into what I do professionally.

4. I currently do research on the ecology of Raritan Bay in several capacities. Some is done in my current role as an ecologist at

1

AD084

Rutgers University. Previously I did research as an ecologist at the City University of New York. My research on horseshoe crabs is done as a volunteer for Cornell University Cooperative Extension of Suffolk County. I also do some research on my own. I do academic writing and publish papers based on the research that I do.

5. Most of my research is focused on the relationship between water birds and the New York Harbor estuary. A lot of this work is directly related to water quality and to the distribution of species throughout the year. My research includes land-based and water-based surveys. Much of my research involves looking at birds and their behaviors through a spotting scope. I observe things like birds' foraging behavior, the amount of time birds are underwater, and the other species they're associating with, which is an important indicator. I also observe how birds are distributed relative to the shoreline and Ambrose shipping channel and observe any disturbance related to foraging and wintering waterbirds. Some of my research also focuses on marsh restoration and its impact on breeding birds, such as salt marsh sparrows, which are designated as endangered by New York state. Most of the water-based surveys are done between May and October. During

2

AD085

winter and spring, I'm usually doing observations from the shoreline, which can include taking note of sea ducks and other wintering birds.

6. For my water-based surveys I go out in the Bay in a kayak with my spotting scope to observe birds. I go throughout the entire Bay, including in the area directly above where the underwater portion of the planned NESE pipeline will be constructed. I also do water quality sampling of the water about three feet down from the surface, which requires regularly going back to the same specific locations.

7. I also do research on the American horseshoe crab, including its spawning phenology and its interaction with shorebirds, like the federally threatened red knot.

8. Additionally, I do research on fish communities in the Bay, including how species are changing over time in response to changes in water quality and temperature, such as species that require good water quality that now come into the Bay. We're now seeing new species that were never recorded here before that were able to expand their range, such as skilletfish. Skilletfish are a species you expect to see where the seabed is pretty good. If you disturb the seabed, you will affect the skilletfish and other species.

AD086

9. I'm concerned that the construction of the NESE pipeline will negatively impact the species that I study and will also impact my ability to conduct this research. The disturbance from dredging for the NESE pipeline will impair the water quality by suspending particles in the water, including resuspension of metals, which could cause declines in colonial waterbirds that breed in the harbor and shorebird populations that stop over in the area. Because of the resuspension of contaminated sediment, we'll see changes in the whole ecological community, starting with the benthic community, which would show up in the higher trophic levels and species that eat smaller creatures. I'm concerned that this construction could affect populations of horseshoe crabs and of many of the birds I observe. For example, in New York Bay I do surveys on scoters, sea birds that eat things like blue mussels and northern quahog. 25% of the scoter population is staging in the Bay.

10. Any extended disturbance of the habitat in the Bay will harm my ability to research. It will change where the birds are able to go and impact what they're foraging on, such as causing them to use a food source that is not optimal. It may change their pairing behavior. It would change the entire behavioral landscape and the physical spatial

4

AD087

distribution of those birds. It might drive them out farther into the Bay where there are not as good food resources and would make it more difficult for me to make my observations.

11.    I'm also worried that construction of the NESE pipeline could lead to increased pollution, such as heavy metals, near the surface of the water, and that this pollution could negatively impact my health if I am exposed to that water while kayaking to conduct my research.

12.    I go out birding recreationally all the time. Every day I watch birds on the shore and log my observations in eBird. Birding here is fantastic. It's great recreation, and it's my escape.

13.    Throughout my years as a birder, from when I was a kid until now, I've been able to observe the changes in species as the water quality got better and we started to see so many more species in the Bay, including the northern gannet, which are one of my favorites. The northern gannets breed in Newfoundland. Historically, northern gannets were rare here because of poor water quality, but now we see a high abundance of gannets because improved water quality has brought in species of fish like menhaden that they forage on at the nearshore.

