# 25-2938

# United States Court of Appeals for the Second Circuit

RARITAN BAYKEEPER, INC., FOOD & WATER WATCH, PROTECTORS OF PINE OAK WOODS, INC., SIERRA CLUB, SURFRIDER FOUNDATION, NATURAL RESOURCES DEFENSE COUNCIL, INC.,

*Petitioners,*

v.

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION; AMANDA LEFTON, Commissioner, New York State Department of Environmental Conservation, TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

*Respondents..*

PETITION FOR REVIEW FROM THE NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

## FINAL FORM BRIEF FOR STATE RESPONDENTS

BARBARA D. UNDERWOOD
 *Solicitor General*
JEFFREY W. LANG
 *Deputy Solicitor General*
BRIAN LUSIGNAN
 *Assistant Solicitor General*
SUSAN L. TAYLOR
MEREDITH G. LEE-CLARK
KYLE BURNS
 *Assistant Attorneys General*
 *Environmental Protection Bureau*
  *of Counsel*

LETITIA JAMES
*Attorney General of the*
 *State of New York*
Attorney for State Respondents
The Capitol
Albany, NY 12224
(518) 776-2401

Dated: April 20, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................................................iv

PRELIMINARY STATEMENT................................................................1

ISSUES PRESENTED .............................................................................2

REGULATORY FRAMEWORK...............................................................3

    A.    Federal Laws Governing Approval and Environmental Review of Natural Gas Pipelines...............................................3

    B.    State Laws Governing Impacts of Natural Gas Pipelines on State Water Quality .................................................................5

STATEMENT OF THE CASE ...............................................................10

    A.    Transco's Application for a Certificate of Public Convenience and Necessity and FERC's Environmental Review..................................................................................... 10

    B.    The Department Denies Transco's Applications for a Water Quality Certification. .......................................................... 13

    1.    Transco Failed to Establish the Appropriateness of Using the Default 500-foot Mixing Zone. .............................................15

    2.    Transco Failed to Support Its Reliance on 5% Sediment Loss Rate for Jet Trenching. .....................................................17

    3.    Transco Failed to Justify a Four-foot Burial Depth. ............19

    C.    Transco Cancels, then Revives, the NESE Project and Reapplies for a Water Quality Certification. ........................ 19

    1.    Transco Supports Use of the Default 500-foot Mixing Zone and Addresses Concerns About Impacts on Hard Clams and Fish Habitats. ..............................................................................22

    2.    Transco Supports Use of a 5% Sediment Loss Rate for Jet Trenching..............................................................................25

    3.    Transco Supports Use of a Four-foot Burial Depth..............26

    4.    Transco Submits Draft Compliance Plans...........................26

    D.    The Department Grants a Water Quality Certification for the NESE Project...................................................................27

1.      The Department Accepts Transco's Use of a 500-foot Mixing Zone to Measure Compliance................................................29

2.      The Department Accepts Transco's Use of a 5% Sediment Loss Rate for Jet Trenching Activities. .........................................31

3.      The Department Accepts Transco's Use of a Four-foot Burial Depth. .................................................................32

4.      Requirement that Transco Develop and Implement Post-Certification, Pre-Construction Compliance Plans. .............33

E.      This Proceeding...................................................................36

SUMMARY OF ARGUMENT................................................................37

STANDARD OF REVIEW.....................................................................39

ARGUMENT........................................................................................41

POINT I..............................................................................................41

THE DEPARTMENT ADEQUATELY EXPLAINED ITS 2025 DECISION TO GRANT THE WATER QUALITY CERTIFICATION, NOTWITHSTANDING ITS PRIOR DENIALS ...............................................................................................41

A.      The Department Was Not Required to Provide a More Substantial Justification for Granting Transco's 2025 Application Because of Its Prior Denials. ...........................41

B.      The Department Rationally Explained Why It Reached a Different Conclusion in 2025. ..............................................45

1.      The Department Explained Its Determination of the Applicability of the 500-foot Mixing Zone. ...........................47

2.      The Department Explained Its Acceptance of Sediment Modeling Based on Transco's Estimate of 5% Sediment Loss from Jet Trenchers. ...............................................................50

3.      The Department Explained Its Acceptance of a Four-foot Burial Depth for the Pipeline. ..............................................51

4.      The Department Did Not Change its Position on Mitigation of Water Quality Impacts .......................................................52

POINT II .............................................................................................54

ii

THE DEPARTMENT RATIONALLY RELIED ON TRANSCO'S SUBMISSION OF POST-CERTIFICATION COMPLIANCE PLANS ........................................................... 54

    A.    States May Rely on Post-Certification Compliance Plans In Issuing Section 401 Certifications. ......................................... 54

    B.    The Department's Reliance on Transco's Submission of Post-Certification Compliance Plans Was Rational. .................... 58

POINT III .................................................................................................. 63

THE DEPARTMENT COMPLIED WITH ALL PUBLIC NOTICE AND COMMENT REQUIREMENTS ...................................................................................... 63

    A.    The Department Complied with the Public Notice and Comment Requirements of Section 401 and State Laws. ..... 63

    B.    The Department Was Not Required to Release Transco's Re-calculation of Hard Clam Density or Support for Its Predicted Sediment Loss Rate for Public Comment. ............................ 66

    C.    The Department Was Not Required to Provide for Public Notice and Comment on Post-Certification Compliance Plans. ............................................................................................. 71

CONCLUSION ........................................................................................... 73

CERTIFICATE OF COMPLIANCE ....................................................... 74

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcoa Power Generating Inc. v. FERC,*
 643 F.3d 963 (D.C. Cir. 2011) ................................................................. 54

*Alina Health Servs. v. Sebelius,*
 746 F.3d 1102 (D.C. Cir. 2015) ............................................................... 68

*American Radio Relay League, Inc. v. FCC,*
 524 F.3d 227 (D.C. Cir. 2008) ................................................................. 70

*Appalachian Voices v. State Water Control Board,*
 912 F.3d 746 (4th Cir. 2019) .............................................................. 56, 63

*Berkshire Env't Action Team, Inc. v. Tennessee Gas,*
 851 F.3d 105 (1st Cir. 2017) ............................................................... 63, 69

*Central Jersey Safe Energy Coal., et al. v. FERC,*
 Docket No. 25-1252 (D.C. Cir. Oct. 30, 2025) ...................................... 37

*City of Tacoma, Wash. v. FERC,*
 460 F.3d 53 (D.C. Cir. 2006) ................................................................... 63

*Constitution Pipeline Co., LLC v. New York State Dep't of Env't
Conservation,*
 868 F.3d 87 (2d Cir. 2017) ...................................................................... 40

*Delaware Riverkeeper Network v. Secretary of Pa. Dep't of Env't
Protection,*
 783 Fed. App'x 124 (3d Cir. 2019) ......................................................... 72

*Delaware Riverkeeper Network v. Secretary Pa. Dep't of Env't
Protection,*
 833 F.3d 360 (3d Cir. 2016) .................................................................... 71

iv

*Delaware Riverkeeper Network v. Secretary of Pa. Dep't of Env't Protection,*
903 F.3d 65 (3d Dep't 2018)......................................................64, 68, 71

*Department of Transp. v. Public Citizen,*
541 U.S. 752 (2004) ....................................................................... 4

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016).................................................................. 42, 46

*F.D.A. v. Wages and White Lion Investments, LLC,*
604 U.S. 542 (2025) ................................................................. 46, 52

*FCC v. Fox Television Stations,*
556 U.S. 502 (2009) ..............................................................41-42, 46

*Greater Yellowstone Coal, Inc. v. Servheen,*
665 F.3d 1015 (9th Cir. 2011).......................................................... 62

*Hoopa Valley Tribe v. Federal Energy Regulatory Comm'n,*
913 F.3d 1099 (D.C. Cir. 2019) ......................................................... 7

*Idaho Farm Bureau Fed'n v. Babbitt,*
58 F.3d 1392 (9th Cir. 1995)........................................................... 68

*Islander E. Pipeline Co., LLC v. Conn. Dep't of Env't Prot.,*
482 F.3d 79 (2d Cir. 2006) ......................................................... 40, 68

*Islander E. Pipeline Co., LLC v. McCarthy,*
525 F.3d 141 (2d Cir. 2008) .........................................................40-41

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ..................................................................... 41

*Matter of Citizens for Clean Air v. New York State Dept. of Env't Conserv.,*
135 A.D.2d 256 (N.Y. App. Div. 3d Dep't 1988)................................... 69

*Matter of Concerned Citizens of Allegany County v. Zagata,*
231 A.D.2d 851 (N.Y. App. Div., 4th Dep't 1996) ............................... 64

*Millennium Pipeline Company v. Seggos,*
    860 F.3d 696 (D.C. Cir. 2017) ...................................................... 4, 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins.,*
    463 U.S. 29 (1983) ......................................................................... 40

*National Audubon Society v. Hoffman,*
    132 F.3d 7 (2d Cir. 1997) .............................................................. 62

*Natural Resources Defense Council v. EPA,*
    808 F.3d 556 (2d Cir. 2015) .......................................................57-58

*Natural Resources Defense Council v. New Jersey Department of
    Env't Protection,*
    2d Cir. Nos. 25-2932, 25-2933 (Feb. 3, 2026) ................................... 37

*New Jersey v. Bessent,*
    149 F.4th 127 (2d Cir. 2025) ......................................................... 40

*New York State Dep't of Env't Conservation v. Federal Energy
    Regulatory Comm'n,*
    884 F.3d 450 (2d Cir. 2018) ....................................................6-7, 10

*New York State Dep't of Env't Conservation v. Federal Energy
    Regulatory Comm'n,*
    991 F.3d 439 (2d Cir. 2021) ....................................................6-7, 43

*Ohio Valley Env't Coal. v. U.S. Army Corps of Engineers,*
    674 F.Supp.2d 783 (S.D.W.Va. 2009) ................................................. 68

*Perez v. Mortgage Bankers Ass'n,*
    575 U.S. 92 (2015) ......................................................................... 42

*Port of Seattle v. Pollution Control Hearings Bd.,*
    151 Wash.2d 568 (Wash. 2004) ........................................................ 55

*PUD No. 1 of Jefferson County v. Washington Dep't. of Ecology,*
    511 U.S. 700 (1994) ......................................................................... 8

*S.D. Warren Co. v. Maine Bd. of Env't Prot.,*
    547 U.S. 370 (2006) ....................................................................... 57

*Sierra Club v. State Water Control Bd.*,
   898 F.3d 383 (4th Cir. 2018)..........................................................55-56

*Solite Corp. v. EPA*,
   952 F.2d 473 (D.C. Cir. 1991) ..............................................................68

*United States v. Nova Scotia Food Products Corp.*,
   568 F.2d 240 (2d Cir. 1977) ...................................................................68

*Waterkeeper Alliance, Inc. v. EPA*,
   399 F.3d 486 (2d Cir. 2005) ...............................................56-57, 67, 72

**Federal Statutes**

5 U.S.C.
   § 706..............................................................................................40-41, 70

15 U.S.C.
   § 717.............................................................................................3-4, 11, 39

33 U.S.C.
   § 1341............................ 1-2, 4-8, 20, 36, 38-39, 43, 54-58, 63-69, 71-72
   § 1342..................................................................................56-57, 67, 72
   § 1344.............................................................................................................68
   § 1370...............................................................................................................5

