25-2938
*Baykeeper v. NYSDEC*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

**SUMMARY ORDER**

*Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.*

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of August, two thousand twenty-six.

PRESENT: STEVEN J. MENASHI,
SARAH A. L. MERRIAM
*Circuit Judges,*
JOHN P. CRONAN,
*District Judge.*[*]

---

RARITAN BAYKEEPER, INC., FOOD & WATER WATCH, PROTECTORS OF PINE OAK WOODS, INC., SIERRA CLUB, SURFRIDER FOUNDATION, NATURAL RESOURCES DEFENSE COUNCIL, INC.,

*Petitioners,*

v. No. 25-2938

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, AMANDA LEFTON, COMMISSIONER, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION,

---

[*] Judge John P. Cronan of the United States District Court for the Southern District of New York, sitting by designation.

TRANSCONTINENTAL GAS PIPELINE COMPANY, LLC,

*Respondents*.†

---

*For Petitioners Raritan Baykeeper, Inc., Food & Water Watch, Protectors of Pine Oak Woods, Inc., Sierra Club, and Surfrider Foundation:*

SUSAN J. KRAHAM, Earthjustice, New York, NY (Nicholas Loh, Moneen Nasmith, Earthjustice, New York, NY, Ann Jaworski, Earthjustice, Chicago, IL, *on the brief*).

*For Petitioner Natural Resources Defense Council, Inc.:*

Jared E. Knicley, Natural Resources Defense Council, Washington, DC, Jackson P. Garrity, Natural Resources Defense Council, Chicago, IL, Mark A. Izeman, Natural Resources Defense Council, New York, NY.

*For Respondent New York State Department of Environmental Conservation:*

BRIAN LUSIGNAN, Assistant Solicitor General, Environmental Protection Bureau (Barbara D. Underwood, Solicitor General, Jeffrey W. Lang, Deputy Solicitor General, Susan L. Taylor, Meredith G. Lee-Clark, Kyle Burns, Assistant Attorneys General, Environmental Protection Bureau, *on the brief*), *for* Letitia James, Attorney General of the State of New York, Albany, NY.

† The Clerk of Court is directed to amend the caption as set forth above.

| | |
|---|---|
| *For Respondent Transcontinental Gas Pipe Line Company, LLC:* | YVONNE HENNESSEY, Barclay Damon LLP, Albany, NY. |

On a petition for review from the New York State Department of Environmental Conservation.

Upon due consideration, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the petition for review is **DENIED**.

Petitioners Raritan Baykeeper, Inc., Food & Water Watch, Protectors of Pine Oak Woods, Inc., Sierra Club, Surfrider Foundation, and Natural Resources Defense Council, Inc., petition for review of a decision by the New York State Department of Environmental Conservation ("NYSDEC") granting an application by Transcontinental Gas Pipe Line Company, LLC, ("Transco") for a Water Quality Certification ("WQC") pursuant to § 401 of the Clean Water Act. Transco was required to obtain a WQC before beginning construction of its natural gas pipeline, the Northeast Supply Enhancement ("NESE") project, which will traverse seventeen miles of sea floor in state waters in the New York Harbor. NYSDEC denied Transco's similar application for a WQC in 2020 but concluded that Transco's 2025 application addressed the agency's concerns about the previous application and demonstrated that the NESE project would comply with the state's water quality standards. The petitioners argue that NYSDEC acted arbitrarily and capriciously and contrary to law when it issued the 2025 WQC to Transco. The petitioners seek vacatur of the 2025 WQC. We assume the parties' familiarity with the facts, procedural history, and issues on appeal.

**I**

In March 2017, Transco applied to the Federal Energy Regulatory Commission for a certificate of public convenience and necessity authorizing it to construct and operate roughly 37 miles of natural gas pipeline and various

associated facilities as part of the NESE project. The proposed NESE project would transport natural gas from Pennsylvania to customers in Brooklyn, Queens, and Long Island. The project would include constructing a 26-inch-diameter underwater natural gas pipeline loop spanning 23.5 miles across Raritan Bay, off the coasts of New York and New Jersey (the "Raritan Bay Loop").