5

AD088

Bald eagles are now nesting on Staten Island and foraging on fish and sea ducks.

14. If the NESE pipeline is constructed, I'm concerned that it would harm my ability to enjoy recreational birding. Watching birds is my primary interest, and the birds I enjoy watching could face population declines because of the pollution dredging for the pipeline will resuspend, or they could move to other locations to avoid the pollution, where I would not be able to see them as often. I'm especially concerned for species that are already not doing well, such as black crowned night herons, which are seeing precipitous declines across the region.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Éxecuted on January __22__ , 2026.

José Ramírez-Garofalo

6

AD089

## DECLARATION OF JAMES SCARCELLA

I, James Scarcella, declare as follows:

1.      I am a member of the Natural Resources Defense Council (NRDC). My wife, Margaret, and I joined NRDC in 2020 because of its work to protect New York's waters and wetlands, an issue that I am very passionate about. In fact, before I joined NRDC, I had been aware of and supported NRDC's work from the sidelines for decades. Starting in the early 1990s, I volunteered with the Natural Resources Protective Association (NRPA) as part of its Dredge Material Management Group, which worked in coalition with NRDC, Port Authority, New York State Department of Environmental Conservation, and other interested parties. We met regularly at NRDC's New York offices to review digging projects that were being proposed in the New York–New Jersey Harbor Estuary and to discuss innovative solutions to the harms of dredging, such as using dredge spoils as landfill cover or in remediation of brownfield sites.

2.      I am also a member of NY/NJ Baykeeper.

3.      I am now retired, but I previously worked at the New York City Housing Authority.

4.      I was born and raised on Staten Island, and the water around the Island has always been at the center of my life. I even like to say that loving the

AD090

water is in my family's blood: My grandfather was a boatbuilder who immigrated to the United States from Portugal.

5. I grew up near Great Kills Harbor, which has a large boating and recreational fishing community. My father and my uncle were members of the Great Kills Yacht Club. My three brothers, sister, and I would go out boating, sailing, and crabbing with our dad and uncle throughout our childhoods.

6. I have many fond memories of going out on the water with my family, and I continued the tradition with my own son, Christopher. My younger brother John had a boat that we would go out on every summer of Christopher's childhood to fish and swim. I also taught Christopher about the importance of protecting the water, and he would join me to volunteer with NY/NJ Baykeeper. Together, we collected samples for water quality testing and kept a list of the trash that we collected on the beaches to help with the Floatables Monitoring Program. It was wonderful to be able to pass down my love of the water to Christopher, and I hope that future generations will also be able to experience everything that the water has to offer.

7. My wife and I still live on Staten Island with Christopher, Christopher's partner, and our family dog, Nala. Our current home is less than a 15-minute walk to the Lower New York Bay waterfront.

AD091

8. Enjoying the waterfront is a daily part of my life. I try to get out for a walk or bike ride along the waterfront every day. I also swim in either the Lower New York Bay or Raritan Bay nearly every day that is warm enough, from early spring through late fall. I even take a plunge on New Year's Day after my annual hike at Gateway National Recreation Area. Swimming in the ocean gives me a psychological boost that I cannot get anywhere else. My brother John and I have continued our family tradition of kayaking and canoeing together a few times each year. Just earlier this summer, we went kayaking near Sandy Hook in Raritan Bay.

9. I also take advantage of the local seafood the bays have to offer. About six to eight times a year, I cast out a lure to fish from Great Kills Park, about where Raritan Bay meets Lower New York Bay. While I generally don't catch a ton myself, I enjoy the chance to spend more time out on the water and the occasional good luck of bringing some fish home to cook and eat. My brother's neighbor is a more avid fisherman, and my family and I greatly enjoy eating the delicious filets from the striped bass that he catches and occasionally shares with us.