42 U.S.C.
   ch. 55.................................................................................................................3
   § 4332(C)..........................................................................................................4

**State Statutes**

N.Y. Env't. Conserv. Law
   art. 17 ..............................................................................................................7
   § 15-0505 ......................................................................................................7-8
   § 70-0109(2)(a)........................................................................................64, 67

## Federal Regulations

18 C.F.R.
  § 157.206(b)(2)(i) ................................................................................ 4

33 C.F.R.
  § 325.3(a) ........................................................................................ 68

40 C.F.R.
  § 121.3........................................................................... 7, 36, 53

## State Regulations

6 N.Y.C.R.R.
  pt. 608 ...........................................................................................7-9
  pt. 621 ...........................................................8-9, 21, 64-65, 67, 69, 71
  pt. 700-706...................................................................................7-8
  pt. 750 ........................................................................................... 7

## Miscellaneous Authorities

*Certificate of Public Convenience and Necessity*
  167 FERC ¶ 61,110 (2019)................................................................ 13

D.G. Clarke & D.H. Wilbur, *Assessment of Potential Impacts of*
  *Dredging Operations Due to Sediment*................................................24

*FERC vacated certificate* 187 FERC ¶ 61,145 (2024) ...........................20

N.Y. State Dep't of Env't Conservation, *Queens and Richmond*
  *Counties - Extension of Public Comments for the Northeast*
  *Supply Enhancement Project SPDES, Article 15 Permit, and*
  *Water Quality Certification Applications,* Env't Notice Bull.
  (July 23, 2025) https://dec.ny.gov/news/environmental-
  notice-bulletin/2025-07-23/public-notice/queens-and-
  richmond-counties-extension-of-public-comments-for-the-
  northeast-supply-enhancement-project-spdes-article-15-
  permit-and-water-quality-certification-applications ........................21

## PRELIMINARY STATEMENT

After a comprehensive administrative process, respondent New York State Department of Environmental Conservation granted a water quality certification under section 401 of the Clean Water Act, 33 U.S.C. § 1341, to intervenor-respondent Transcontinental Gas Pipe Line Company, LLC (Transco). The Department concluded that Transco's proposal to construct an underwater natural gas pipeline across Raritan Bay, connecting natural gas suppliers in New Jersey and Pennsylvania with customers in New York City and Long Island, would comply with New York's water quality standards and other requirements. However, the Department's conclusion was conditional, requiring Transco to comply with more than 60 detailed permit conditions, including requirements that Transco develop and comply with multiple plans that were subject to Department approval. The plans detailed how Transco would manage, monitor, and mitigate its project's water-quality impacts.

Petitioners—five environmental advocacy organizations—brought this original proceeding in this Court to vacate the Department's certification. But contrary to their contention, the Department did not adopt a new policy or position without explanation. The Department

1

acknowledged that it had denied several previous applications submitted by Transco for the same project but explained why Transco's most recent application addressed the concerns underlying the prior denials. Moreover, because section 401 of the Clean Water Act requires certifying authorities to act on a request for certification within a reasonable period of time not to exceed one year, or risk waiving their authority to issue a certification at all, the Department rationally relied on compliance plans that would be fully developed and approved by the Department after the certification was issued but prior to Transco commencing construction. The Department also complied with all federal and state procedural requirements, including providing the required opportunity for public comment.

The petition for review should, therefore, be denied.

## ISSUES PRESENTED

1. Did the Department act arbitrarily and capriciously or contrary to law in granting Transco's application for a section 401 certification in 2025 after denying similar applications?

2. Did the Department act arbitrarily and capriciously or contrary to law in relying on compliance plans by Transco that would be

2

fully developed and approved by the Department after the certification was issued but before construction commences?

3.     Did the Department fail to provide the requisite opportunity for public participation before issuing the water quality certificate?

**REGULATORY FRAMEWORK**

**A.     Federal Laws Governing Approval and Environmental Review of Natural Gas Pipelines**

The Federal Energy Regulatory Commission (FERC) is responsible for regulating the interstate transportation of natural gas under the Natural Gas Act. 15 U.S.C. §§ 717-717w. FERC may authorize the construction and operation of an interstate natural gas pipeline if it certifies that the project "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e).

The Natural Gas Act also designates FERC as the lead agency responsible for reviewing the potential environmental impacts of a natural gas pipeline under the National Environmental Policy Act (NEPA), 42 U.S.C. chapter 55. *See* 15 U.S.C. § 717n(b)(1). Before issuing a certificate of public convenience and necessity, FERC must assess the environmental impacts of the pipeline and associated facilities, identify any potentially adverse environmental effects and possible alternatives

3

to the project, and balance the proposed project's short-term environmental impacts with its long-term societal benefits. *See* 42 U.S.C. § 4332(C); *Department of Transp. v. Public Citizen*, 541 U.S. 752, 756-57 (2004).

In addition to FERC's certificate of public convenience and necessity, the Natural Gas Act requires that applicants also obtain any other authorizations required by federal law. *See* 15 U.S.C. §§ 717n(a), (b); *see also* 15 U.S.C. § 717b(d)(3) ("nothing in [the Natural Gas Act] affects the rights of States" under the Clean Water Act); 18 C.F.R. § 157.206(b)(2)(i) (activities authorized by certificate of public convenience and necessity must comply with Clean Water Act). Consistent with these requirements, before beginning construction of a natural gas pipeline, an applicant must obtain certification under section 401 of the Clean Water Act, 33 U.S.C. § 1341(a)(1), that the proposed project will comply with state water quality standards and requirements. *See Millennium Pipeline Company v. Seggos*, 860 F.3d 696, 698 (D.C. Cir. 2017).

4

**B.** **State Laws Governing Impacts of Natural Gas Pipelines on State Water Quality**

Under the Clean Water Act, 33 U.S.C. chapter 26, the States are primarily responsible for preventing, reducing, and eliminating water pollution within their borders. *See* 33 U.S.C. § 1251(b), (g); § 1370. To ensure that federal agencies do not authorize construction of an activity that would harm state water quality, section 401 of the Clean Water Act reserves for States the authority to determine whether any activity that may result in a discharge originating within that State "will comply" with state water quality standards and requirements. 33 U.S.C. § 1341(a)(1). Any applicant for federal authorization to conduct any such activity must obtain a section 401 certification. *Id.* If the State issues a water quality certification, it may include conditions sufficient to ensure that the applicant will comply with those standards and requirements, which conditions then become part of the federal permit. *Id.* § 1341(d). If the State denies certification, the federal agency may not authorize the activity in question. *Id.* § 1341(a)(1). The State also must "establish procedures for public notice" of all applications for water quality

5

certifications, as well as for "public hearings" on "specific applications" as the State "deems appropriate." *Id.*

Section 401 of the Clean Water Act provides that if a State "fails or refuses to act" on an application "within a reasonable period of time (which shall not exceed one year)," the certification requirement is "waived." 33 U.S.C. § 1341(a)(1). If the State waives its authority, the State's position on whether a project will comply with state water quality standards and requirements has "no legal significance." *Millennium Pipeline Co., LLC*, 860 F.3d at 701. Courts have interpreted the waiver provision of section 401 to prohibit states from obtaining more time to review an application. That is so even if the application does not comply with State procedural requirements, *New York State Dep't of Envt'l Conservation v. Federal Energy Regulatory Comm'n*, 884 F.3d 450, 455-456 (2d Cir. 2018) (*NYSDEC v. FERC I*), and even if the applicant agrees that the State should have more time to review the application, *New York State Dep't of Envt'l Conservation v. Federal Energy Regulatory Comm'n*, 991 F.3d 439, 447-448 (2d Cir. 2021) (*NYSDEC v. FERC II*).

Thus, if a State concludes that it lacks sufficient information to grant a water quality certificate by within the established reasonable

6

period of time, the State generally must deny the application without prejudice thereby allowing the applicant to submit a new application. *See New York State Dep't of Envt'l Conservation v. Federal Energy Regulatory Comm'n*, 991 F.3d at 450 n.11; *New York State Dep't of Envt'l Conservation v. Federal Energy Regulatory Comm'n*, 884 F.3d at 456.[1]

Consistent with the Clean Water Act, New York has established robust protections for state water quality. *See* Environmental Conservation Law (E.C.L.) articles 15, 17; 6 N.Y.C.R.R. Parts 608, 700-706, and 750. The U.S. Environmental Protection Agency (EPA) approved New York's water quality standards pursuant to section 303(c) of the Clean Water Act and its accompanying regulations. 33 U.S.C. § 1313(c); 40 C.F.R. §§ 131.4, 131.21. Accordingly, an applicant must establish that its proposed activity will comply with these EPA-approved

---

[1] This Court has also said that the Department could ask an applicant to withdraw and resubmit its application to reset the waiver clock. *See NYSDEC v. FERC I*, 884 F.3d at 456. However, during the time period in question, the D.C. Circuit had cast doubt on whether this process could be used to extend an agency's time to review an application. *See, e.g., Hoopa Valley Tribe v. Federal Energy Regulatory Comm'n*, 913 F.3d 1099, 1104-1105 (D.C. Cir. 2019), *cert. denied*, 589 U.S. 1117 (2019). Thus, to avoid an inadvertent waiver, when the Department was considering Transco's first three applications, denial without prejudice was the State's safest option.

7

state water quality standards before the Department can issue a section 401 certification. 33 U.S.C. § 1341(a); *see also PUD No. 1 of Jefferson County v. Washington Dep't. of Ecology*, 511 U.S. 700, 713 (1994).

Under Department regulations, to obtain a section 401 certification, an applicant must submit sufficient information to demonstrate compliance with all applicable water-quality requirements. 6 N.Y.C.R.R. §§ 608.6(d), 608.9(a), 621.3(a)(1). Among other things, New York's water-quality requirements mandate that applicants minimize the discharge of fill or excavation within navigable waters, E.C.L. § 15-0505, and avoid any discharge that will impair the "best usages" of a particular waterbody, 6 N.Y.C.R.R. §§ 701.1, 701.10, 701.11. The best usages of the waterbodies to be crossed by Transco's proposed pipeline are recreation, fishing, shellfishing, and wildlife propagation and survival. *Id.* §§ 701.10, 701.11. And New York's water quality standards establish the maximum acceptable concentration of various pollutants, including copper and mercury, in state waterbodies, based on the classification and best uses of the waterbodies. *See* 6 N.Y.C.R.R. § 703.5.

Consistent with the Clean Water Act's requirement that States "establish procedures for public notice" on all applications, 33 U.S.C.

8

§ 1341(a)(1), the Department processes applications for water quality certifications under New York's Uniform Procedures Act, E.C.L. article 70, and its implementing regulations, 6 N.Y.C.R.R. Part 621. *See* 6 N.Y.C.R.R. § 608.9(d). After receiving an application, the Department must first determine whether it is "complete," meaning it meets certain regulatory criteria that allow the Department to commence review and make the application available for public comment, while recognizing that the application "may need to be supplemented during the course of review" to allow the Department "to make the findings and determinations required by law." E.C.L. § 70-0105(2); *see also* 6 N.Y.C.R.R. §§ 621.3(a), 621.6(g), 621.7 (regulatory requirements for complete application).