FERC issued a Final Environmental Impact Statement ("FEIS") for the NESE project in January 2019. FERC observed that the New York waters that the project would cross are designated as "impaired" under the Clean Water Act, meaning the "current pollution control technologies alone cannot meet the water quality standards set for that waterbody." App'x 376. Still, FERC determined that construction could have "adverse effects on aquatic species" in the roughly 88 acres of seafloor directly affected by the project. *Id.* at 325. Burying the pipeline would require dredging the seabed of Raritan Bay, and aquatic organisms would be directly impacted by mechanical activities and construction equipment and indirectly impacted by sediment disturbance and redeposition as well as noise. Transco's dredging activities would also cause sediments contaminated with mercury and copper to become suspended. FERC explained that benthic invertebrates—such as clams, worms, and crustaceans—and bottom-dwelling fish species would be most affected because they cannot vacate the disturbed area. The Raritan Bay Loop would cross the most productive hard clam area in New York Waters, based on Transco's estimation at the time, based on a 2016 survey, that the hard clam density in the area is approximately 69.6 individuals per square foot.

FERC ultimately concluded, however, that "[g]iven the relatively short duration of dredging and backfilling activities, and the rapid pace at which resuspended sediments are expected to settle out of the water column," the impacts of the sedimentation and turbidity due to the NESE project on aquatic resources "are anticipated to be temporary and minor." *Id.* at 396. FERC recommended that Transco work with NYSDEC to develop mitigation plans before commencing construction. In May 2019, FERC issued Transco a certificate of public convenience and necessity approving the NESE project, subject to certain

environmental conditions in the FEIS. *See* Order Issuing Certificate, Docket No. CP17-101-000, 167 FERC ¶ 61110 (May 3, 2019), 2019 WL 1977358; *see also* App'x 435.

To proceed with the NESE project, Transco was also required to obtain a Water Quality Certification from NYSDEC pursuant to § 401 of the Clean Water Act, which requires applicants for federal permits to provide federal licensing agencies such as FERC with certifications from affected states confirming that the proposed activity "will comply" with state water quality standards and requirements. 33 U.S.C. § 1341(a)(1). Between 2017 and 2019, Transco submitted three WQC applications to NYSDEC for the NESE project, each of which was denied. The agency denied Transco's third application in 2020 after a public comment period during which NYSDEC received over 16,000 comments.

As relevant here, NYSDEC gave three reasons for the 2020 denial. First, Transco failed to establish that project construction would comply with applicable water quality standards for mercury and copper without the use of a 500-foot "mixing zone"—an area within which a regulator "will accept temporary exceedances of water quality standards resulting from short-term disruptions to the water body caused by dredging." App'x 69-70. NYSDEC concluded that a 500-foot mixing zone was inappropriate in areas of the project with hard clam habitats because Raritan Bay is one of the last highly productive hard clam beds in New York, and hard clams—especially in early life stages—are sensitive to the effects of suspended contaminated sediment.

Second, NYSDEC concluded that "without further documentation," it could not accept Transco's "modeled sediment loss rate of 5%, which was used to project sediment loss due to jet trencher activities." *Id.* at 440.[1] Transco proposed to use jet trenching, which causes less sediment disturbance than traditional excavation,

[1] A jet trencher is a remote-controlled bottom-crawling vehicle that fluidizes seabed sediments, reducing their density and allowing the pipeline to settle beneath the seafloor without excavating a traditional trench.

to bury roughly 15 miles of the pipeline. It provided modeling estimating that only 5% of seabed sediments would be lost in areas of the project where jet trenching was proposed. But NYSDEC rejected this estimate because modeling for comparable projects had assumed a 25% to 30% sediment loss rate for jet trenching activities.

Third, Transco failed to justify its plan to bury the pipeline only four feet below the seabed as opposed to the traditional six feet. NYSDEC observed that if the pipeline were buried only four feet deep, it could interfere with future installation of electrical transmission cables and would risk being compromised by fishing vessels or gear. The agency concluded that it could not make a determination regarding the water quality impact of a four-foot burial depth "absent an evaluation by Transco." *Id.* at 446. As a result, NYSDEC denied Transco's application.