10. Given the central role the waters around Staten Island play in my life, I have spent much of my retirement volunteering to safeguard them. I serve as a beach captain with the American Littoral Society, where I partner with groups like NYC H2O to help organize beach sweeps at least once to twice a month to clean

AD092

up the beaches, shorelines, and waterfront parks on Staten Island. The sweeps are often attended by high school students that are trying to serve their community while also learning about New York's local ecology. I have also volunteered with the New York City Department of Parks and Recreation's Natural Resources Group to help restore New York's salt marshes by helping to plant saltmarsh cordgrass and other native plants. I have continued to volunteer with NY/NJ Baykeeper to help protect water quality through water sampling and beach cleanups, and I am a dues-paying member of several environmental organizations.

11. Because of my love for the water, I am very worried about the plans to construct the Northeast Supply Enhancement (NESE) pipeline and the damage that it will cause to the underwater ecology of the Lower New York Bay and Raritan Bay. The pipeline's construction will cause massive sediment disturbance that will be harmful to the bays' marine life, from microorganisms all the way up to large marine mammals. I fear that many fish and shellfish will die and wash up onto the beaches that I and many others love to frequent. Even animals who do not live in the water will be affected. For instance, the small but growing bald eagle population on Staten Island would be severely harmed by any reduction of menhaden, a small fish that is a key element of the eagles' diet. Furthermore, the toxins and heavy metals that the dredging will release into the water can

AD093

bioaccumulate up the food chain, risking the health of the animals and people who eat seafood from the bays—including me and my family.

12. Construction of the NESE pipeline would have a large impact on me personally. If construction moves forward, I will be concerned about the water pollution in the parts of the bays I swim, fish, and kayak in. I would no longer feel comfortable going out to swim in the bays, which would take a significant toll on my mental health. My brother and I would not go out to kayak or canoe as often, if ever. I would stop going out to fish, and I would be nervous about eating any fish or other seafood from the bays due to my fears about toxins bioaccumulating up the food chain.

13. I fully support NRDC's lawsuit challenging approvals for the NESE pipeline because I believe that the pipeline will cause devastating harm to the water that I have loved, enjoyed, and sought to protect since my childhood. I have worked to oppose the pipeline going back several years, including volunteering with Food and Water Watch to urge New York's government to deny the pipeline's construction permit because of its incompatibility with the state's water quality standards. While I understand that underwater infrastructure requires updates and maintenance, the construction of an entirely new, incredibly damaging pipeline does not make any sense to me. I hope that this lawsuit can prevent the

AD094

construction of the pipeline and the inevitable harm it will cause, so that I, others in my community, and future generations can continue enjoying the water.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on __18__ November, 2025.

James Scarcella

## DECLARATION OF JUDITH C. STARK

I, Judith C. Stark, declare as follows:

1.      I am a member of the Natural Resources Defense Council (NRDC). I joined NRDC in 2023 because of its international membership and reach. So many of our environmental issues, especially the climate crisis, must be addressed at a global level, and so I want to support groups that work internationally. I also joined NRDC because I appreciate its use of legal action to advocate for and defend our environment.

2.      I live in South Orange, New Jersey.

3.      I am a professor of philosophy and the environment at Seton Hall University. I have worked and taught at Seton Hall for 45 years, during which time I helped establish its environmental studies program. I currently teach several seminars, including a seminar to help other professors incorporate environmental topics into their existing courses. Throughout my time at Seton Hall, I have educated students on local, regional, and global environmental issues. I often take students to Sandy Hook, a barrier spit on the eastern edge of Raritan Bay. There, we observe the wetlands and wildlife, and the ways that climate change and pollution greatly affect them.

4.      In addition to my work at Seton Hall, I regularly volunteer with church and other community groups, where I give talks about climate change and

AD096

present the ways we can work to help protect the environment. I have also volunteered at Delia Bolden Elementary School in Maplewood, New Jersey. During my visits, I take students on a walk to the nearby East Branch Rahway River—a tributary of the Raritan River, which flows into Raritan Bay—and explain its importance and its role in our local ecosystems.