When the Department has sufficient information to make a final determination on the application, it may grant the request by issuing a water quality certification (with or without conditions) or deny the request, with an explanation for the denial. 6 N.Y.C.R.R. § 621.10(a). The Department must render a decision on the application within the established reasonable period of time (here, six months), regardless of

9

when (or whether) the application was deemed complete. *See NYSDEC v. FERC I*, 884 F.3d at 455-456.

## STATEMENT OF THE CASE

### A. Transco's Application for a Certificate of Public Convenience and Necessity and FERC's Environmental Review

In March 2017, Transco applied to FERC for a certificate of public convenience and necessity authorizing it to construct and operate roughly 37 miles of natural gas pipeline and various associated facilities, referred to as the Northeast Supply Enhancement (NESE) project. (*See* FERC, Final Envt'l Impact Statement [FEIS], at ES-1.) (Deferred Appendix [A] 316.]) The proposed NESE project included installation of a 26-inch-diameter underwater natural gas pipeline across Raritan Bay, connecting existing Transco facilities in Middlesex County, New Jersey and Queens County, New York. (FEIS at 2-1 to 2-5.) (A347-351].) About 17.3 miles of the underwater pipeline would be constructed in New York State waters. (*Id.* at 2-1.) (A347.) The NESE project would provide natural gas to customers in New York City and Long Island. (*See* Cover Letter to 2025 Certification, at 2.) (A1030.)

10

Consistent with its role as lead agency for environmental reviews under the Natural Gas Act, 15 U.S.C. § 717n(b)(1), FERC issued a final environmental impact statement for the NESE project in January 2019. (FEIS Cover Page.) (A292.) FERC noted that all of the New York waters through which the project would cross are designated as "impaired" under the Clean Water Act, meaning the waters are already unsuitable for certain best usages, such as fish consumption, because of pollutants. (FEIS at 4-54.) (A376.) Still, in its application to FERC, Transco estimated the density of hard clams living on the seabed along a seven-mile stretch of the proposed pipeline. (*Id.* at 4-101-4-102.) (A381-382.)

FERC concluded that construction of the proposed pipeline across Raritan Bay would have "temporary" impacts on aquatic resources that would be "minor to moderate" in severity. (FEIS at ES-15.) (A330.) Specifically, burying the pipeline would require dredging the seabed of Raritan Bay, which would result in direct impacts on aquatic organisms from construction equipment as well as indirect impacts from the suspension and redeposition of seafloor sediments stirred up by the dredging. (*Id.* at 4-106 to 4-107, 4-116.) (A386-387, 396.) Additionally, sediment-testing conducted by Transco revealed that some of the

11

sediments in the project area were contaminated with heavy metals such as copper and mercury as a result of historical human activities in New York Harbor. (*Id.* at 4-121.) (A401.) Transco's dredging activities would result in these contaminated sediments becoming suspended in the water, potentially resulting in exceedances of the applicable water-quality standards for copper and mercury in the vicinity of the project. (*Id.* at 4-122.) (A402.)

FERC concluded that the majority of unavoidable impacts from the project would be felt by the benthic community—invertebrate organisms that live on the seabed or in the sediment. (*Id.* at 4-97.) (A377.) Although benthic organisms are thought to be more resilient than mobile species to suspended sediment, with hard clams able to survive being buried in up to 15 centimeters of sediment, they are not able to leave the impacted areas. (*Id.* at 4-116.) (A396.) However, FERC concluded that the construction activities would be short in duration such that the impacts to the benthic community would be relatively minor. (*Id.*) FERC recommended that Transco work with the Department to develop mitigation plans before commencing construction, potentially including restrictions on when construction could occur, as well as plans to monitor

12

the recovery of the benthic community for five years after construction was completed. (*Id.* at 4-119 to 4-121, 5-10 to 5-14.) (A399-401, 417-421.)

FERC issued a certificate of public convenience and necessity conditionally approving the NESE project in May 2019. 167 FERC ¶ 61,110 (2019). Among many other conditions, the certificate required Transco to submit its final mitigation and monitoring plans before commencing construction. *Id.* at 61,602 to 61,606.

## B. The Department Denies Transco's Applications for a Water Quality Certification.

In June 2017, while FERC's environmental review of the project was ongoing, Transco first applied to the Department for a water quality certification for the project. (2019 WQC Denial at 1 n.3.) (A422.[2]) The Department denied Transco's first application without prejudice because FERC's environmental review was ongoing. (*Id.*) In May 2018, Transco applied a second time for a water quality certification and related permits. In January 2019, the Department determined this application was complete and published it for public notice and comment. (*Id.* at 1.)

---

[2] Transco also applied for various permits required by state environmental laws. Because those permits are not at issue in this proceeding, they are not addressed in this brief.

(A422.) However, in May 2019, the Department again denied Transco's application without prejudice, observing, among other things, that Transco had not provided adequate details of how the project would meet New York's water quality standards, particularly for mercury and copper; Transco had not sufficiently identified steps to mitigate the project's impacts on water quality, shellfish beds, and the benthic community; and the Department had not had time to fully review the 14,000 public comments received on the project. (2019 Denial at 4.) (A425.)

In May 2019, Transco applied a third time for water quality certification. (2020 WQC Denial at 1.) (A434.) The Department again concluded the application was complete and published it for public notice and comment. (*Id.*) This time, the Department received 16,000 comments on the application. (*Id.* at 1 n.4, 3.) (A434, 436.) The Department also sought additional information from Transco to clarify the project's impacts on water quality. (*Id.* at 3.) (A436.)

In May 2020, with the Department's reasonable period of time to act on the application, which was one year, approaching, the Department denied Transco's application for a water quality certification for a third

14

time. (2020 WQC Denial at 1.) (A434.) Based on the information before it, the Department concluded that Transco had not demonstrated that the NESE project would comply with state water quality standards. (*Id.* at 3.) (A436.) The Department gave three principal reasons, as follows.[3]

### 1. Transco Failed to Establish the Appropriateness of Using the Default 500-foot Mixing Zone.

The Department concluded that Transco had failed to establish that project construction would comply with applicable water quality standards for mercury and copper without the use of a 500-foot "mixing zone." (*Id.* at 4, 7-13.) (A437, 440-446.) A mixing zone allows an applicant to take into account the dilution of pollutants within a given distance of a discharge when determining whether the discharge complies with state water quality standards. (EPA Water Quality Standards Handbook Chapter 5, General Policies, at 2.) (A79.) In areas with contaminated sediment the Department generally allows permittees to measure

---

[3] The Department also concluded that the project was not consistent with New York's Climate Leadership and Community Protection Act, E.C.L. Part 75. (2020 Denial at 14.) (A447.) Analyzing the project under that statute's framework, the Department determined that the project would result in greenhouse gases and Transco had not identified any alternatives for delivering natural gas to downstate customers and had not proposed any greenhouse gas mitigation measures. (*Id.*)

15

compliance with state water quality standards at the edge of a 500-foot mixing zone. (Tech and Ops Guidance 5.1.9 at 35-37.) (A69-71.) However, the Department retains discretion to require a permittee to use a smaller mixing zone, or no mixing zone at all, based on its consideration of the nature of the sediment contamination and the proximity of sensitive habitats or important biological resources. (*Id*.)

In the 2020 denial, the Department determined that a 500-foot mixing zone was inappropriate for certain areas of the project with hard clam habitats, because construction of the project would result in the suspension of sediment contaminated with copper, mercury, and other metals. (2020 Denial at 9.) (A442.) In particular, the Department observed that Raritan Bay was one of the last highly-productive hard clam beds in the State and that hard clams, especially in their early life stages, were sensitive to the effects of suspended contaminated sediments. (*Id*. at 9-10.) (A442-443.) Given these highly localized impacts on one of the last productive hard clam beds in the State, the Department concluded that use of the default 500-foot mixing zone to measure compliance was inappropriate in the absence of information from Transco

16

regarding how it might "minimize the likely adverse effects" on hard clams. (*Id.*)

The Department acknowledged that Transco had proposed to "slow its proposed rate of dredging" in order to reduce the amount of contaminated sediment suspended in the hard clam habitat but concluded that Transco had "not provided sufficient documentation" regarding how it could slow the rate of dredging while simultaneously complying with various time-of-year restrictions on construction activities and meeting its ambitious construction schedule. (2020 Denial at 11-12.) (A444-445.) And because all of Transco's modeling predicted compliance with state water quality standards based on the use of a 500-foot mixing zone, the Department concluded that Transco had not established that the project would comply with state water quality standards. (*Id.* at 7-12.) (A440-445.)

## 2. Transco Failed to Support Its Reliance on 5% Sediment Loss Rate for Jet Trenching.

The Department concluded that Transco had failed to provide adequate support for its assertion that only 5% of sediment would be "lost"—become suspended in the water column—at locations where it used a "jet trenching" technique to bury the pipeline. (*Id.* at 7.) (A440.)

17

"Jet trenching" refers to the use of a remote-controlled bottom-crawling vehicle that fluidizes seabed sediments, reducing their density and allowing the pipeline to settle beneath the seafloor without excavating a traditional trench. (FEIS at 2-46 to 2-47.) (A370-371.) Jet trenching causes reduced turbidity when compared to traditional excavation techniques. (*Id.* at 2-47.) (A371.)

Transco proposed to use jet trenching to bury roughly 15 miles of the pipeline. (FEIS at 2-46.) (A370.) Transco provided modeling showing that the project would comply with state water quality standards in the vicinity of jet-trenching, but this relied on Transco's estimate that only 5% of seabed sediments would be lost from jet trenching operations. (2020 WQC Denial at 7.) (A440.) The Department concluded that "without further documentation" it could not accept Transco's projection that only 5% of sediments would be lost in locations where Transco used a jet trencher to bury the pipeline. (*Id.*) The Department observed that recent modeling for another project suggested a 25% to 30% sediment loss rate was more likely. (*Id.*) A higher sediment loss rate called into question Transco's modeling results showing that water quality standards could

18

be achieved, even if the Department determined the default 500-foot mixing zone was appropriate for the project.

### 3. Transco Failed to Justify a Four-foot Burial Depth.

The Department concluded that Transco had failed to justify burying the pipeline only four feet below the seabed. (*Id.* at 4.) (A437.) The Department observed that it generally required that in-water utility projects be buried six feet beneath the seabed. (*Id.* at 13.) (A446.) The Department expressed concern that if the pipeline was only buried four feet deep, it could interfere with the later installation of electrical transmission lines or could become damaged by fishing gear or other sea vessels. (*Id.*) But the Department did not categorically reject Transco's proposed four-foot burial depth; the Department merely concluded that "absent an evaluation by Transco" on the impacts and appropriateness of a shallower, four-foot burial depth, the Department could not conclude that it would meet state water quality standards and requirements. (*Id.*)

### C. Transco Cancels, then Revives, the NESE Project and Reapplies for a Water Quality Certification.

Although the Department's 2020 denial identified the information that Transco could submit to establish that the NESE project would comply with state water quality standards, Transco did not immediately

re-apply for a water quality certification. In April 2024, Transco notified FERC that it would let its certificate for the NESE project expire, after which FERC vacated the certificate. 187 FERC ¶ 61,145 (2024). More than a year later, in May 2025, Transco petitioned FERC to reissue the certificate for the project, stating that the purpose, scope, and impact of the project had not changed since FERC issued its first certificate in 2019. In September 2025, FERC reissued the certificate. (*See* Order Issuing Certificate at 57-58.) (A978-979.)