In May 2025, Transco sought to restart development of the NESE project. Transco petitioned FERC to reissue the certificate of public convenience and necessity for the project, which had since expired, and FERC did so in August 2025. On May 30, 2025, Transco submitted a new application for a Water Quality Certification to NYSDEC. Transco's 2025 WQC application highlighted the increased need for the project given that existing gas infrastructure is unable to meet New York's demand for affordable and reliable energy, particularly during a cold snap or heat wave. NYSDEC determined the application was complete, began review, and opened a public comment period. Over the course of NYSDEC's review of the application, Transco submitted additional supporting materials regarding the NESE project, exchanged follow-up emails with the agency to further clarify its submissions, and participated in multiple meetings with staff to address the bases for the 2020 denial.

After the previous denial, Transco provided several categories of information to NYSDEC relevant to this petition for review. First, Transco provided additional sediment modeling discussion establishing that water quality

standards for turbidity, mercury, and copper would be met at the edge of a proposed 500-foot mixing zone. Second, Transco informed NYSDEC that it had miscalculated the density of hard clams along the project route in its initial application to FERC as being 69.6 individual clams per square foot when it should have been 3.7 clams per square foot. Third, Transco explained that the estimated 5% sediment loss rate from jet-trenching was based on the experiences of its contractors and that studies estimating a 25% to 30% sediment loss rate for comparable projects turned out to have overestimated sediment loss. Fourth, Transco explained that a four-foot burial depth would result in less disturbance to the seabed and would not interfere with fishing gear because the affected areas are infrequently used by bottom-trawling fishing vessels, and that Transco would permit future transmission lines to cross the pipeline. Fifth, Transco provided draft plans detailing how it would monitor and mitigate effects on the hard clam community, suspended sediment, and water quality.

Without issuing a new public notice or reopening the comment period, on November 7, 2025, NYSDEC issued Transco a conditional Water Quality Certification for the NESE project. The WQC authorized construction, installation, and operation of the NESE project subject to 57 project-specific permit conditions in addition to the conditions applicable to all NYSDEC permits. The conditions included, among other things, limitations on construction methods, mixing zones for various portions of the project with stringent water quality standards to protect aquatic organisms, requirements for pipeline burial depth and the manner of trenching, a third-party environmental monitor, seasonal construction windows to protect marine resources, water quality standards specific to the presence of hard clams, and requirements that Transco submit plans regarding dredging rates and tools, monitoring of suspended sediment and water quality, and mitigation of impacts on hard claims.

In granting Transco's 2025 application, NYSDEC acknowledged that it had previously denied a water quality certification for the NESE project but concluded that if Transco adhered to the permit's conditions, the project would comply with

applicable water quality standards. The agency explained that since the 2020 denial, "considerable in-water utility construction has occurred in New York waters, which has provided NYSDEC with new information relating to in-water construction related water quality impacts and measures to appropriately avoid and minimize such impacts." App'x 1031. In a "Responsiveness Summary," the agency responded to the public comments on Transco's 2025 application and provided further detail on how the 2025 application addressed the concerns expressed in the 2020 denial. *See id.* at 1104.

The agency offered three principal reasons for issuing the 2025 WQC. First, with respect to hard clams, NYSDEC explained that Transco had corrected its estimated number of hard clams per square foot from 69.9 individual clams to 3.7 individual clams, and NYSDEC staff reviewed the raw data and confirmed the accuracy of the recalculation. The WQC prohibited any "sediment disturbing activities" between June 1 and July 31 within the hard clam area "[t]o minimize impacts to vulnerable life stages of hard clam." *Id.* at 1044. The agency "defined a strict 500-foot mixing zone in areas where hard clams are present and areas of contamination outside of the hard clam area." *Id.* at 1099. And it imposed stricter limits for total suspended solids in the water when construction would occur for longer continuous duration. *See id.* at 1105.

Second, "[t]hrough additional correspondence with [Transco], NYSDEC obtained additional, sufficient justification" for the 5% sediment loss rate for jet trenching activities. *Id*. at 1100. In the 2025 application, Transco justified the 5% sediment loss rate by explaining that although comparable projects that had estimated higher loss rates, the actual data from those projects showed loss rates far lower than expected. And Transco's estimate relied on the expertise of its modeler, who has experience with modeling this installation technology.