5. The waters in and around New Jersey and New York have always been an important part of my life. I grew up in Bayonne, New Jersey, which is located on the southern tip of a peninsula between Newark Bay and Upper New York Bay. My childhood home was about a half a mile walk from the waterfronts of both bays, although I usually visited the water by biking to Collins Park at Bayonne's southern tip. I had my first experiences birdwatching at Hudson County Park on Bayonne's western shoreline.

6. As a teenager, I spent almost all of my summer free time outside. My friends and I would bike over Bayonne Bridge to Staten Island to go swimming at South Beach on Lower New York Bay. Once we got our drivers' licenses, we had the freedom to explore even more of New Jersey and New York's beaches, like Lawrence Harbor Beach on Raritan Bay in Old Bridge, New Jersey, and the Rockaways in Queens, New York. I had so much fun getting to bike, walk, swim, and birdwatch in and along these shorelines, and I hope that my students and many more generations to come will have the same wonderful experiences.

2

AD097

7.    Even with these fond memories, I also remember how polluted the waters around New Jersey and New York were during my childhood and how worried I was about the pollution's effects on me and my family. For instance, I remember being horrified when my Mom ate shad that was caught out of the Hudson River after the fish completed their spring run from the Atlantic Ocean through the New York–New Jersey Harbor Estuary. Even though the fish were only in those waters for a short time, I was concerned that any contact with New York Harbor or the Hudson River would contaminate them and harm my mother.

8.    Since then, the water quality throughout the Estuary and its nearby rivers has greatly improved. Having spent so much of my life in New Jersey, I have been able to witness the ways that its land, air, and especially water have gotten so much cleaner over the last 35 years. I credit these changes, in large part, to legislation like the Clean Water Act and to work by both community groups and organizations like NRDC.

9.    I have personally been able to enjoy these positive changes and dramatic improvements in New Jersey's environment. Outside of my work and volunteering, I continue to spend as much time as I can outside in nature. I hike frequently, including at Palisades Interstate Park along the Hudson River. I enjoy the practice of forest bathing, where I spend time intentionally in nature to enjoy

3

AD098

the beauties of nature and de-stress. I believe that nature is healing both for one's mental and physical health.

10. Birdwatching continues to be one of my greatest passions. At least two or three times a month, and even more during the migratory seasons of April to June and August to November, I go out to observe the different birds that live in or migrate through New Jersey. I especially love getting to see the great variety of birds that the Raritan Bay has to offer, from shorebirds like piping plovers and red knots, to wading birds like great blue herons and egrets, to the many different species of gulls. One of my favorite places to birdwatch is Sandy Hook's portion of Gateway National Recreation Area in Raritan Bay. It is a wonderful place for birding because of the extent of undeveloped coastline, which leads many birds migrating along the Atlantic Flyway to stop there. I also frequently visit Cheesequake State Park (right off of Raritan Bay) to see its shoreline and upland birds, and Great Kills Park in Staten Island (on Lower New York Bay). I feel fortunate to live just a short drive away from all these wondrous places.

11. I am very concerned that the planned construction of the Northeast Supply Enhancement (NESE) pipeline will harm New Jersey and New York's waters and the wildlife that depend on them. I fear that the pipeline's construction will undo some of the tremendous work that has been done to improve water quality over the last 35 years. The construction's disruption to the seabed would

4

AD099

release toxins into the water that could have serious negative effects on entire local ecosystems. I am particularly concerned about the impacts of this pollution on the shore birds that live on or migrate through Raritan and Lower New York Bay, as any toxins in the water can bioaccumulate up the food chain into the fish that they eat.

12. The NESE pipeline's pollution would undermine my enjoyment of New Jersey and New York's waters and nature as well. I would be devastated by any harm to the birds that I observe. I and many others use birding as a way to relax, reduce stress, and connect with nature. Any reduction in bird populations would greatly diminish my enjoyment of birding and nature in general. And even knowing that the birds I am watching may be ingesting fish with heightened levels of toxic chemicals will make my birding in and around Raritan and Lower New York Bay far less enjoyable.