The day after Transco requested that FERC reissue its certificate, Transco re-applied to the Department for a water quality certification under section 401. (*See* Joint Application Cover Letter.) (A452-456.) Although Transco's application included "substantially the same information" as supported its prior application, Transco committed to work with the Department to provide any additional information necessary to address the Department's concerns set forth in the 2020 denial. (*Id.* at 2-3.) (A453-454.) In July 2025, the Department determined the application was complete for purposes of commencing the Department's review, and released the application for a 30-day public comment period, later extended to 45 days. (*See* Notice of Complete

20

Application.) (A749-751.[4]) Consistent with the requirements of 6 N.Y.C.R.R. § 621.7(b), the public notice described the project, noted that it might result in unavoidable impacts to water quality that could require mitigation, and provided instructions on where interested parties could obtain the application and related materials. (Notice of Complete Application.) (A749-751.)

Meanwhile, the Department requested additional information about the project from Transco that would address the bases for the 2020 denial. (Request for Additional Information [RFAI] at 1-7.) (A752-758.) Over the ensuing months, Transco submitted a wide range of additional supporting materials, exchanged follow-up emails with the Department to further clarify its submissions, and participated in multiple meetings with Department staff to address the bases for the 2020 denial. (*See, e.g.,* Transco Response to RFAI; Transco Response to Department Questions.) (A760-838; 913-914.) In particular, Transco responded to the Department's concerns in the following four principal ways.

---

[4] *See* Queens and Richmond Counties - Extension of Public Comments for the Northeast Supply Enhancement Project SPDES, Article 15 Permit, and Water Quality Certification Applications, Environmental Notice Bulletin (July 23, 2025). The addresses for any website cited can also be found in the Table of Authorities.

21

**1. Transco Supports Use of the Default 500-foot Mixing Zone and Addresses Concerns About Impacts on Hard Clams and Fish Habitats.**

The Department asked Transco to provide a variety of information supporting Transco's proposal to measure the project's compliance with state water quality standards at the edge of the default 500-foot mixing zone in the vicinity of sensitive hard clam habitats. (RFAI at 5-7.) (A756-758.) Transco provided extensive additional sediment modeling discussion establishing that water quality standards for turbidity, mercury, and copper would be met at the edge of a 500-foot mixing zone. (Response to RFAI at 25-49; NESE NYSDEC Email Question Responses Rev_9Sep2025_Final; Scenario Clarification Call Summary Table 09092025; 2025.09.23 SAM Comments on NESE NYSDEC Call Item Response_Final; 2025.09.23 NESE NYSDEC 19Sep25 Call Item Response_Final_Rev1; Sediment Transport Model Summary; Sediment Data Review.) (A784-808; 983-990; 982; 1009-1012; 1005-1008; 1113-1124.) Transco also provided details of the dredging rate it would employ at various locations and committed to adjusting the rate of dredging as necessary to maintain compliance with state water quality standards and requirements. (2025 07 28 RFAI Response, Att_1 at 43-44.) (A802-803.)

22

The Department also asked Transco to evaluate whether impacts to hard clams could be minimized by restricting construction activities in hard clam habitats to certain times of year. (RFAI at 7.) (A766.) However, Transco stated that it was not aware of any evidence of the benefits of time-of-year restrictions on construction in hard-clam habitats. (Response to RFAI at 74.) (A833.) Transco did provide evidence that hard clams were generally resistant to effects from sedimentation. (NESE NYSDEC 19Sep25 Call Item Response Final Rev. 1 at 1-2.) (A1005-1006.) Nonetheless, the Department developed a time-of-year restriction for construction in the productive hard clam area for June and July, the time period when the clams would be spawning, recognizing that hard clams in their larval or juvenile stages would be most sensitive to in-water contaminants.[5] (*See* 2025 Decision Rationale Summary; August 6 Barnes and Bozzi Emails; 2025 09 16 NESE TSS Justification for Hard Clam

---

[5] Contrary to petitioners' characterization of the record (Br. at 20), Department staff were not "puzzled" by the discussion of the appropriate mixing zone. To the contrary, the single internal email cited by petitioners for this proposition demonstrates that Department staff understood the bases for the 2020 denial but thought that harms could be minimized by limiting construction activities in the vicinity of hard clam habitats when larval clams were most likely to be present. (2025 08 06 Barnes Email.) (A891-892.)

23

area; D.G. Clarke & D.H. Wilbur, *Assessment of Potential Impacts of Dredging Operations Due to Sediment* Resuspension, DOER Technical Notes Collection, U.S. Army Engineer Research & Dev't Center (2000).) (A1110-1112; 891-892; 996-998; 48-61.) Transco also provided additional information regarding its use of time-of-year restrictions on construction activities in sensitive fish habitats. (2025 08 21 Response to Questions; 2025 09 02 NESE DEC Email Question Responses Rev_9Sep2025_Final.) (A913-914; 983-990.)

Transco also notified the Department that it had miscalculated the density of hard clams along the project route in its initial application to FERC as being 69.6 individual clams per square foot when, in fact, it should have been 3.7 individual clams per square foot and, at the Department's request, provided its underlying data supporting its recalculation.[6] (2025 09 23 NESE DEC 19Sep25 Call Item Response_Final_Rev1; 2025 09 23 NESE DEC Email Question Responses_Rev_24Sep2025_clean_v1; 2017 03 Raritan Bay Benthic Sample Processing Results.) (A1005-1008; 1013-1016; 83-291.) The

---

[6] Transco also notified FERC of its miscalculation, which FERC had referenced in its FEIS. (2025 09 24 Fw_Certificate of Compliance Report submitted in FERC CP 17-101-007 by Transco.) (A1017-1020.)

24

Department's head of shellfisheries verified these recalculations as the Department continued to evaluate the impacts of the project on the hard clam population. (2025 Barnes HC density Calculations for Revised Clam Density; 2025 09 25 Reference Memo – Concentration Analysis; 2025 09 30 Reference Memo – Studies.) (A1108-1109; 1021-1024; 1025-1028.)

### 2. Transco Supports Use of a 5% Sediment Loss Rate for Jet Trenching.

The Department asked Transco to provide support for its reliance on a 5% sediment loss rate when modeling the project's compliance with state quality standards and requirements in the vicinity of jet-trenching operations. (RFAI at 5.) (A756.) In response, Transco explained that the 5% sediment loss rate was based on the experiences of its contractors. (Response to RFAI at 51-52.) (A810-811.) Transco cited multiple case studies in which modeling suggested a 25% to 30% sediment loss rate was expected, but direct observations revealed a loss rate of 5% or less. (*Id.*) Accordingly, Transco stated that the modeling for previous projects had likely "overestimated" the rate of sediment loss. (*Id.*; *see also* Memo on Jet Trencher Sediment Loss Rate.) (A917-921.)

25

### 3. Transco Supports Use of a Four-foot Burial Depth.

The Department asked Transco to evaluate the burdens and environmental impacts of burying the pipeline four feet deep and provide a justification for its use of the shallower burial depth. (RFAI at 2.) (A753.) In response, Transco explained that a six-foot burial depth would be impractical and have greater environmental impacts because it would result in longer construction times, increased disturbance of the seabed, and a longer period of elevated sedimentation. (Response to RFAI at 7-8.) (A766-767.) Transco also explained that a pipeline buried four feet below the seabed would not interfere with fishing gear because the affected areas see infrequent shellfish harvest or bottom trawling. (*Id.*) Transco noted that another of its pipelines in Raritan Bay was buried four feet deep, and Transco had observed no adverse effects. (*Id.*) Transco also told the Department that the other transmission lines could cross the pipeline and committed to coordinate with the developer of another proposed project to enter into appropriate crossing agreements. (*Id.* at 3, 5.) (A762-764.)

### 4. Transco Submits Draft Compliance Plans.

The Department asked Transco to provide draft plans describing the details of how it would manage, monitor, and mitigate various specific

26

impacts on water quality from the project. (RFAI at 4, 7.) (A755, 758.) In particular, the Department requested additional information from Transco about its planned mitigation to account for unavoidable impacts on the hard clam resource along the project route and adjacent area. (2025.08.04 Calculations in HC Impacts 2018; 2025 NESE Hard Clam Mitigation.) (A888-890; 1107.) Transco provided draft mitigation plans as well as examples of previous shellfish mitigation projects that could serve as models for its own mitigation project. (Response to RFAI at 75-79.) (A834-838.) Transco also provided drafts of other management, monitoring, and mitigation plans, including draft plans for monitoring project impacts on sturgeon (Sturgeon Monitoring Plan.) (A839-847) and benthic organisms (Post-Construction Benthic Monitoring Plan.) (A863-885.)

## D. The Department Grants a Water Quality Certification for the NESE Project.

In November 2025, the Department granted Transco's request and issued a conditional water quality certification for the NESE. (2025.11.07 WQC and Art 15 Permit [2025 certification].) (A1037-1066.) The Department imposed 57 project-specific conditions on the water quality certification in addition to the Department's standard 11 permit

conditions. (*Id.*) Among other things, the Department established mixing zones for various portions of the project with stringent numeric water quality standards to protect aquatic organisms; imposed requirements for pipeline burial depth and the manner of trenching; required Transco to submit plans, subject to approval by the Department, to monitor water quality to ensure compliance with water quality standards; and imposed limitations on construction methods. (*Id.* at 5, 11-24.) (A1041, 1047-1060.) The Department required Transco to restore the affected benthic community and to undertake mitigation to account for any unavoidable impacts, the full extent of which would be determined with post-construction monitoring. (*Id.* at 26; Permit Cover Ltr. at 2-3.) (A1062, 1030-1031.)

The Department acknowledged that it had previously denied Transco's applications for a water quality certification, but that based on the 2025 application and supplemental materials Transco had submitted, the Department now determined that if Transco followed the permit's conditions, the project would comply with applicable state water quality standards and other requirements. (Permit Cover Letter at 1.) (A1029.) The Department further explained that, since its 2020 denial,

28

"considerable in-water utility construction has occurred in New York waters, which has provided the Department with new information relating to in-water construction-related water quality impacts and measures to appropriately avoid and minimize such impacts." (*Id.* at 3.) (A1031.) The Department also released its response to the 17,000 public comments received on the 2025 application, which provided further grounds for the Department's decision to issue the water quality certification. (RTC Summary.) (A1085-1106.) With respect to each of the three principal bases for the 2020 denial, the Department explained how Transco's current application addressed that concern and why it no longer warranted denial.