Third, Transco demonstrated the appropriateness of a four-foot burial depth. NYSDEC explained that as it had reviewed more offshore cable projects, it had learned that "the need for a deeper burial depth is based on factors not

applicable to this Project." *Id*. The six-foot burial depth is generally required for high-voltage transmission line projects to minimize EMF impacts, a concern inapplicable to a gas pipeline. And a four-foot burial depth would sufficiently minimize risks to fishing gear and vessels because the relevant area "is not heavily fished by bottom-tending fishing gear." *Id.* Moreover, burying the pipeline six feet below the seabed "could increase sediment suspension, which could hinder meeting water quality standards." *Id.* at 1101.

The petitioners seek vacatur of the WQC for the NESE project.

**II**

The petitioners offer two reasons why this court should vacate the 2025 WQC. First, NYSDEC failed to adequately explain its change of position when it granted Transco's fourth application for a WQC for the NESE project after having denied the prior applications. The petitioners argue that the complete change of position of NYSDEC required a "more detailed justification." Petitioners' Br. 38 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Second, NYSDEC acted arbitrarily and capriciously and contrary to the Clean Water Act by relying on documents it failed to subject to public comment, including future compliance plans. Moreover, NYSDEC's reliance on uncertain future compliance plans violated the public participation requirements contained in the Clean Water Act.

We apply a two-step approach to review the decision of NYSDEC to issue the Water Quality Certification, which is a decision of a state agency made pursuant to federal law. *See Islander E. Pipeline Co., LLC v. Conn. Dep't. of Env't Prot.*, 482 F.3d 79, 94 (2d Cir. 2006). First, we "review de novo whether the state agency complied with the requirements of the relevant federal law." *Id.* Second, if no illegality is uncovered, we then analyze the factual determinations of the state agency pursuant to the "more deferential arbitrary-and-capricious standard of review usually accorded state administrative bodies' assessments of state law principles." *Id.* (quoting *Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc.*, 339 F.3d

428, 433 (6th Cir. 2003)). Even though the Administrative Procedure Act ("APA") directly "applies only to federal agency actions," we apply the arbitrary-and-capricious standard developed in that context. *Id.*

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Our "review under that standard is deferential," and this court "may not substitute its own policy judgment for that of the agency." *Id.* Rather, our role is simply to "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* To determine whether an agency action is arbitrary and capricious, we consider whether the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Islander E. Pipeline*, 482 F.3d at 94-95.

Applying these standards, we conclude that the decision of NYSDEC to issue the 2025 WQC to Transco did not violate the Clean Water Act, was not arbitrary and capricious or otherwise contrary to law, and did not violate notice and comment principles or state procedural requirements.

**A**

We hold that the decision of NYSDEC to issue the water quality certification was not arbitrary and capricious. We reject the petitioners' argument that NYSDEC was required to provide a more substantial justification when it granted Transco's 2025 application after having denied previous similar applications from Transco. An agency is not required to give more reasoning than is otherwise required simply because it is reversing a previous position or decision. *See Fox Television Stations*, 556 U.S. at 514 (2009) (rejecting "a requirement that all agency

change be subjected to more searching review" and explaining that "agency action representing a policy change" need not be "justified by reasons more substantial than those required to adopt a policy in the first instance"). Rather, the agency must "display awareness that it is changing position and show that there are good reasons for the new policy." *New Jersey v. Bessent*, 149 F.4th 127, 154 (2d Cir. 2025) (quoting *Encino Motorcars v. Navarro*, 579 U.S. 211, 221 (2016)).

NYSDEC satisfied those requirements. The petitioners themselves note that the agency acknowledged its change in position. And NYSDEC provided sufficient reasons for granting the 2025 application despite having previously denied a similar application from Transco. In particular, NYSDEC explained that the new application addressed the concerns that formed the basis of the 2020 denial.

First, NYSDEC explained its decision to allow Transco to measure compliance with the state's water quality standards by using a 500-foot mixing zone. In the 2020 denial, NYSDEC concluded that a 500-foot mixing zone was inappropriate in areas of the project with sensitive hard clam habitats because hard clams are vulnerable to mercury and copper. But in granting the 2025 WQC, NYSDEC explained that Transco had demonstrated other ways it could protect the hard clams, including a time-of-year restriction on sediment disturbing activities to protect clams in early life stages, lower contaminant limits in places with longer-duration construction, an agency-approved "Suspended Sediment and Water Quality Monitoring Plan" for continuous contaminant monitoring, and an agency-approved "Hard Clam Mitigation Plan." A 500-foot mixing zone would adequately protect hard clams, particularly in light of the corrected clam density calculation.