13. For these reasons, I strongly support NRDC's litigation challenging approvals for the NESE pipeline. The pipeline will harm the waters and the animals that I care deeply about. I have spent my entire life enjoying New Jersey and New York's nature and have committed my career to educating future generations about how to protect it so that they, too, can appreciate all that our environment has to offer. I believe all the steps—large and small—we take to protect our environment add up. Preventing the harmful pollution this pipeline

5

AD100

would cause is essential for the health of Raritan Bay and New York Bay, along with all of their inhabitants.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on _9_ December, 2025.

_Judith C. Stark_

Judith C. Stark

6

AD101

## DECLARATION OF VALERIE ZANDOLI

I, Valerie Zandoli, declare as follows:

1.       I am a member of the Natural Resources Defense Council (NRDC). I joined NRDC because Earth and our environment are my greatest passions and reason for life, from which all else flows. My late father's involvement in and support of environmental causes since the 1940s inspired my active membership with NRDC.

2.       I have lived near the Atlantic Ocean all my life. I grew up in Queens and, for nearly 10 years, I have lived in Wolfe's Pond Park, an area of Staten Island located on the Raritan Bay. I moved to Wolfe's Pond Park to be with my partner, who has lived there for 30 years. Our home is about 500 feet from the waterfront, and the walk from our from door to the water's edge takes about two minutes.

3.       I was the sole caregiver for my parents until they recently passed, and I am currently wrapping up their estates while also processing my bereavement. I have prior experience in healthcare as a care manager and in commercial dining as a business development associate for a global fast-casual restaurant brand.

4.       My life in Staten Island is interwoven with Raritan Bay. I enjoy the water in a number of ways. I take frequent walks by the Bay and sometimes sit by it on a blanket, chair, or in a car to take in its beauty and observe wildlife, including dolphins, osprey, cormorant, porpoises, horseshoe crabs, and Brandt

AD102

geese. I also wade into it daily when weather permits, up to three or four feet. I enjoy kayaking monthly during warmer months, especially with my cousin, and kayak along the Bay and lower New York Harbor, often as far as one to two thousand feet from the shore.

5.      My partner and I also enjoy and maintain a salt-water aquarium in our living room that is home to several local, native species including algae, anemone, a blue claw crab, herbivorous snails, and killifish collected during our walks along Raritan Bay's tidepools. The snails that we collect from Raritan Bay to place in the tank eat the algae to maintain the tank's ecological balance, as they do in the wild, and thus maintain the tank's overall health. We enjoy having the tank in our home. We rehome the various species in the tank instead of purchasing species because our household budget is tight. The population of each species near our home already fluctuates significantly, corresponding to the presence of local algal blooms, and sometimes finding any of them is hard.

6.      If construction of the Northeast Supply Enhancement (NESE) pipeline proceeds, I would be afraid to wade or kayak in the Bay because of the potential exposure to contaminants in the water, including mercury and copper, that would be released by the construction. I also worry that the construction will harm the local ecosystem, including by reducing the populations of the animals that I enjoy observing in the wild and that we collect for our aquarium. I tear up thinking of

AD103

that potential. Those changes would be devastating for my lifestyle. I hope that my efforts in filing this declaration will help stop the project so that those harms to the Bay and the wildlife that live there do not occur.

7.      I support NRDC's lawsuit because I want to protect my lifestyle and the Raritan Bay, which has given me daily joy for the past decade. I believe that if NESE were built, it would disrupt the recreational activities on the Bay that I enjoy and damage the ecosystem that my partner and I rely on. If NRDC prevails in this litigation, I will be able to continue enjoying the Bay as I do currently and have for years.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on 17 November, 2025.

_____
Valerie Zandoli

AD104