### 1. The Department Accepts Transco's Use of a 500-foot Mixing Zone to Measure Compliance.

The Department explained why it now considered use of a minimum 500-foot mixing zone appropriate to evaluate Transco's compliance with state water quality standards. In particular, the Department added a "strict unconditional prohibition" on sediment-disturbing construction in June or July in the area of the project with the most sensitive hard clam habitat. (Permit Cover Letter at 2; 2025 Certification at 8.) (A1030, 1044.) This would protect the sensitive hard

29

clam resource and associated benthic habitat from impacts during the clams' vulnerable spawning and larval stages. (*See* RTC Summary at 21.) (A1105.) For construction activities outside of the restricted period, the Department set numeric limits for total suspended solids in the water depending on the duration of construction activities, so as to minimize the impacts of sediment deposits on hard clams outside of the direct work area. (2025 Certification at 14; RTC Summary at 21.) (A1050; 1105.[7]) The Department also noted that impacts to hard clams would be less severe than previously expected in light of Transco's corrected calculation of the hard clam density in the affected portion of Raritan Bay. (RTC Summary at 21.) (A1105.) But the Department clarified that even with the lower density calculation, it still considered the area to be a critical resource area. (*Id.*)

---

[7] Specifically, when sediment-disturbing activities will last up to 96 consecutive hours with a pause to allow sediment to resettle to ambient levels, Transco must keep the total suspended solids concentration in that area to no more than 100 mg/L above ambient levels. (2025 Certification at 14.) (A1050.) When such work occurs in the hard clam area for more than 96 consecutive hours without a resettling pause, Transco must apply a more stringent limit, 50 mg/L above ambient levels. (*Id.*)

The Department recognized that the project could also adversely affect Atlantic and shortnose sturgeon as well as winter flounder and added seasonal construction restrictions for these species. (2025 Certification at 7.) (A1043.) The 2025 certification allows Transco to conduct some construction activities during the restricted time periods if Transco complies with certain requirements, including employing a third-party environmental monitor to detect any nearby tagged sturgeon, and submitting for Department approval a sturgeon avoidance and monitoring plan detailing the process for acoustic monitoring, how Transco will respond when a sturgeon is detected, and how and when the data collected will be sent to the Department for review. (*Id.*) Transco must obtain approval of this plan from the Department before any construction may begin. (*Id.*)

### 2. The Department Accepts Transco's Use of a 5% Sediment Loss Rate for Jet Trenching Activities.

The Department acknowledged that the 2020 denial was based, in part, on Transco's failure to support its modeled sediment loss rate of 5% for construction activities using a jet trencher in the hard clam area. (RTC Summary at 22.) (A1044.) However, the Department now concluded that Transco had adequately explained its use of a 5% sediment loss rate

31

for jet-trenching activities, by referencing actual loss rates for completed utility projects that used jet trenching technologies. (*Id.*; *see also* RFAI; 2025.08.20 Sediment Loss Rate Memo; NESE NYSDEC Email Question Responses Rev_9Sep2025_Final.) (A752-759; 917-922; 983-995.) To minimize the risks of water-quality impacts caused by jet trenching, the Department also set strict requirements for field testing for suspended sediment before, during, and after jet-trenching construction to ensure compliance with water quality standards. (2025 Certification at 23.) (A1059.)

### 3. The Department Accepts Transco's Use of a Four-foot Burial Depth.

The Department noted that while the 2020 denial had sought a six-foot burial depth, it would now allow a four-foot depth. (Permit Cover Ltr. at 2; RTC Summary at 20.) (A1030, 1104.) The Department observed that for this particular project location, the shallower depth would minimize construction-related impacts by reducing the amount of suspended contaminated sediment generated from project construction. (RTC Summary at 14, 20.) (A1098, 1104.) Additionally, the Department concluded that the standard six-foot burial depth sought for utility lines was not necessary for a natural gas pipeline which, unlike a high-voltage

electricity transmission line, would not generate electromagnetic fields that can disturb plant and wildlife. (*Id.*) And the Department concluded that adverse impacts on the pipeline from vessels or other underwater activities were unlikely, because the project is located in an area that is not heavily fished with bottom-trawling equipment that could potentially damage the pipeline or the fishing gear. (*Id.*)

4. **Requirement that Transco Develop and Implement Post-Certification, Pre-Construction Compliance Plans.**

In addition to the conditions described above, the water quality certification issued by the Department required that Transco submit for the Department's approval various mitigation, monitoring, and management plans. (2025 Certification at 7, 9, 11, 20, 25-26.) (A1043, 1045, 1047, 1056, 1061-1062.) Although the Department did not expect that the project would impair water quality if Transco complied with the conditions in the certification, the required monitoring plans and operational controls provide additional protection in the event of an exceedance of permit water quality standards. (RTC Summary at 13-17, 21.) (A1097-1101, 1105.) The certification does not permit construction to begin on any part of the project in New York until the Department has

33

approved all of these plans. (2025 Certification at 7, 11-17, 20, 23-25.) (A1043, 1047-1053, 1056, 1059-1061.)

For example, Transco must submit to the Department for its approval a dredge management plan. (*See* 2025 Certification at 20.) (A1056.) This compliance plan must include measures Transco will take to minimize the risk of exceeding any water quality limitations, such as proposed controls to meet water quality standards while dredging, procedures for equipment maintenance throughout project construction, and procedures for management and disposal of dredged sediment. (*Id.*) This plan must also describe how Transco will respond to "any actual or imminent exceedance" of state water quality standards. (Permit Cover Letter at 3.) (A1031.)

The 2025 certification also requires that Transco prepare a suspended sediment and water quality monitoring plan to demonstrate how Transco will measure compliance with the certification's applicable water quality standards. (*See* 2025 Certification at 1.) (A1037.) This plan must detail the sampling and monitoring protocols Transco will use during construction as well as corrective actions Transco will take if water quality exceedances occur, including turbidity monitoring during

34

nightwork and halting any nightwork if there are daytime turbidity violations. (RTC Summary at 16; *see also* 2025 Certification at 11-13, 19.) (A1100; 1047-1049, 1055.) And the plan must explain the quality assurance and control methodology that Transco will use to ensure that its data submissions are accurate and representative. (*See* 2025 Certification at 11.) (A1047.) The Department noted that, based on its recent experience with in-water utility work, exceedances of suspended sediment limits may occur even where the Department has imposed more strict conditions on the activities generating the sediment. (RTC Summary at 21.) (A1105.)

The 2025 certification also requires that Transco prepare for the Department's approval a sturgeon acoustic monitoring plan. (2025 Certification at 7.) (A1043.) The plan must include the procedures Transco will use to conduct the mandatory acoustic monitoring for the presence of tagged sturgeon when working in an area where sturgeon are known to inhabit. (*Id.*)

Finally, the Department recognized that even with these construction and monitoring controls in place, the project may still have unavoidable impacts on the area's biological resources, and so required

35

Transco to mitigate those impacts to maintain the waters' best usages. (RTC Summary at 12-13; 2025 Certification at 26-27; Permit Cover Ltr. at 2-3.) (A1096-1097; 1062-1063; 1030-1031.) The Department broadly estimated the costs of mitigation for each affected species (hard clams, as well as sturgeon and winter flounder) and required Transco to submit mitigation plans and provide financial assurance prior to starting project construction. (2025 Certificate at 9-10.) (A1045-1046.)[8] However, the Department stated in its cover letter that the actual cost of mitigation could not be determined until after project construction. (Permit Cover Ltr. at 3.) (A1031.)

## E.   This Proceeding

In December 2025, petitioners—five environmental advocacy organizations—commenced this original proceeding in this Court, seeking vacatur of the Department's 2025 section 401 certification. (Petitioners' Proof Brief [Br.] 67-68.) In a separate proceeding transferred to the Third Circuit, petitioners are also challenging the water-quality

---

[8] The Department also noted that under federal regulations promulgated under section 401 since the 2020 denial, the agency cannot impose greenhouse gas mitigation as part of its certification. (Permit Cover Letter at 5.) (A1033, citing 40 C.F.R. § 121.3 and 88 Fed. Reg. 66601).

certification for the NESE project issued by New Jersey. *See* Order, *Natural Resources Defense Council v. New Jersey Department of Env't Protection*, 2d Cir. Nos. 25-2932, 25-2933 (Feb. 3, 2026) (transferring proceeding to the Third Circuit). In a third proceeding in the D.C. Circuit, petitioners are challenging FERC's decision to re-issue the certificate of public convenience and necessity. *See Central Jersey Safe Energy Coal., et al. v. FERC*, Docket No. 25-1252 (D.C. Cir. Oct. 30, 2025).

## SUMMARY OF ARGUMENT

This Court should deny the petition for review. In issuing the 2025 certification for the NESE project, the Department did not act arbitrarily and capriciously or otherwise violate any federal or state law. As the voluminous administrative record demonstrates, the Department rationally determined that the project would meet water quality standards.

Contrary to petitioners' contention, the Department was not required to provide a "more substantial justification" for issuing the certificate than would have been required if the Department had not previously denied similar applications. Those denials were based on concerns that Transco had not yet adequately addressed. Although

37

absent the reasonable period of time deadline (then, one year), the Department might have continued to work with Transco to satisfy the Department's concerns, the Department had to deny the application in May 2020 to avoid the risk of waiving its section 401 authority at a point when it was not yet satisfied with the application. In granting the 2025 certification, the Department acknowledged the bases for its denials of similar certification requests and explained why the additional materials submitted by Transco now allowed the Department to conclude that the project would not violate state water quality standards.

The Department also rationally relied on the requirement that Transco submit various management, monitoring, and mitigation plans, the details of which would be developed and approved after the certification was issued but before construction could commence. Nothing in Clean Water Act section 401 (or any other federal or state statute) forbids an agency from relying upon such post-certification, pre-construction compliance plans. Indeed, state certifying agencies frequently rely upon such plans, especially given the narrow window of time an agency has to act on a section 401 application without waiving its authority. Moreover, for each of the compliance plans to which

38

petitioners object, the Department established clear and detailed standards that Transco had to meet to obtain the Department's approval.

Finally, the Department provided an adequate opportunity for public comment on Transco's 2025 application, as required by section 401 and the State's administrative procedures. Petitioners are incorrect in asserting that the Department failed to provide adequate opportunity for public comment on Transco's recalculation of hard clam density or on the various management, monitoring, and mitigation plans that Transco would have to develop and the Department would have to approve before construction commences.

## STANDARD OF REVIEW

Under the Natural Gas Act, the U.S. Court of Appeals for the circuit covering the area where a natural gas facility is proposed has "original and exclusive jurisdiction" to review any "order or action" of a state agency "acting pursuant to Federal law to issue, condition, or deny" any approval required for a natural gas pipeline project. 15 U.S.C. § 717r(d)(1). This Court reviews the Department's determination on whether to grant a section 401 certification for a natural gas pipeline according to the standard set forth in the federal Administrative

Procedure Act (APA). 5 U.S.C. § 706(2)(A); *see Islander E. Pipeline Co., LLC v. Conn. Dep't of Env't Prot.*, 482 F.3d 79, 94 (2d Cir. 2006) (*Islander East I*). First, the Court reviews *de novo* whether the state agency complied with the relevant federal law. *Id.* at 94. Second, if the agency "correctly interpreted federal law," this Court reviews "its factual determinations under the arbitrary-and-capricious standard." *Constitution Pipeline Co., LLC v. New York State Dep't of Envt'l Conservation*, 868 F.3d 87, 100 (2d Cir. 2017), *cert. denied* 584 U.S. 962 (2018), citing 5 U.S.C. § 706(2)(A).

Under the arbitrary-and-capricious standard, the scope of judicial review is "narrow," looking to whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins.*, 463 U.S. 29, 43 (1983); *see Islander E. Pipeline Co., LLC v. McCarthy,* 525 F.3d 141, 150-51 (2d Cir. 2008) (*Islander East II)*, *cert. denied,* 555 U.S. 1046 (2008). Unlike an agency's interpretation of a statute, which is afforded no deference, judicial review of agency action under the arbitrary and capricious standard is "narrow and particularly deferential." *New Jersey v. Bessent*, 149 F.4th 127, 152 (2d Cir. 2025) (internal quotation marks

40

and citations omitted); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("Section 706 [of the APA] *does* mandate that judicial review of agency policymaking and factfinding be deferential"). This Court will not "lightly" conclude that an agency failed to consider an important aspect of the central problem at issue. *Islander East II,* 525 F.3d at 151 (citations omitted).