Second, NYSDEC explained why it accepted Transco's estimation of a 5% sediment loss rate in areas where jet trenchers would be used, despite having based the 2020 denial in part on its conclusion that this estimation was, "without further documentation" from Transco, unjustified. In 2020, NYSDEC rejected the

5% estimate because modeling for comparable projects "assumed a 25% to 30% sediment loss." App'x 440. But by 2025, those projects had been completed, and far lower rates of sediment loss had been observed. The agency also credited Transco's estimate because it relied on the expertise and experience of its contractor.

Third, NYSDEC adequately explained its willingness to accept a four-foot burial depth in 2025 despite having rejected the same proposal from Transco in 2020. In 2020, NYSDEC stated that "absent an evaluation by Transco" on the impacts and appropriateness of a four-foot burial depth, it could not conclude that four feet would be appropriate. *Id.* at 446. Transco's 2025 application provided such an evaluation. Based on facts identified by Transco—that a four-foot burial depth would minimize the amount of suspended sediment and reduce impact to water quality, that six feet is generally sought to minimize EMF impacts from high-voltage transmission lines whereas the NESE project involves a gas pipeline, and that the project is not located in seafloor areas that are heavily fished by bottom-tending fishing gear—the agency was able to conclude that a four-foot burial depth was appropriate.

We also reject the petitioners' argument that it was arbitrary and capricious for NYSDEC to rely on the corrected hard clam density calculation in issuing the 2025 WQC. The revised calculation was not a new factual finding but rather a correction of a mathematical error based on the same raw data that had been submitted to NYSDEC in Transco's 2019 application and had been subjected to public comment and review. The underlying technical data did not change.

We conclude that NYSDEC did not act arbitrarily or capriciously. It explained why it was changing course in issuing the 2025 WQC. It did not "rel[y] on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463

U.S. at 43. The decision of the agency survives the highly deferential arbitrary and capricious standard. *See Prometheus Radio Project*, 592 U.S. at 423.

**B**

The petitioners next argue that the decision of NYSDEC to allow Transco to submit post-certification compliance plans was contrary to § 401 of the Clean Water Act, arbitrary and capricious, and violated the public notice and comment requirements of the Clean Water Act or New York's Uniform Procedure Act. We disagree.

**1**

The petitioners claim that NYSDEC was not permitted to rely on post-certification compliance plans in granting the water quality certification. Section 401 of the Clean Water Act requires the water quality certification to "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that [the project] will comply" with applicable water quality standards. 33 U.S.C. § 1341(d). The petitioners argue that NYSDEC could not conclude that the NESE project would comply with state water quality standards by relying on "Transco's *future* submission of plans to minimize, mitigate, and monitor the project's water quality impacts." Petitioner's Br. 49. We disagree.

The requirement in the Water Quality Certification that Transco submit certain compliance plans and monitoring measures to NYSDEC did not violate § 401. The WQC is based on NYSDEC's extensive technical review of Transco's application and the agency's determination that the NESE project will comply with New York water quality standards if certain conditions are met, including continuous water quality monitoring, specific construction windows, and employment of an independent third-party monitor with stop-work authority. The WQC requires Transco to comply with specific water quality standards as to roughly a dozen pollutants for each segment of the proposed pipeline, based on best usages and anticipated environmental conditions of each segment. The post-certification compliance plans did not constitute a deferral of the agency's

obligation to ensure the project would meet water quality standards. Rather, the agency discharged that obligation by incorporating additional protections into the WQC. Moreover, many of the plans must be submitted to NYSDEC for the agency's review and approval before construction commences.

In any event, for each of the plans to which the petitioners object, NYSDEC established specific parameters for compliance and in most cases required Transco to submit a draft plan before the WQC was issued. The Dredge Management Plan requires Transco to explain how it will comply with the requirements in the certification—including when dredge rates will slow down to protect various wildlife and how it will respond to any unforeseen exceedances of water quality limits—prior to beginning construction. The Suspended Sediment and Water Quality Monitoring Plan does not independently set any limits or standards but simply requires Transco to use certain detection instrumentation, set locational and temporal parameters for monitoring, and provide extensive details about how monitoring will be conducted prior to beginning construction. The Sturgeon Monitoring Plan requires Transco to submit a plan for approval—prior to beginning construction—detailing how it will detect the presence of sturgeon and implement best management practices upon detection. Finally, the WQC requires mitigation plans to ensure that the NESE project will not impair the long-term best usages of the impacted waters beyond what the certification already contemplates. The Water Quality Certification contains the necessary guardrails for NYSDEC to ensure that the NESE project will comply with state water quality standards once construction commences.