## ARGUMENT

## POINT I

**THE DEPARTMENT ADEQUATELY EXPLAINED ITS 2025 DECISION TO GRANT THE WATER QUALITY CERTIFICATION, NOTWITHSTANDING ITS PRIOR DENIALS**

**A. The Department Was Not Required to Provide a More Substantial Justification for Granting Transco's 2025 Application Because of Its Prior Denials.**

As an initial matter, petitioners' assertion that the Department was required to provide a "more substantial justification" for granting Transco's 2025 application because the Department had denied prior applications for the same project (Br. at 34) is incorrect. The Administrative Procedures Act (APA) "makes no distinction" between "initial agency action and subsequent agency action undoing or revising that action." *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

41

An agency must sometimes provide a "more substantial justification" when it adopts a new policy that involves factual findings that contradict those that underlay the agency's prior policy, or when the agency's prior policy has engendered serious reliance interests in the regulated community that would be disturbed by the new policy. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015); *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009). The requirement for a "more substantial justification" for a policy change in these circumstances is an extension of the traditional arbitrary-and-capricious standard of review: "it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 515-516; *accord Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-222 (2016).

Here, the Department did not make any change in policy whatsoever. In 2020, the Department concluded that Transco's application and supplemental submissions failed to establish that Transco would comply with applicable water-quality standards during construction of the NESE project. (2020 Denial at 3-4.) (A436-437.) But

42

the Department repeatedly acknowledged that its determination might be different if Transco could provide additional relevant documentation. (2020 Denial at 7, 11-13.) (A440, 444-446.) Although in other circumstances the Department might have worked with the applicant to obtain the necessary additional documentation and avoid an unnecessary denial, Clean Water Act section 401 imposes a strict deadline for state action that cannot be extended even if the Department and the applicant agree that more review time is appropriate. *See NYSDEC v. FERC II*, 991 F.3d at 447-448. Thus, the Department *had* to make a decision on the 2019 application in May 2020 or risk waiving its authority either to impose protective conditions or deny a certificate entirely. *See id.* And at that point, the information before the Department was insufficient for the agency to conclude that Transco would comply with state water quality standards. Similar information gaps and inadequate time for review underpinned the Department's 2019 denial. (2019 Denial at 4.) (A425.) And the Department's 2018 denial was required because FERC's environmental review—which would serve as the baseline for the Department's more detailed review of water-quality impacts—was ongoing. (2019 Denial at 1 n. 2.) (A422.)

43

But the Department's prior denials did not foreclose Transco from providing the additional information to address the bases for those denials. Indeed, Transco immediately re-applied for a certification shortly after the Department's 2018 and 2019 denials. (2020 Denial at 3.) (A436.) The only thing that could be considered unusual about Transco's 2025 re-application was that Transco waited five years before submitting it. But neither the need to meet section 401's strict time limits nor Transco's five-year delay in submitting a new application justify requiring the Department to provide a "more substantial justification" for granting Transco's 2025 application.

Even if the Department's decision to grant Transco's 2025 application after denying Transco's earlier applications could be construed as a change of policy, a more substantial justification would still not be required, because the Department's determination was not based on "contradictory" facts, as petitioners contend.[9] (Br. at 34-38.)

---

[9] Petitioners do not allege that the Department's 2020 denial engendered any reliance interests that would require a more substantial justification. Nor would such an allegation be plausible, in view of the Department's contemporaneous explanation that its denial was based on the absence of information at the time a decision was required, an absence which Transco might well be able to remedy on a subsequent application.

44

Although Transco stated in its application filing letter that it was "resubmitting its application as it existed at the time of the [2020] Denial with substantially the same information" (Joint Application Filing Letter at 3) (A454), the Department did not consider only the 2025 application.[10] Rather, the Department requested and received from Transco voluminous additional data and supporting documents, responding directly to the Department's concerns in the 2020 denial, which enabled the Department to reach a different conclusion with respect to the 2025 application. (*See generally, e.g.,* RFAI; Transco Response to RFAI.) (A752-759; 760-838.) Thus, petitioners are wrong to claim that the Department based its 2025 certification on "substantially the same" information and materials as its 2020 denial. (Br. at 33.)

## B. The Department Rationally Explained Why It Reached a Different Conclusion in 2025.

Even if the 2025 certification constituted a change in agency position, which it does not, the Department provided ample explanation for its decision as compared with its earlier denials. When an agency

---

[10] Petitioners also speculate that the Department's change in position was due to political pressure. (Br. at 16-18.) Neither petitioners nor the administrative record supply any evidence to support this assumption.

45

changes position, it must "provide a reasoned explanation" for the change. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). The agency must "display awareness that it *is* changing position," *Fox Television Stations*, 556 U.S. at 515 (emphasis in original), and "provide a reasoned explanation for the change," *F.D.A. v. Wages and White Lion Investments, LLC,* 604 U.S. 542, 568 (2025) (internal quotation marks, citations, and alterations omitted). But except in limited circumstances inapplicable to this proceeding, *see* Argument Point I.A, *supra*, the agency need not "provide a more detailed justification than what would suffice" for an initial determination made on a "blank slate," *Fox Television Stations*, 556 U.S. at 515. The scope of judicial review is "narrow" and the reviewing court may not "substitute its judgment for that of the agency." *Id.* at 513.

Here, the Department reviewed Transco's extensive submissions from 2025, including the supplemental information provided in response to the Department's targeted inquiries, and rationally concluded that Transco had adequately addressed each of Department's three principal bases for denying Transco's similar application in 2020. (*See* Permit Cover Letter; RTC Summary.) (A1029-1034; 1085-1106.)

46

### 1. The Department Explained Its Determination of the Applicability of the 500-foot Mixing Zone.

The Department acknowledged and fully explained its decision to allow Transco to use mixing zones to assess compliance with the State's water quality standards. When determining an appropriate "mixing zone," the Department takes into account the dilution of pollutants within a reasonable distance of the point of their discharge. (EPA Water Quality Standards Handbook Chapter 5, General Policies, at 2.) (A79.) In areas with contaminated sediments the Department generally determines that a 500-foot mixing zone is appropriate to measure and ensure compliance with state water quality standards, but retains discretion to require applicants to measure compliance with a smaller mixing zone, or no mixing zone at all, in certain circumstances. (*See* Tech and Ops Guidance 5.1.9 at 33-35.) (A67-69.). In its 2020 denial, the Department determined that a 500-foot mixing zone was inappropriate for the portion of the project crossing the productive hard clam habitats because project construction would suspend contaminated sediment, elevating levels of copper, mercury, and other metals, that could be particularly harmful to immobile hard clams. (2020 Denial at 9.) (A442.)

47

In 2025, following an extensive back-and-forth process in which Transco worked with the Department to develop an approach to minimize impacts on hard clams, the Department determined that a 500-foot mixing zone would be protective of water quality and the sensitive hard clam resource, including the associated benthic habitat, provided it observe a strict prohibition on sediment-disturbing construction activities during June and July, when larval and juvenile hard clams would be most sensitive to impacts from contaminants. (*See* Permit Cover Letter at 2-3; 2025 Certification at 9; RTC Summary at 20-21.) (A1030-1031; 1045; 1104-1105.) The Department also required Transco to monitor water quality throughout construction and take steps to address any imminent or inadvertent exceedances of water quality standards. (2025 Certification at 12-13.) (A1048-1049.) And the Department required Transco to implement mitigation plans for species that might be adversely affected by construction, including hard clams, and to provide financial assurances in advance so that money would be available to mitigate any impacts. (Permit Cover Letter at 2-3; 2025 Certification at 9-10.) (A1030-1031; 1045-1046.) With these protections in place, the Department concluded, based on its review of Transco's submissions, its

48

independent literature review, and its practical experiences with in-water construction work, that complying with water quality monitoring and limits at the edge of a 500-foot mixing zone would be protective when measuring its compliance with state water quality standards. (Permit Cover Letter at 2-3; RTC Summary at 20-21.) (A1056-1057; 1104-1105.)

Contrary to petitioners' contention (Br. at 34-39), Transco's determination that it had previously overestimated hard-clam density was not "dispositive" or even a "key determinant" for the Department's decision to grant the permit. To be sure, once the Department validated Transco's recalculation of the hard-clam density in the affected portion of Raritan Bay, it acknowledged that the 20-fold reduction in hard-clam density suggested that impacts on hard clams would not be as severe as the Department had initially projected. (RTC Summary at 21; *see also* 2025.09.23 NESE Response to DEC Email; 2025 Barnes HC density calculations for Revised Clam Density.) (A1105; 1005-1008; 1108-1109.) But the Department clarified that *even with the lower density*, the hard-clam beds along the pipeline route were still considered a critical resource area. (RTC Summary at 21.) (A1105.) That is why the Department imposed the robust protections for hard clams described above.

49

**2. The Department Explained Its Acceptance of Sediment Modeling Based on Transco's Estimate of 5% Sediment Loss from Jet Trenchers.**

In its 2020 denial, the Department concluded that "without further documentation," it could not accept Transco's projection that only 5% of sediments would be disturbed in locations where Transco used a jet trencher to bury the pipeline. (2020 Denial at 7.) (A440.) A higher sediment loss rate would call into question Transco's modeling results showing that water quality standards could be achieved at the edge of a 500-foot mixing zone. (*Id.*)

In 2025, Transco submitted the "documentation" for its estimated 5% sediment loss rate for jet trenching. (Response to RFAI at 51-52.) (A810-811.) Specifically, Transco provided multiple project studies in which its contractors had observed less than 5% sediment loss during jet trenching, even when modeling suggested a 25% to 30% sediment loss rate was expected. (*Id.; see also* Memo on Jet Trencher Sediment Loss Rate.) (A810-811; 917-921.) In light of this documentation, the Department concluded when it issued the 2025 certificate that Transco had adequately demonstrated the appropriateness of a 5% sediment loss rate in its sediment modeling. (RTC Summary at 22.) (A1106.)

50

Nonetheless, the Department required Transco to monitor water quality during any sediment-disturbing work and, if any exceedances of water quality standards were observed, work with the Department to address those exceedances. (2025 Certificate at 23.) (A1059.) Thus, the Department once again addressed the facts underpinning its previous position, noted what changed, and described the reasons for its change in position.

### 3. The Department Explained Its Acceptance of a Four-foot Burial Depth for the Pipeline.

The Department likewise rationally explained why, in 2025, it decided to accept a four-foot minimum burial depth for the pipeline. The 2020 denial did not categorically reject Transco's proposed four-foot burial depth but instead recognized that the Department generally sought a six-foot burial depth for transmission lines and that "absent an evaluation by Transco" on the impacts and appropriateness of a four-foot burial depth, the Department could not conclude that it would be appropriate. (2020 Denial at 13.) (A446.) Transco provided just such an evaluation in 2025. (Response to RFAI at 7-8.) (A766-767.)