Our decisions in *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486 (2d Cir. 2005), and *Natural Resources Defense Council v. EPA*, 808 F.3d 556 (2d Cir. 2015), are not to the contrary. In *Waterkeeper Alliance*, we held that an EPA rule authorizing regulated entities to develop and implement compliance plans that would not be subject to further review and approval by regulating agencies was inconsistent with § 402 of the Clean Water Act because "[b]y failing to require permitting authority review" of the compliance plans, the rule "allows permits to issue that

do not assure compliance with all applicable" standards and limitations. 399 F.3d at 501. Here, however, the Water Quality Certification does require NYSDEC to review and approve Transco's compliance plans. In *Natural Resources Defense Council*, we held that a § 402 permit issued by the EPA instructing the permittee to control discharges "as necessary to meet applicable water quality standards" was arbitrary and capricious because "without giving specific guidance on the discharge limits," the permit was "insufficient to give … guidance as to what is expected or to allow any permitting authority to determine whether a [permittee] is violating water quality standards." 808 F.3d at 578. Here, the water quality limits are set out in the permit, not the compliance plans, and the compliance plans themselves are sufficiently detailed and specific.

We hold that the decision of NYSDEC to allow Transco to submit post-certification compliance plans was not contrary to § 401 or arbitrary and capricious.

**2**

The petitioners also claim that NYSDEC violated the public notice and comment requirements of the Clean Water Act when it failed to subject the compliance plans to public comment. Again, we disagree.

Section 401 of the Clean Water Act requires states to "establish procedures for public notice in the case of all applications for certification by it" and provide "procedures for public hearings in connection with specific applications" "to the extent it deems appropriate." 33 U.S.C. § 1341(a)(1). "State Agencies have broad discretion when developing the criteria for their Section 401 Certification" and when implementing the requirements of the statute. *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 754 (4th Cir. 2019); *see also Berkshire Env't Action Team, Inc. v. Tenn. Gas*, 851 F.3d 105, 113 (1st Cir. 2017) (seeing "no indication" in § 401 that "Congress … intended to dictate how" a state agency "conducts its internal decision-making before finally acting"). New York has established public notice and comment procedures to govern the § 401 water quality certification

process. *See* 6 N.Y.C.R.R. part 621; E.C.L. art. 70. And the petitioners do not argue that NYSDEC violated any state procedural rules when it deemed Transco's 2025 application complete, opened the application for public comment, requested supplemental information from Transco regarding the application, or granted the water quality certification.

Rather, the petitioners argue that NYSDEC violated the principles of public participation by failing to subject the compliance plans to public comment. But a general policy favoring public participation cannot be read to impose public notice and comment requirements over and above those already contained in federal and state law, which mandate public notice and comment only on complete § 401 "applications." 33 U.S.C. § 1341(a)(1); E.C.L. § 70-0105(2); 6 N.Y.C.R.R. § 621.7. The petitioners cite several cases about the importance of public comment from the "analogous rulemaking context" governed by the APA. *See* Petitioners' Br. 42. But even if we were to apply the APA standards applicable to notice and comment rulemaking on top of the public notice provision of § 401, the Water Quality Certification did not violate notice and comment principles. "Under APA notice and comment requirements, among the information that must be revealed for public evaluation are the technical studies and data upon which the agency relies in its rulemaking." *Banner Health v. Price*, 867 F.3d 1323, 1336 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008)). Here, the public had notice and the opportunity to comment with respect to all the underlying data and studies on which NYSDEC ultimately relied when issuing the Water Quality Certification. That the permit contained conditions not subjected to an additional public comment period does not violate APA notice and comment principles.

We hold that NYSDEC did not violate the public notice and comment requirements of the Clean Water Act or New York's Uniform Procedure Act when it failed to subject to public comment the compliance plans on which the Water Quality Certification was conditioned.

*   *   *

We have considered the petitioners' remaining arguments, which we conclude are without merit. For the foregoing reasons, we deny the petition for review.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court