The Department reviewed Transco's submissions along with its own experiences with other in-water utility projects before concluding

51

that a deviation from the generally sought six-foot burial depth was appropriate. (Permit Cover Ltr. at 2; RTC Summary at 20.) (A1030; 1056.) First, the shallower depth would lessen the amount of contaminated suspended sediment generated from project construction; second, a natural gas pipeline, unlike electrical utility lines, does not generate an electromagnetic field that can disturb flora and fauna; and third, the project is located in an area that is not heavily fished with bottom-trawling equipment that could potentially damage the pipeline or the fishing gear. (RTC Summary at 14, 20.) (A1098, 1104.) This "reasoned explanation" met the agency's mandate to explain its change in position on this issue. *Wages and White Lion Investments*, 604 U.S. at 568.

### 4. The Department Did Not Change its Position on Mitigation of Water Quality Impacts

Finally, petitioners claim that the Department changed its position on mitigation for impacts on water quality, by comparing the Department's 2019 denial to the 2025 certification. (Br. at 38.) However, that 2019 denial merely observed that, at that time, mitigation plans had not been finalized and would have to be developed before the Department could issue a water quality certification. (2019 Denial at 4.) (A425.)

52

Although the Department denied Transco's re-application in 2020, that denial did not rely on the lack of water quality mitigation plans. Rather, in 2020 the Department concluded that Transco had proposed no mitigation for unavoidable *greenhouse gas emissions* impacts, not water quality impacts. (2020 Denial at 14-15.) (A447-448.) The 2025 certification again recognized that Transco had failed to develop greenhouse gas mitigation plans, but conceded that under EPA regulations then in effect, the Department could not require Transco to develop those plans as a condition of a water quality certification. (Permit Cover Letter, at 5, citing 40 C.F.R. former § 121.3 (2025).) (A1033.) With respect to water-quality mitigation, however, the Department imposed extensive requirements, including financial assurances and requiring Transco to develop and approve species-specific mitigation plans after the certification was issued but before construction commenced. (Permit Cover Letter at 2-3, 2025 Certification at 9-10.) (A1030-1031, 1045-1046.)

53

In short, the Department did not change its position as to water quality mitigation.

## POINT II

**THE DEPARTMENT RATIONALLY RELIED ON TRANSCO'S SUBMISSION OF POST-CERTIFICATION COMPLIANCE PLANS**

### A. States May Rely on Post-Certification Compliance Plans In Issuing Section 401 Certifications.

Petitioners' claim (Br. at 48-65) that the Department improperly relied upon post-certification compliance plans is without merit. Clean Water Act section 401 authorizes state agencies to include in their certifications any "limitations" or "monitoring requirements" necessary to ensure that the applicant complies with state water quality standards and requirements. 33 U.S.C. § 1341(d). Nothing in section 401 prohibits states from using this authority to require an applicant to develop and follow appropriate compliance measures after the certification is issued. *See Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 974 (D.C. Cir. 2011) ("Nowhere in Section 401 is it stated that a certification must be fully effective" when issued.) To the contrary, allowing state agencies to rely on compliance plans, the details of which will be developed after the certification is issued but before the regulated activity commences,

54

"appropriately balances the agencies' need for specific additional information against the one-year time constraint placed on state certification" by section 401. *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wash.2d 568, 602, 90 P.3d 659, 676 (Wash. 2004), citing 33 U.S.C. § 1341(a)(1). Moreover, allowing the applicant to develop the details of a compliance plan after a certification is issued ensures that the compliance plan is based on the most up-to-date information regarding the proposed activity and the requirements of other federal and state permits. *See Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 404 (4th Cir. 2018) (reasonable for agency to rely on monitoring plan "to adjust to any unexpected contingencies that may lead to a short-term exceedance").

Consistent with section 401's authority, state certifying agencies can, and frequently do, require applicants to develop and follow post-certification management, monitoring, and mitigation plans as a condition of a water quality certification. For example, in *Sierra Club v. State Water Control Board*, the Fourth Circuit concluded that it was not arbitrary for a state certifying agency to issue a water quality certification before approving the required site-specific erosion and

stormwater management plans. 898 F.3d at 405 n.14. Similarly, in *Appalachian Voices v. State Water Control Board*, the Fourth Circuit found that it was not arbitrary for the certifying agency to require post-certification contingency plans for encountering unusual geology during construction as part of its water quality certification because those plans assured the agency that the project would meet the applicable water quality standards. 912 F.3d 746, 758 (4th Cir. 2019). This Court should likewise uphold the Department's reliance on post-certification compliance plans.

Petitioners cite *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486 (2d Cir. 2005), for the proposition that all of a permit's terms "must be included in the permit itself, not plans developed outside the permit process." (Br. at 49, 54-55.) But, as petitioners concede (*id.* at 54), *Waterkeeper* is not a section 401 case. Rather, the case concerned a challenge to an EPA rule promulgated pursuant to Clean Water Act section 402, 33 U.S.C. § 1342, which would have authorized regulated entities to develop and implement compliance plans that would not be subject to further review and approval by regulating agencies. *Waterkeeper Alliance*, 399 F.3d at 495. The Supreme Court has

recognized that section 401 and section 402 "are not interchangeable, as they serve different purposes and use different language to reach them." *S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 381 (2006). In *Waterkeeper*, this Court concluded that the rule was inconsistent with section 402 of the Clean Water Act because, "[b]y failing to require permitting authority review" of compliance plans, the rule "allows permits to issue that do not assure compliance with applicable" standards and limitations. *Id.* at 501. But the Department's 2025 certification *does* require Department review and approval of Transco's compliance plans. (2025 Certification at 7, 11, 20, 25.) (A1043, 1047, 1056, 1061.) Thus, to the extent caselaw applicable to an EPA rulemaking under section 402 applies to the Department's issuance of a certification under section 401, the Department's certification here does what this Court criticized the EPA's rulemaking for not doing in *Waterkeeper Alliance.*

Petitioners' reliance on *Natural Resources Defense Council v. EPA*, 808 F.3d 556, 562 (2d Cir. 2015) (*NRDC*), is similarly flawed. (*See* Br. at 49, 53, 56, 57, 61, 64.) Similar to *Waterkeeper*, *NRDC* addressed a general permit issued by EPA under section 402 regulating the discharge of ballast water from ships, in which EPA had instructed the permittee to

control discharges "as necessary." 808 F.3d at 578. Even if *NRDC* applied to water quality certifications under section 401, the terms of the Department's 2025 certification are much more specific than the general instruction challenged in *NRDC* that failed to issue any kind of standard at all. (*See* 2025 Certification at 14-27.) (A1050-1063.)

## B. The Department's Reliance on Transco's Submission of Post-Certification Compliance Plans Was Rational.

Contrary to petitioners' contention (Br. at 49), this is not a case where the Department has stated a desired result and "punted" on the details of how that result will be achieved. *Cf. NRDC*, 808 F.3d at 578 (rejecting general permit that required regulated parties to meet applicable water quality standards without "giving specific guidance"). To the contrary, for each of the compliance plans that petitioners find objectionable, the Department established specific parameters and, in most cases, required Transco to submit a draft plan for the Department's review *before* the certification was issued. (*See supra* at 27.) Moreover, each of the plans will need to be reviewed and approved by the Department *before* Transco commences any activities that could affect water quality. (2025 Certification at 7, 11, 20, 25.) (A1043, 1047, 1056, 1061.)

Contrary to petitioners' argument (Br. at 51-57), the Department did not act arbitrarily and capriciously by requiring Transco to develop and comply with a dredge management plan. (2025 Certification at 20-24.) (A1056-1060.) The 2025 certification requires Transco to comply with specific limitations applicable to roughly a dozen pollutants for each segment of the proposed pipeline, based on best usages and anticipated environmental conditions of each segment. (*Id.* at 15-19.) (A1051-1055.) The required dredge management plan minimizes the risk of any adverse impacts to water quality by requiring Transco to explain to the Department exactly how it will comply with the requirements in the certification, including when dredge rates will slow down to protect various wildlife, and respond to any unforeseen exceedances of water quality limits, prior to beginning construction. (*Id.* at 20.) (A1056.) The Department did not "punt" on those requirements, as petitioners allege. (*See* Br. at 53.) And the condition that Transco explain how it plans to comply with the certification requirements does not change the fact that they *are* included in the 2025 certification.

Likewise unavailing is petitioners' argument (Br. at 57-59) that the Department acted arbitrarily and capriciously by requiring Transco to

59

develop and comply with a suspended sediment and water quality monitoring plan. (2025 Certification at 11-17.) (A1047-1053.) This plan requires that Transco use certain detection instrumentation, set locational and temporal parameters for monitoring, and provide extensive details about how monitoring will be conducted. (*Id.* at 11.) (A1047.) This plan ensures that Transco complies with the water quality standards and limits for in-water work laid out in the 2025 certification. (*Id.* at 15-19.) A1051-1055.) The plan does not independently set any such limits or standards, which are already in the certificate itself. Instead, it provides assurances that Transco will effectively monitor for any exceedances of water quality standards and address any exceedances. Thus, the certificate's condition that Transco submit this monitoring compliance plan is consistent with the Clean Water Act.

Nor are petitioners correct in their assertion (Br. at 60-62) that the Department acted arbitrarily and capriciously by requiring Transco to develop and comply with a sturgeon monitoring plan. The 2025 certification requires that Transco conduct acoustic monitoring for the presence of tagged sturgeon in the area where sturgeon are known to inhabit. (2025 Certification at 7.) A1043.) To ensure that this monitoring

60

is effective, Transco must submit a comprehensive plan to the Department for its approval detailing how it will detect the presence of sturgeon, how it will implement best management practices upon sturgeon detection, and procedures for the Department oversight of any impacts on sturgeon populations. (*Id.*) This obligates Transco to adopt best management practices for detecting and avoiding sturgeon before any construction on the project begins and provides a mechanism for the Department to confirm that the plan is fully executed, ensuring protection of sturgeon populations in the project area. And, contrary to petitioners' insistence (Br. at 60), the certification requires that Transco conduct acoustic monitoring as well as video monitoring. (2025 Certification at 7.) (A1043.) As such, the certification rationally sets out specific guidelines with which Transco must comply.

Finally, contrary to petitioners' contention (Br. at 62-65), the Department acted rationally when conditioning the 2025 certification on Transco submitting mitigation plans prior to commencing construction, recognizing that the project will have some unavoidable impacts on sturgeon, winter flounder, and hard clams that will require mitigation. These mitigation plans will ensure that the project does not impair the

61

long-term best usages of the project waters beyond what the certification already contemplates. And the Department's requirement that Transco provide mitigation plans closer to the time they will be put into place is rational, as they will account for unanticipated changes to the construction timeline or techniques, as well as availability of potential mitigation projects. (Permit Cover Letter at 3.) (A1031.) Thus, there is no support for petitioners' attempt to portray the Department's proactive efforts to account for the project's unavoidable impacts as a flaw in its process rather than a feature of the Department's thorough review and detailed 2025 certification. (Br. at 63-65.)

The two cases cited by petitioners do not apply to mitigation in the context of the Clean Water Act. Rather, one (Br. at 61-62, 64) simply explains that NEPA provides for review under the "substantial evidence" standard of any mitigation required by that statute. *See National Audubon Society v. Hoffman*, 132 F.3d 7 (2d Cir. 1997). And the other concerns a challenge to the delisting of the grizzly bear as a threatened species under the Endangered Species Act. *See Greater Yellowstone Coal, Inc. v. Servheen*, 665 F.3d 1015, 1029 (9th Cir. 2011). Neither has any application here.

## POINT III

### THE DEPARTMENT COMPLIED WITH ALL PUBLIC NOTICE AND COMMENT REQUIREMENTS

**A. The Department Complied with the Public Notice and Comment Requirements of Section 401 and State Laws.**

Clean Water Act section 401 requires states to "establish procedures for public notice" on "all applications for certification" and to provide for public hearings on specific applications "to the extent it deems appropriate." 33 U.S.C. § 1341(a)(1). States have "broad discretion" in determining how to implement these requirements. *Appalachian Voices*, 912 F.3d at 754; *see also Berkshire Envt'l Action Team, Inc. v. Tennessee Gas*, 851 F.3d 105, 113 (1st Cir. 2017) (finding "no indication" in section 401 that Congress "intended to dictate how" a state agency "conducts its internal decision-making before finally acting").

Once a State establishes procedures to implement section 401's public notice requirements, it must, of course, follow those procedures. *See City of Tacoma, Wash. v. FERC*, 460 F.3d 53, 68 (D.C. Cir. 2006). But "[n]otice need only be adequate to allow interested parties to participate in the process that is actually pending"; states are not required to provide notice and solicit comments at every stage of the agency's administrative

review. *Delaware Riverkeeper Network v. Secretary of Pa. Dep't of Envt'l Protection*, 903 F.3d 65, 76 (3d Dep't 2018).

The Department's public notice and comment procedures are established by the Uniform Procedures Act, ECL article 70, and regulations promulgated pursuant to that Act, 6 N.Y.C.R.R. part 621. Those laws establish specific requirements that must be met before the Department can determine that a section 401 application is complete. *See* 6 N.Y.C.R.R. § 621.3 (general requirements), § 621.4(d) (additional requirements for section 401 applications). Upon determining that an application is complete, the Department generally must release a "notice of complete application" and allow interested parties an opportunity to submit comments. 6 N.Y.C.R.R. § 621.7; *see also* ECL § 70-0109(2)(a). The notice must include certain information, including "[a] brief description of the proposed project and its location." 6 N.Y.C.R.R. § 621.7(b). But a complete application "commenc[es]" the Department's substantive review of the application, which may require that the application "be supplemented" as necessary "to enable the [D]epartment to make the findings and determinations required by law." ECL § 70-0105(2); *see also Matter of Concerned Citizens of Allegany County v.*

64

*Zagata*, 231 A.D.2d 851, 851 (N.Y. App. Div., 4th Dep't 1996), *lv. denied* 90 N.Y. 814 (N.Y. 1997) (Department may require additional information during the public comment process). Nothing in state law requires the Department to also release those supplemental materials for public notice and comment.

The Department complied with the public participation requirements of section 401 and state law. Once the Department determined that the application met the criteria for completeness under E.C.L. § 70-0105(2) and 6 N.Y.C.R.R. § 621.3(a), it issued a notice of complete application, which opened a 30-day public comment period, later extended to 45 days. (Notice of Complete Application.) (A749-751.) The public notice included the information required by state law, including "[a] brief description of the proposed project and its location." 6 N.Y.C.R.R. § 621.7(b). The public notice also provided details of where a member of the public could access a full copy of Transco's application and other related materials. (Notice of Complete Application.) (A749-751.)

Petitioners do not argue that the Department's robust public notice and comment requirements are inconsistent with section 401. Nor do they argue that the Department failed to follow those public notice and

65

comment requirements in processing Transco's 2025 application. Instead, petitioners merely wish that New York law had provided *additional* opportunities for public comment throughout the Department's consideration of the water quality certification application, citing inapplicable cases that do not relate to section 401. But the record demonstrates that the Department complied with all requirements in processing the project application, including those for providing public notice and comment.

**B.    The Department Was Not Required to Release Transco's Recalculation of Hard Clam Density or Support for Its Predicted Sediment Loss Rate for Public Comment.**

Petitioners' argument that the Department was required to publish Transco's re-calculation of hard clam density data or its justification for relying on a 5% sediment loss rate when modeling compliance with water quality standards in the vicinity of jet-trenching operation (Br. at 42-47) is without merit. Petitioners cite no specific federal or state law that required the Department to publish Transco's post-application submissions or the Department's validation of those submissions, instead citing a general policy recognizing the importance of public participation in administrative processes. (Br. at 42.) But a general policy favoring

66

public participation cannot be read to impose public notice and comment requirements over and above those already contained in federal and state law, which mandate public notice and comment only on section 401 "applications." 33 U.S.C. § 1341(a)(1); ECL § 70-0109(2)(a); 6 N.Y.C.R.R. § 621.7(b). And Transco's recalculation of hard clam density and justification for relying on a 5% sediment loss rate, along with the Department's validation of those materials, were not part of Transco's section 401 application.

The cases that petitioners proffer to support their argument are based on the specific requirements of other federal laws, not Clean Water Act section 401 or the State of New York's public participation requirements. For example, in *Waterkeeper*, this Court found that EPA, when promulgating a regulation under section 402 of the Clean Water Act, violated the public participation requirements specific to section 402, 33 U.S.C. § 1342, when it exempted certain portions of permits regulating point source discharges from public comment. 399 F.3d at 503-04. But that holding was premised on section 402's specific requirement for public notice of *permits* in addition to applications. *See id.* at 503, citing 33 U.S.C. § 1342(j). Likewise, in *Ohio Valley Environmental Coalition v.*

67

*U.S. Army Corps of Engineers*, a federal court held that the U.S. Army Corps of Engineers failed to follow its own regulations defining a "complete application" for a permit under section 404 of the Clean Water Act, 33 U.S.C. § 1344. 674 F.Supp.2d 783, 802 (S.D.W.Va. 2009), citing 33 C.F.R. § 325.3(a). Petitioners do not contend here that the Department failed to follow its own regulatory framework regarding when an application is "complete" and ready for public comment.

Petitioners also rely on cases interpreting the public notice and comment requirements of the federal Administrative Procedure Act that apply to federal agency rulemakings. *See Alina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2015); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *Solite Corp. v. EPA*, 952 F.2d 473, 499 (D.C. Cir. 1991); *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 252 (2d Cir. 1977). Although the APA established the standard for judicial review of section 401 certifications by federal courts, *e.g., Islander East I*, 482 F.3d at 94, section 401 certifications are fundamentally state permits subject to the procedural requirements of state law, *see, e.g., Delaware Riverkeeper Network v. Sec. of Pa. Dep't of*

68

*Envt'l Conservation*, 903 F.3d 65, 72 (3d Cir. 2018); *Berkshire Envt'l Action Team, Inc.*, 851 F.3d at 113.

Here, the Department acted entirely consistently with state public participation requirements, *see* E.C.L. 70-0105(2); 6 N.Y.C.R.R. Part 621, by making Transco's application available for public comment once it was deemed complete. And the Department is allowed to seek additional information from an applicant even after its application is deemed complete without having to publish that information. *See Matter of Citizens for Clean Air v. New York State Dept. of Env't Conserv.*, 135 A.D.2d 256, 260 (N.Y. App. Div. 3d Dep't 1988) (the Department was not required to publish additional information elicited from an applicant whose application was already deemed complete). Transco's recalculation of hard clam density and its justification for its sediment-loss rate were just such additional information, provided to address the Department's substantive concerns with Transco's administratively complete application. Thus, the Department was not required to publish this information.

Even if the APA's public notice and comment requirements applied to the Department's review of section 401 certification, they would not

have required publication of Transco's hard clam density recalculation or sediment-loss-rate justification. The APA requires courts to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706. Thus, a party claiming to have been denied an opportunity for public review and comment must show that they have been prejudiced by the lack of opportunity to comment. *See American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008).

Petitioners repeatedly claim to have been denied an opportunity to comment on Transco's recalculation of hard clam density or its justification for relying on 5% sediment loss rate from jet trenching operations. (Br. at 43-47.) But despite having had access to this information since September 2025 (when Transco updated the data on FERC's docket), petitioners never say *what* they would have said if given the opportunity to comment. The best they can do is to suggest they "might have engaged experts" and assert, without elaboration, that they "would have provided significant information relevant to the agency's decision-making." (Br. at 47.) These generic assertions, without any details regarding what they would have said or how their comments might have altered the Department's decision to issue the certification,

70

are insufficient to establish the prejudice required by the APA. *See, e.g., Delaware Riverkeeper Network v. Secretary Pa. Dep't of Envt'l Protection*, 833 F.3d 360, 378 (3d Cir. 2016).

## C. The Department Was Not Required to Provide for Public Notice and Comment on Post-Certification Compliance Plans.

There is likewise no merit to petitioners' claim (Br. at 65-67) that the Department violated the Clean Water Act by not subjecting Transco's future compliance plans to public comment. Section 401 of the Clean Water Act requires states to allow for public notice and comment on *applications*, not final certifications. 33 U.S.C. § 1341(a)(1). Similarly, New York's procedural laws provide for public notice and comment on an *application* once it is deemed "complete" (a threshold determination that allows the agency to begin a full evaluation on the merits). E.C.L. § 70-0105(2); 6 N.Y.C.R.R. § 621.7. Making an application available for public comment does not automatically prevent an agency from imposing additional requirements in the certification it ultimately issues. *See Delaware Riverkeeper Network v. Secretary of Pa. Dep't of Envt'l Conservation*, 903 F.3d 65, 76 (3d Cir. 2018) (opportunity for public notice on section 401 certification is adequate even if conditioned on applicant

subsequently obtaining necessary permits); *accord Delaware Riverkeeper Network v. Secretary of Pa. Dep't of Envt'l Protection,* 783 Fed. App'x 124, 129 (3d Cir. 2019). In particular, given section 401's strict reasonable period of time, which is not to exceed one year, for state action on an application, 33 U.S.C. § 1341(a)(1), requiring subsequent rounds of public notice and comment on every condition developed by a state agency would make the certification process difficult, if not impossible, to complete in a timely manner.

Petitioners' only case in support of their argument for mandatory public notice of post-certification, pre-construction compliance plans— *Waterkeeper Alliance Inc.*—is inapplicable. That case involved a proposed rule that would have nullified a specific statutory mandate requiring that *permits* issued under Clean Water Act section 402 be subject to public notice and comment. 399 F.3d at 503, citing 33 U.S.C. § 1342(j). Section 401 includes no similar mandate and petitioners make no attempt to argue that the Department violated its own public participation rules, which require public notice and comment on *applications.* Accordingly, this Court should reject petitioners' arguments that the Department

72

failed to satisfy public notice and comment requirements with respect to

the subject water quality certification.

## CONCLUSION

The petition for review should be denied.

Dated:     April 20, 2026                Respectfully submitted,
           Albany, New York

                                         Letitia James
                                           *Attorney General*
                                           *State of New York*
                                         Attorney for State Respondent

                             By: _____

                                         MEREDITH G. LEE-CLARK
                                         KYLE BURNS
                                         Assistant Attorneys General
                                         Office of the Attorney General
                                           The Capitol
                                           Albany, New York 12224
                                           (518) 776-2400

73

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Meredith G. Lee-Clark, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,759 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

/s/  *Meredith G. Lee-Clark*